**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.  08-16-01 (CKK)** |
| **MARTIN R. MCLAREN** | : | |


<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully presents this memorandum in aid of sentencing.

**SUMMARY**

Defendant McLaren lead a criminal scheme which defrauded health care benefit programs out of $1.75 million.  During a period of approximately five years, the defendant repeatedly created false entries in medical records of his patients indicating that he had performed intricate procedures that he had not performed; the defendant caused his staff to submit false claims for payment of these procedures; and the defendant kept almost all the proceeds for himself.  The advisory sentencing guideline range of 37 to 46 months incarceration properly takes these factors into account.  The defendant should be sentenced within that range.

**ARGUMENT**

"As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. <u>Gall v. United States</u>, 128 S.Ct. 586, 596 (2007).  The government's recommendation of a within-guideline sentence is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and

serves the vital goal of uniformity and fairness in sentencing.  While, to be sure, "[i]n accord

with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among

several courts must consider in determining an appropriate sentence," Kimbrough v. United

States, 128 S.Ct. 558, 564 (2007), it remains the case that "the Commission fills an important

institutional role: It has the capacity courts lack to 'base its determinations on empirical data and

national experience, guided by a professional staff with appropriate expertise,'" id. at 574

(quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J.,

concurring)).  The Supreme Court "accordingly recognized that, in the ordinary case, the

Commission's recommendation of a sentencing range will 'reflect a rough approximation of

sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough, 128 S.Ct. at 562-63 (quoting

Rita v. United States, 127 S. Ct. 2456, 2465 (2007)).

        The advisory Guidelines are the sole means available for assuring some measure of

uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform

Act of 1984.  Reference to the Guidelines, while carefully considering the 3553(a) factors

particularly relevant to an individual defendant, is the only available means of preventing the

disfavored result of basing sentences on the randomness of the draw in judicial assignments.

Therefore, the Supreme Court has held that "district courts must begin their analysis with the

Guidelines and remain cognizant of them throughout the sentencing process."  Gall, 128 S.Ct. at

597 n.6.

> It is also clear that a district judge must give serious consideration
> to the extent of any departure from the Guidelines and must
> explain his conclusion that an unusually lenient or an unusually
> harsh sentence is appropriate in a particular case with sufficient
> justifications.  For even though the Guidelines are advisory rather

> than mandatory, they are, as we pointed out in <u>Rita</u>, the product of
> careful study based on extensive empirical evidence derived from
> the review of thousands of individual sentencing decisions.

<u>Id.</u> at 594.

In <u>Kimbrough</u>, which was issued on the same day as <u>Gall</u>, the Court emphasized the

district courts' responsibility to consider the Sentencing Guidelines as a bulwark against

disparate sentencing. The Court held that the Guidelines for crack cocaine offenses are advisory,

and that a sentencing court in such a case may consider, among other factors, the criticism stated

by the Sentencing Commission and others of those particular guidelines. Responding to an

assertion that such case-by-case assessment of the propriety of the Guidelines may lead to

significant disparity in sentencing, the Court emphasized the district courts' responsibility to

avoid that result:

> Section 3553(a)(6) directs *district courts* to consider the need to avoid unwarranted
> disparities — along with other § 3553(a) factors — when imposing sentences. See *Gall,*
> *ante* . . . .

<u>Kimbrough</u>, 128 S.Ct. at 574 (emphasis in original). Recognition of the unique value of the

Guidelines is the only available means of carrying out this mandate.

Rather than encourage wholesale abandonment of guideline sentencing, <u>Kimbrough</u>

narrowly focused on sentencing for crack cocaine offenses. With respect to those offenses alone,

the Court suggested that the Guidelines are not entitled to the ordinary respect given to the

Sentencing Guidelines on the basis of the care and study put into them, given that the Sentencing

Commission itself has condemned its own guidelines in this area. Regarding any other offenses,

the Supreme Court suggested that rejection of the suggested guidelines based only on an

individual judge's disagreement with the formulation of the guidelines may not fare well on

appeal, stating: "while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect §3553(a) considerations' even in a mine-run case." Id. at 563 (quoting Rita, 127 S. Ct. at 2465). These statements reflect the fact that, ordinarily, the Sentencing Guidelines reflect the distillation of national sentencing experience and provide a useful measure for determining appropriate and consistent punishments.

   B. 3553(a) Factors Support Imposition of a Sentence Within the Advisory Guideline Range.

      For the above reasons, the advisory guideline range deserves significant respect. To be clear, the government recognizes that the Guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. However, our point is that a district court must consider the guideline range, see § 3553(a)(4), and is usually well advised to follow the Sentencing Commission's advice, in order to assure fair, proportionate, and uniform sentencing of criminal offenders. Moreover, as explained below, other 3553(a) factors support imposition of a sentence within the guideline range.

Nature and circumstances of the offense

      The nature and circumstances of the defendant's offense are consistent with the sentence of incarceration recommended by the Guidelines. During a period of approximately five years, the defendant repeatedly caused his staff to bill for medical procedures that he did not perform. In executing this scheme, the defendant began the process by circling codes on superbills.[1]  As

_____

      [1]  The medical billing procedure is not repeated in detail here because it was fully described in the Pre Sentence Report and the Statement of the Offense.

the only medical doctor in his practice, the defendant controlled the decision about what medical procedures to perform and what codes to circle.  Although he was responsible for accurately preparing the superbills, he knowingly selected codes for procedures he did not perform.  Yet his control over the medical record extended further.  The defendant routinely had detailed progress notes placed in the patient charts in support of the false claims.  These typed notes described in detail the deep insertion of a "3 ½ inch 25 gauge needle," filled with a combination of pain medications, which he "slowly" directed and then redirected beneath the skin of the patient in order to inject the medication into multiple places in the patient's spinal column.  Not only did the defendant not perform this procedure, he did not even own the size of needle needed to perform the procedure.  Yet the charts of his patients contain numerous progress notes describing the intricate procedure in support of the fraudulent billing codes he selected.

The defendant relied on Lakeal Ellis, who is pending sentencing before this Court for her participation in the scheme, to take the codes he had circled on the superbills and transfer them to claim forms that she would submit on the defendant's behalf to health care benefit programs.  As a result, the defendant's practice, the Pain Management Center, received millions of dollars of revenue.  The parties have agreed that the portion of the practice's revenue resulting from false billing to health care programs was $1.75 million.

The defendant's motive in this crime was simply greed.  Because the Pain Management Center received multiple millions of dollars of income unrelated to his criminal scheme, the defendant could have been satisfied with profit from those procedures.  But he was not.  The defendant's desire for money was so great that he did not even pay 8% of the billing to Ellis as he initially had agreed to give her.  Instead, the defendant merely paid Ellis's living expenses over

and above her regular paycheck of approximately $60,000 a year to which she was entitled for work as office manager.

The defendant fired Ellis effective July 23, 2004, for what the termination letter called "illegal and unauthorized monetary transactions." However, the transactions to which the defendant referred were not the false medical claims. To the contrary, after firing Ellis, the defendant continued to circle codes on the superbills for procedures he had not performed. When the new employee in charge of billing began to question these claims, the defendant told the employee not to change the billing. Fortunately, the new employee began correcting the claims that were being submitted. As the billing became more accurate, the amount of money paid to the defendant's medical practice declined. In January 2006, the employee in charge of medical billing resigned. Immediately, the defendant rehired Ellis so that she could resume submitting false claims.

The Pre Sentence Report correctly concludes that the defendant should receive an upward adjustment of two levels under § 3B1.1(c) for his role in the offense as an "organizer, leader, manager, or supervisor in any criminal activity" not involving five or more participants. The defendant's conduct falls within several of the factors described by the Commission as indicative of a leadership role.[2] First, the defendant exercised decision making authority. He alone decided

_____

[2] Commentary Note 4 and the Background to § 3B1.1 state:

4. In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised

whether to set in motion the process of submitting a false claim by circling a fraudulent code on a superbill. Not only did each false claim start with his decision about the code; but without him the scheme would have stopped in its tracks. In fact, the defendant could have ended the scheme after he fired Ellis; but he did not. He decided that the scheme should continue after the new billing employee arrived. Second, he was a crucial participant in the commission of the offense. The defendant was responsible for circling the codes on the superbills and certifying that certain procedures had been performed. This was not only a qualitively important activity, but it also meant that he initiated each and every false claim that was submitted. Third, the defendant's position as owner of the practice and its sole medical doctor gave him control and authority over others in the practice. For instance, the defendant fired Ellis and hired her replacement. Later the defendant rehired Ellis to resume her place in the false billing scheme. Fourth, the

---

over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

**Background:** This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

defendant's leadership is reflected by the large share of the proceeds that he claimed for himself

Even if he had paid Ellis 8% of the billing according their agreement, the larger share of the

proceeds that he kept for himself would have demonstrated that he was the leader.  By deciding

not to pay even the agreed upon 8%, the defendant kept even more money for himself, which is

probative evidence that he was the leader of the scheme.

History and characteristics of the defendant

Nothing about the defendant's history or characteristics indicates that he should receive a

sentence below the guideline range.  The defendant is an accomplished professional who has

accumulated significant wealth through the practice of medicine.  There is no excuse for his

avarice, and he should be sentenced accordingly.

Sentence Which Reflects the Offense, Promotes Respect for Law, and Provides Just Punishment

The Guidelines reflect the new consensus that those convicted of economic crimes should

not be able to avoid incarceration, even where such crimes constitute the defendant's first

offense.  The legislative history of the Sentencing Reform Act of 1984, which created the United

States Sentencing Commission, made clear that one of the goals of the legislation was to correct

what Congress saw as a significant problem in the criminal justice system: the fact that "some

major offenders, particularly white-collar offenders . . . frequently do not receive sentences that

reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984) at 3260.

As Justice Breyer, one of the Sentencing Commission's original members, has explained:

> The Commission found in its data significant discrepancies
> between pre-Guideline punishment of certain white-collar crimes,
> such as fraud, and other similar common law crimes, such as theft.
> The Commission's statistics indicated that where white-collar
> fraud was involved, courts grant probation to offenders more

> frequently than in situations involving analogous common law
> crimes; furthermore, prison terms were less severe for white-collar
> criminals who did not receive probation. To mitigate these
> discrepancies, the Commission decided to require short but certain
> terms of confinement for many white collar offenders, including
> tax, insider trading, and antitrust offenders, who previously would
> have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,"

17 Hofstra L. Rev. 1, 20 (1988). This approach provides just punishment for the considerable

harm that white collar crimes cause society. This is particularly true of the harm caused by fraud

in the area of health care, where, as the Court knows, there is an acute need for every dollar to

address the legitimate needs of patients.

Need for Deterrence and to Protect the Public from the Defendant's Further Crimes

As is the situation with many first time white collar offenders, it is unlikely that the

defendant will commit additional crimes in the future. This reduces the need for specific

deterrence of the defendant through imposition of a harsher sentence than normal. However, the

need for general deterrence remains high in this situation. The community needs to know not

only that white collar criminals receive just punishment, as described above, but also that

sentences will deter future crimes by others. If the extensive false billing submitted by the

defendant does not result in significant punishment, others may be emboldened to commit crimes

that they would avoid if they feared punishment.

Need to provide Educational or Vocational training, Medical Care, or Correctional Treatment

The defendant has no need for special treatment in this regard. He already has an

advanced degree and an extensive record of employment. Similarly, he has no unusual health

conditions that merit a reduced sentence.

<u>Avoiding Unwarranted Disparities Among Defendants with Similar Records and Conduct</u>

In this area, the Guidelines provide unparalleled assistance to the Court. Because they have been crafted by an expert Sentencing Commission based upon the average sentences given by judges in thousands of cases, the Guidelines provide a neutral measure that can be used to compare defendants and the crimes which they commit. In <u>Rita</u> the Supreme Court held that the Guidelines "seek to embody the §3553(a) considerations, both in principle and in practice." <u>Id.</u> at 2464.

> The upshot is that the sentencing statutes envision both the
> sentencing judge and the Commission as carrying out the same
> basic § 3553(a) objectives, the one, at retail, the other at wholesale.

<u>Id.</u> at 2463.

<u>Need to Provide Restitution to Victims</u>

In this case the defendant has agreed to a global resolution of the pending criminal, civil, and administrative actions. Dr. McLaren intends that compensation be made to the victims, and the government intends to provide the victims with compensation from the forfeited assets. There is no reason to reduce the period of incarceration in order to provide restitution.

<u>CONCLUSION</u>

The Court should use its discretion to stay within the guideline range and sentence the

defendant to a period of incarceration of 37 to 46 months.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

/s/ *Thomas E. Zeno*
_____
THOMAS E. ZENO
 D.C. Bar. No. 348623
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-6957
Thomas.Zeno@usdoj.gov

-11-