**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.:** |
| | : | **08-16-01** |
| **Plaintiff,** | : | |
| | : | |
| **V.** | : | **Judge Kollar-Kotelly** |
| | : | |
| **MARTIN R. McLAREN,** | : | |
| | : | **Sentencing Hearing:** |
| **Defendant.** | : | **July 11, 2008** |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Dr. Martin R. McLaren, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing in the above captioned case.

Dr. McLaren is a respected member of the medical profession who is a devoted caregiver to his patients, a loving father to two daughters, a supportive companion to his wife, a new grandfather, and a loyal friend. His family, friends, and patients know him as compassionate, selfless, and generous. The video testimonials and letters submitted with this Memorandum demonstrate that Dr. McLaren is a man of integrity who is revered by his patients and loved by his family, and establish that the crime to which he has pleaded guilty is an aberration in the context of his entire life. Dr. McLaren has accepted full responsibility for his conduct and agreed to a substantial civil forfeiture of $5 million, which is nearly three times the estimated actual loss caused by the overbilling that constitutes the offense.

Dr. McLaren respectfully requests this Court to consider all of the foregoing in imposing a sentence. To that end, Section 3553 of Title 18 of the U.S. Code specifies factors courts must consider when imposing a sentence on a defendant, including the nature and circumstances of the offense, the defendant's personal history and characteristics, the need for the sentence imposed,

the kinds of sentences available, the range set by the U.S. Sentencing Guidelines (the

"Guidelines"), any pertinent policy statement, the need to avoid unwarranted sentence

disparities, and the need to provide restitution to the victims.  See 18 U.S.C. § 3553(a) (2008).

The U.S. Supreme Court holding in U.S. v. Booker, 543 U.S. 260 (2005), confirms that the

Guidelines are not mandatory, should be used in an advisory fashion, and are only one of several

statutory factors courts can consider in imposing a sentence.  See U.S. v. Gall, 128 S. Ct. 586,

596 (2007).  Indeed, the Supreme Court recently held that the "Guidelines are not the only

consideration . . . Accordingly, after giving both parties an opportunity to argue for whatever

sentence they deem appropriate, the district judge should then consider all of the § 3553(a)

factors to determine whether they support the sentence requested by a party . . . ."  Id.

Assessment of the all the § 3553(a) factors demonstrates that a non-Guidelines, non-

custodial sentence is appropriate in this case, such as a sentence of probation with home

confinement and a substantial community service requirement as conditions of probation.  In the

alternative, Dr. McLaren's ability to contribute to the betterment of the community and to repay

his debt through productive means warrants a split sentence with a period of incarceration and a

period of supervised release with home confinement and an extensive community service

requirement as conditions of the supervised release.[1]

I.      **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE**
        **DEFENDANT'S PERSONAL HISTORY AND CHARACTERISTICS**

Dr. McLaren foolishly permitted himself to be manipulated by Lakeal Ellis and became

entwined in overbilling Medicare.  He did not plan or design the scheme to overbill.  Indeed, Ms.

Ellis intentionally hid her scheme from him.  Yet once he discovered the overbilling, he

permitted it to continue.  After the onset of the government's investigation, Dr. McLaren took

---

[1] Dr. McLaren will submit a detailed community service proposal under separate cover explaining how he proposes to serve his sentence through volunteer work.

steps to rectify his actions by establishing new billing practices that are in complete compliance with the applicable laws.  Furthermore, not only does Dr. McLaren have no criminal history, but also he has lived an upstanding life, participating in the community by mentoring young adults and assisting friends and patients in need.  During his many years of practice, he has never been disciplined by any professional organization to which he belongs.  His sentence should reflect the limited role he played in the offense, his decency, and his contributions to society.

> ### A.    The Nature and Circumstances of the Offense

Dr. McLaren is a gifted doctor whose strength lies in his extensive experience in pain management.  He had little interest and, consequently, limited involvement in the management of his practice.  Running a large, sophisticated medical practice requires substantial business and office management skills, and Dr. McLaren mistakenly relied upon Lakeal Ellis for business acumen.  Ms. Ellis was a domineering and greedy employee who implemented a scheme to embezzle funds from Dr. McLaren.  To avoid detection, Ms. Ellis overbilled Medicare to increase the practice's revenue.  By this scheme, she hoped that Dr. McLaren would not detect her embezzlement because the embezzled amounts were offset, in part, by the additional income from the overbilling.  Once Dr. McLaren discovered the overbilling, he permitted the criminal conduct that was orchestrated, led, and concealed by Ms. Ellis to continue.

Ms. Ellis is a nurse with experience managing medical practices.  Dr. McLaren hired her to administer his billing department, collect payments, and supervise the business affairs of the office.  Dr. McLaren gave Ms. Ellis direct responsibility and autonomous control for handling the financial and accounting tasks of his practice.

Dr. McLaren's office used a preprinted form called a Superbill listing all of his office's medical procedures, diagnoses, and treatments.  Dr. McLaren recorded these services on the Superbill for billing purposes.  He circled a description of the service or the code that was

supposed to correspond to the service he was performing. For a substantial period of time, Dr. McLaren believed that the procedures and treatments he performed corresponded to the specific codes from the American Medical Association Guidebook he circled on the Superbill.

Ms. Ellis was involved in creating the Superbill, and she drafted the form in a way that permitted this fraudulent billing to go undetected. In some instances, the billing codes on the Superbill did not correspond to the service Dr. McLaren was actually providing. Instead, the codes corresponded to a higher level of service. At first, Dr. McLaren believed that he was circling codes for procedures that he was actually performing in his office. He later learned, however, that he was mistaken about the meaning of the codes he was circling.

Ms. Ellis was solely responsible for using the Superbill to create a claims submission, and her submissions were not reviewed by Dr. McLaren. Often she did not follow the information on the Superbill concerning services rendered and, instead, billed for a higher level of service. She electronically sent the billing information via a claim form to insurance providers, Medicaid, or Medicare for reimbursement. The provider determined the reimbursement owed and remitted a payment to Dr. McLaren's practice. Ms. Ellis intercepted these reimbursements and embezzled much of these funds from the inflated remittances. Ms. Ellis designed this scheme herself and independently initiated the fraudulent billing practices. She concealed her fraudulent conduct and embezzlement from Dr. McLaren for a lengthy period of time.

The Government's own witnesses confirm the controlling role that Ms. Ellis played and indicate that Ms. Ellis was the only one in the office who handled billing administration. According to one witness interviewed by the FBI, all the staff members regarded Ms. Ellis as in control of the office and the decision-maker about personnel and assignments. Federal Bureau of Investigation Report of Interview with Veronica Ilepeju on May 11, 2006, Exhibit 1 ("FBI

Report – Ilepeju").  Patients even described Ms. Ellis to government agents as so powerful that they had to pay Ms. Ellis money to schedule appointments with Dr. McLaren.  Federal Bureau of Investigation Report of Interview with Erin Lee Sheehan-Johnson on Jan. 17, 2007, Exhibit 2.  Another witness also confirmed that Ms. Ellis assumed the leadership role in the overbilling.  U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations, Report of Interview with CS-3-82 on Apr. 26, 2006, Exhibit 3.

Dr. McLaren fired Ms. Ellis in 2004 after discovering her embezzlement, and hired a new billing supervisor, Veronica Ilepeju.  Ilepeju told law enforcement agents that she was convinced that Ms. Ellis controlled Dr. McLaren and the business.  FBI Report – Ilepeju.  A government witness told investigating agents that after Ms. Ellis was fired, for four months, the office's bills were "stacked in the office waiting to be sent to the appropriate insurance companies . . ." because no one was able to handle the billing tasks in Ms. Ellis's absence.  U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations, Report of Interview with Monifa Ahmed on Aug. 4, 2006, Exhibit 4.   By exerting complete control over the billing and financial components of the medical practice, and by prohibiting other employees from working on billing matters, Ms. Ellis controlled the billing process in order to avoid detection of her embezzlement scheme.

More than a year after the overbilling began, Dr. McLaren began to realize that he was getting paid more than he was entitled.  After discovering this discrepancy, Dr. McLaren learned that his office was overbilling, yet he did not take action to stop the practice.  It is in this context that the Court should judge Dr. McLaren's actions.  Ms. Ellis was the instigator and perpetrator of the fraud, and for a significant period of time, Dr. McLaren was unaware of her scheme.  Dr. McLaren's role in the offense was permitting the overbilling to continue after discovering it.

Once Dr. McLaren became aware of an investigation into his billing practices, he hired an outside company to ensure that all billing from his office complied with the applicable governmental and private insurance billing guidelines.  In fact, he has received notice from a major insurance company that his billing is now in full compliance with the applicable rules and regulations.

**B.    The History and Characteristics of the Defendant**[2]

**1.    Dr. McLaren's Personal Background**

Dr. McLaren was born to a working class family on the island of Grenada in the West Indies.  Growing up, he assisted behind the counter of his father's store, where he discovered a love of working with people and a respect for his father that continues to guide him to this day. Dr. McLaren attended the Grenada Boys Secondary School ("GBSS"), a boarding school for the island's brightest young men, from which some of the West Indies' most respected citizens have graduated.

Dr. McLaren has raised an impressive family.  His two daughters are both professionals who attribute their success and happiness to their father.  Indeed, Dr. McLaren's daughters, Candace McLaren, a former state prosecutor and the Director of the New York City Department of Education's Office of Special Investigations, and Tara McLaren Handy, a Senior Manager of Corporate Communications for McDonald's Corporation, have much to say about their father and his integral role in their childhoods and adult lives.  To them, he is their rock and their role model; they depend on him for his wisdom, emotional support, and guidance.  His eldest daughter, Candace, age 34, describes her father on the attached DVD in Aid of Sentencing, Exhibit 5, as "an amazing husband, an amazing father, an amazing physician, an amazing friend,

---

[2] In addition to the excerpts in this memo from statements made by his family and patients, Dr. McLaren submits video testimonials on his DVD in Aid of Sentencing, Exhibit 5, and attaches several letters from friends and esteemed members of the community regarding his personal and professional background, Exhibits 6 through 11.

an amazing mentor, an amazing citizen, an amazing person, who made a mistake."  "My father is

my best friend," she says.  Dr. McLaren's younger daughter, Tara, age 31, wants her father to be

able to share in his new granddaughter's early life so that he may be able to be the positive

influence on her that he is to his own daughters.  She says on the DVD in Aid of Sentencing that

she "prays that he will be able to see his granddaughter grow up."

     Dr. McLaren's wife, Patricia McLaren, worries about "the anxiety, the fear, the panic I

feel whenever I think of the possibility of having to do without my husband – my rock – for

event the shortest period of time."  May 30, 2008 Letter from Mrs. Patricia McLaren on Behalf

of her Husband, Exhibit 12.  To her, he is a "decent, decent human being," whose "biggest fault,

and this is not a crime, is that he is too trusting of everyone to the point of being naïve.  He gives

everyone the benefit of the doubt."  Id.

     **2.**     <u>Dr. McLaren's Professional Background</u>

     Dr. McLaren is an accomplished anesthesiologist and pain management specialist who

has had a long and highly regarded career.  In 1962, at the age of eighteen, Dr. McLaren received

Grenada's Island Scholarship, bestowed every two years upon the high school student with the

highest score on the final exams designed by professors at the Cambridge University in England.

After graduating from GBSS, he matriculated at the University of the West Indies in Kingston,

Jamaica, enrolling in the six year medical program that culminated with his Medical Doctor

degree in 1968.  In 1969, Dr. McLaren interned at Princess Margaret Hospital in Nassau,

Bahamas.  He soon was a teacher in the internship program.

     Dr. McLaren moved from the Caribbean to Syracuse, New York, where he began a one-

year residency at Upstate Medical Center.  In 1971, he moved to New Haven, Connecticut and

continued his residency at Yale University Hospital.  Over the past thirty years, Dr. McLaren has

held a number of positions in varying organizations and associations throughout the District of

Columbia. He has served as Chief Physician for the DC Boxing Commission. He has also served as Chairman of the Anesthesiology Department at Greater Southeast Community Hospital (1989-1992) and Chairman of Anesthesia at Provident Hospital in Baltimore, Maryland (1982-1984). As head of the Department of Anesthesiology at Howard University Hospital (1975-1982), he was one of the youngest in the country to lead an academic medical department.

Dr. McLaren has been licensed to practice medicine in three states and is a member of a number of medical societies, including the American Society of Anesthesiologists and the American Pain Society. He is also affiliated with multiple hospitals throughout Maryland and the District of Columbia, including Hadley Memorial Hospital, Prince George's Hospital Center, and the Premier Surgery Center of D.C.

Dr. McLaren focused his anesthesiology and pain management D.C.-area medical practice on the less fortunate, providing highly-specialized medical care, relief, and comfort to those in severe physical pain. In 1992, he opened the Pain Management Center in suburban Maryland to address the pain-related medical needs of lower-income individuals living in the Greater Washington, D.C. area. This practice is located in Beltsville, Maryland, and he had satellite locations in Waldorf, Maryland and Oxon Hill, Maryland. His practice is staffed by one nurse, one physician's assistant, and five assistants who schedule appointments, work with insurance, and manage patient intake. He has seen thousands of patients in the many years that his practice has been open.

Patients credit Dr. McLaren with saving their lives and describe him as the only doctor who took time to understand their ailments so that he could alleviate their pain. On the DVD in Aid of Sentencing, Exhibit 5 Kevin McDonald, a war veteran, remarked that,

> I never met a man or a doctor like Dr. McLaren. I called him at
> home . . . [and] he would sit there and listen to what I had to say

and try to help me through my problem whether it be family, my
back, whatever.  Sometimes we'd be on the phone for 45 minutes .
. . .  He is an excellent doctor, and he cares.  Any doctor that – that
you call him at night several times . . . [h]e will listen to my
problem and make suggestions, and if he can't solve the problem
that night, like I said, it will continue on the following day . . . .[3]

Another patient named Elvira said on the DVD in Aid of Sentencing,

Dr. McLaren has been like a father to me.  He is such an
inspiration.  He's been a friend to the friendless, and he also has
given us so much encouragement.  He's given me so much
confidence.  I started coming to Dr. McLaren for my pain and for
pain management, and after I got injured, and I was ready to give
up.  And Dr. McLaren had built confidence back up in me again.
He instilled to me that things would get better.[4]

William Stewart, a longtime patient, said on the DVD in Aid of Sentencing,

this is a fine person, a fine doctor, a fine human being that cares for
other human beings.  Anybody can treat you with medicine,
anybody cannot be a complete doctor.[5]

Dr. McLaren made significant contributions to the local community by treating these and

hundreds of other less-fortunate patients, giving them access to elite medical care, easing their

pain, and helping them put their lives back together after suffering debilitatingly painful injuries

or illnesses.

## II.    THE NEED FOR THE SENTENCE IMPOSED

Adequate deterrence, protecting the public, and just punishment are all considerations in

determining a sentence.  Dr. McLaren has already paid a substantial price for his criminal

conduct.  He will lose his medical license and, therefore, his ability to earn a livelihood in his

profession.  As a result, Dr. McLaren will not be in a position to overbill again.  Furthermore, Dr.

---

[3] This excerpt from Mr. McDonald's remarks is included on the attached DVD, Exhibit 5.

[4] This excerpt from Elvira's remarks is included on the attached DVD, Exhibit 5.

[5] This excerpt from Mr. Stewarts's remarks is included on the attached DVD, Exhibit 5.

McLaren has agreed to pay $5 million to the government in forfeitures, compensation, and restitution.  This constitutes just punishment for his actions.

The Government requests a Guidelines sentence to demonstrate to the public that white-collar offenses, such as this, are treated seriously and punished severely.  Yet, even a sentence well below Dr. McLaren's advisory Guidelines range does send a strong message of just punishment for his offense because any sentence imposed would be a significant deprivation of liberty.

## III.    THE KINDS OF SENTENCE AVAILABLE

Because the guidelines are not mandatory, the Court has sufficient discretion to select an appropriate sentence from a wide range of available sentences to punish an individual defendant. The U.S. District Court for the Eastern District of New York recognized "the sentencing judge's discretion in the post-Booker world[,]" and based on the "historic role of sentencing judges in exercising their own sense of what is reasonable, fair and just borne out of many years of experience and literally hundreds if not thousands of sentences imposed, [the Court] may still continue to [] exercise[]" that discretion.   Memorandum and Order at 2-3, U.S. v. Woghin, No. 04 CR 847 (ILG) (E.D.N.Y. Feb. 7, 2007), Exhibit 13.  Judge Glasser affirmed that "[s]urely, the Court . . . is far better positioned to determine the nature, extent and place of serving a sentence" after consideration of the evidence before it, including its own "sense of the defendant" obtained from testimony on the defendant's behalf.  Id.  In Woghin, the Court acknowledged that the 59-year-old defendant had an unblemished record until his offense, was a practicing lawyer for 33 years and served the U.S. Government, and was described in letters as "a gentle, sensitive, generous person, loyal friend, and very capable lawyer." Id. at 1-2.

Based on a careful assessment of the defendant's characteristics, the nature of the offense, and its own discretion, the Court imposed a split sentence of incarceration and home

confinement.  Id. at 1-3.  The defendant's sentencing range was in Zone D of the Guidelines

table, but the Court split the defendant's sentence.  Id. at 1.  In Dr. McLaren's case, this Court

should consider a similar sentence as the one imposed in Woghin.

## IV.    THE KINDS OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED BY THE SENTENCING GUIDELINES

### A.    The Guidelines Calculations Under The Plea Agreement

The plea agreement between Dr. McLaren and the Government establishes the

framework for this Court's use of the non-mandatory U.S. Sentencing Guidelines as an guide in

imposing a sentence.  Since the U.S. Supreme Court decision in Booker, 543 U.S. 220, the

sentencing ranges provided by the Guidelines are no longer mandatory, and courts should

consider the Guidelines as advisory only.

The plea agreement provides that the base offense level under U.S.S.G. § 2B1.1(a) is 6,

and that the base offense level would be increased by 16 points under U.S.S.G. § 2B1.1(b)(1)(I)

to reflect a loss amount of $1,750,000.  This results in a Guidelines calculation of 22.  Dr.

McLaren and the Government also agree that Dr. McLaren's offense level should be decreased

by 2 points under § 3E1.1(a) because Dr. McLaren clearly demonstrated acceptance of

responsibility, and by an additional 1 point under §3E1.1(b) because Dr. McLaren's unadjusted

offense level is greater than 16 and he has assisted authorities by providing timely notice of his

intention to plead guilty, thus avoiding the cost of trial preparation.  Together, this reduction

results in a total offense level of 19.  The parties agree that Dr. McLaren's Criminal History

Category is Category I because he has no prior criminal record.  The parties disagree, however,

as to Dr. McLaren's role in the offense.

**B.**    **Dr. McLaren Should Not Receive an Enhancement for Being a Leader/Organizer**

The Government contends that Dr. McLaren's sentencing calculation should include a 2-point enhancement for Dr. McLaren's role as a leader or organizer of the criminal activity under U.S.S.G. § 3B1.1(c).  A 2-point adjustment under § 3B1.1(c), as requested by the Government, for Dr. McLaren's role in the offense as a leader or organizer is not justified in this case.  As demonstrated above, Dr. McLaren did not play a leadership or organizing role in the conduct; Lakeal Ellis was the architect of the scheme.  She exerted complete control over the billing practices of the office, and for a period of time she hid the overbilling from Dr. McLaren to cover up her embezzlement.

Applying § 3B1.1, the Court can consider several factors in deciding whether to add an enhancement for a leadership or organizational role the defendant played in the criminal conduct. These include, (1) "the exercise of decision making authority," (2) "the nature of participation in the commission of the offense," (3) "the recruitment of accomplices," (4) "the claimed right to a larger share of the fruits of the crime," (5) "the degree of participation in planning or organizing the offense," (6) "the nature and scope of the illegal activity,"  and (7) "the degree of control and authority exercised over others."  *See* U.S.S.G. § 3B1.1., comment (n.4).  In the D.C. Circuit, an enhancement for § 3B1.1 "must be supported by a preponderance of the evidence, <u>U.S. v. Thomas</u>, 114 F.3d 228, 261 (D.C. Cir. 1997), but such evidence may be circumstantial, <u>U.S. v. Layeni</u>, 90 F.3d 514, 524 (D.C. Cir. 1996)."  <u>U.S. v. Graham</u>, 162 F.3d 1180, 1183 (D.C. Cir. 1998) (citing <u>Thomas</u> and <u>Layeni</u>).

Dr. McLaren did not exercise decision-making authority over the billing process; he left that in the hands of Ms. Ellis.  His role was limited to using the Superbill that Ms. Ellis created. Dr. McLaren's former employees testified that Dr. McLaren was unfamiliar with billing

procedures, Monifa Ahmed Dep. 16:22 – 17:11, Feb. 27, 2007, Exhibit 14, did not instruct Ms.

Ellis as to what codes to bill, and did not use the billing computer that Ms. Ellis had set up,

Melissa Joseph Dep. 8:14 – 9:6, July 26, 2007, Exhibit 15.  In sworn testimony, one witness said

that Ms. Ellis,

> ran the office, like, anything was through Lakeal and everything
> was through Lakeal . . . .  [S]he ran the office, it was like whatever
> she fared or whatever she did, we just thought it was OK.  You
> know, that's what her authority was.

> Neki Damanshu Dep. 6: 5 – 6 – 8: 3 – 6, Feb. 27, 2007, Exhibit 16.

Additionally, Ms. Ellis exerted significant control over many other facets of the practice

as well.  An employee of Dr. McLaren's explained that,

> A.    She was the office manager.  She basically was in control
>         of the office when Dr. McLaren wasn't there.  She would
>         make sure the office, I guess, was ran appropriately, and
>         she also handled all the billing.
> Q.    And even when Dr. McLaren was there, was she in charge?
> A.    Yes. . . .  Basically Dr. McLaren was just there to see
>         patients.  Anything else that went on was handled through
>         Lakeal.  Any liens [sic, correct word not obvious] that
>         anybody would need would also go through Lakeal.  Lakeal
>         did payroll.  Lakeal did everything.  Dr. McLaren was just
>         there to see patients.

> Ahmed Dep. 16: 6 – 21

Another employee also established that Ms. Ellis asserted complete control over the

billing department, often telling her subordinates, "I'm in charge of billing."  Joseph Dep. 8:20 –

21.  Ms. Ellis occasionally added charges for procedures that Dr. McLaren did not indicate on

the Superbill.  Joseph Dep. 9:19 – 21.  A billing assistant admitted under oath that "[s]ometimes

when she did review the super bill [sic], she would, you know, adjust it, circle something that she

would say, 'Oh, he forgot to do this.'"  Joseph Dep. 9:19 – 21.  Ms. Ellis did not need Dr.

McLaren's approval for the bills that she submitted, and Dr. McLaren was unaware of and not

familiar with the billing procedures.  Joseph Dep. 17:15 – 18:10.  Thus, Dr. McLaren did not exercise control or decision making authority over the billing department.  That was the role that he assigned to Ms. Ellis when he hired her.

Other § 3B.1.1 Commentary factors also support the conclusion that Dr. McLaren did not perform a leadership or organizational role in the offense.  Dr. McLaren did not recruit Ms. Ellis as an accomplice to overbill Medicare; rather, he later acquiesced in the fraudulent conduct that she imposed  without his knowledge.  Although Dr. McLaren received a larger share of the proceeds from the overbilling, that factor alone should not result in a two-point enhancement because Dr. McLaren did not orchestrate the conduct that led to his practice's receipt of higher-than-justified payments.  Dr. McLaren did not extensively plan to defraud insurance companies or Medicare.

The Government contends that Dr. McLaren played a crucial role in the offense because he was responsible for circling the Superbill codes and certifying that the procedures had been performed.  As such, the Government claims that Dr. McLaren initiated each false claim himself.  To the contrary, for some time, Dr. McLaren was completely unaware that he was circling incorrect codes.  As he had no knowledge of the criminal conduct of his billing supervisor, he could not possibly have lead or initiated it.

Even after he became aware of the overbilling, Ms. Ellis continued to play a more significant role in the offense than Dr. McLaren since she independently determined what codes to bill.  The fact that Dr. McLaren later permitted Ms. Ellis to resume her position does not justify a 2-point aggravated role enhancement, as the Government claims, because Ms. Ellis continued upon her return to act unilaterally and dominate the billing department.  Although Dr.

McLaren admits responsibility for the criminal conduct, his sentence should not be enhanced under the theory he played an aggravating role in the offense.

      **C.**     **A Downward Departure From the Advisory Guidelines Range is Warranted Because the Amount of Loss Attributable to Dr. McLaren Overstates the Seriousness of His Offense Conduct**

The agreed-upon loss amount overstates the seriousness of Dr. McLaren's offense conduct. While the parties have agreed that the amount of the loss is $1.75 million, this does not, however, take into account the unique nature of the offense. Since Ms. Ellis initiated the overbilling unbeknownst to Dr. McLaren and deliberately hid the overbilling from him, the loss amount does overstate Dr. McLaren's offense conduct. Accordingly, Dr. McLaren requests a downward departure from his advisory Guidelines range.

## V.     THE NEED TO PROVIDE RESTITUTION TO ANY VICTIMS

Restitution is an important sentencing goal and component of the criminal justice system. As such, the Court can consider whether a period of incarceration would prevent a defendant from making timely restitution to his victims. Dr. McLaren has already made restitution to his victims as well as forfeiting civil compensation. It would be an absurdity to punish this prompt restitution by invoking as a factor favoring incarceration the fact that Dr. McLaren does not need to make restitution. Dr. McLaren should be treated fairly, and the fact that he used his resources to make restitution before being sentenced should not be considered in determining what sentence is appropriate. Indeed, prompt restitution should be considered as a mitigating factor.

## VI.    ANALYSIS OF THE FACTORS ABOVE DEMONSTRATES THAT A NON-GUIDELINES, NON-CUSTODIAL SENTENCE IS WARRANTED IN THIS CASE

Dr. McLaren has lived his life with integrity, enriched the lives of his patients, and is a constant source of support for anyone in need. He has demonstrated his remorse by pleading guilty, by relinquishing assets that far exceed the loss amount, and by accepting the loss of his

medical license and livelihood.  A lengthy period of incarceration, however, is not the best way for Dr. McLaren to atone for his offense.  Imprisonment for several years disregards Dr. McLaren's unblemished life history and his contributions to society.  He can serve the community and those in need by fulfilling a substantial community service requirement while under probation or home confinement.  Taking into account the § 3553(a) factors, Dr. McLaren requests that this Court impose a sentence of probation with home confinement and a substantial community service requirement as conditions of probation.  In the alternative, Dr. McLaren's ability to contribute to the betterment of the community and to repay his debt through productive means warrants a split sentence with a period of incarceration and period of supervised release including home confinement and an extensive community service requirement as conditions of the supervised release.

Furthermore, the facts and circumstances of this case as a whole also support a non-Guidelines, non-custodial sentence.  Dr. McLaren has no criminal history.  He will lose his profession, and as a result, it will be impossible for him to defraud Medicare again.  And he has a profound capacity to repay his debt to society in a productive manner.  These considerations warrant a sentence that more accurately reflects the harm of the offense and Dr. McLaren's character and nature.  As courts are permitted to sentence defendants based on individual characteristics and on a case-by-case basis, this Court should exercise discretion in this case and select one of the many non-Guidelines sentences available.

Dr. McLaren is an excellent candidate for a sentence involving a substantial community service requirement.  Based on his professional skill set as well as his empathy and compassion for those suffering and in need, Dr. McLaren is in a remarkable position to repay his debt to society through community service.  Dr. McLaren has several plans for fulfilling a lengthy

community service requirement and will soon submit a detailed proposal to the Court in a separate filing. He is committed to giving back to the community and making up for his transgression by giving his time to those less fortunate. Community service and home detention, while less restrictive than prison, would still serve to punish Dr. McLaren, but in a way that ensures that his expertise and personality are put to use in a more productive manner than they would be during an undue period of incarceration.

Additionally, Dr. McLaren has agreed to pay the government $5 million in civil forfeitures and compensation, as well as restitution to his victims. This is a substantial monetary penalty and more than accounts for the amount of unearned money Dr. McLaren received from overbilling. In fact, under the Government's loss calculation, the forfeiture more than twice exceeds the loss. Thus, any additional fine is unwarranted and would be excessive under the circumstances.

## VII.    CONCLUSION

As discussed above, Dr. McLaren has the capacity and the devotion to give back to his community. He can best serve society not by incarceration but by using his varied and robust skill sets and expertise to help the less fortunate and the suffering. Dr. McLaren will submit a detailed community service proposal to this Court under separate cover, describing the organization and the nature of the work he would perform as well as the greater good his efforts would serve. Dr. McLaren also has an appropriate residence in which to serve a home confinement sentence and is willing to submit to all restrictions the Court may place on him during the period that he is under the Court's supervision.

A non-Guidelines, non-custodial sentence accounts for the individual factors in this case and justly punishes Dr. McLaren for his criminal conduct.

Dated: June 6, 2008                              Respectfully Submitted,


                                                 The Defendant,
                                                 Martin R. McLaren


                                  By:      _____/s/Kirby D. Behre_____
                                           Kirby D. Behre (D.C. Bar No.: 398461)
                                           PAUL, HASTINGS, JANOFSKY
                                            & WALKER LLP
                                           875 15th Street NW
                                           Washington, DC 20001
                                           Phone: (202) 551-1719

                                           *Attorneys for Defendant*
                                           *Martin R. McLaren*

## <u>CERTIFICATE OF SERVICE</u>

I hereby affirm that on this 6th day of June, 2008 I filed a true copy of the foregoing

Sentencing Memorandum on Behalf of Martin R. McLaren electronically with the Court and I

served by mail on anyone unable to accept electronic filing.

_____/s/Kirby D. Behre_____
Kirby D. Behre

**EXHIBIT 1**

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION



Date of transcription ___05/16/2006___

VERONICA ILUPEJU, black female, date of birth ▆▆▆▆▆▆ social security account number ▆▆▆▆▆▆▆, residing at ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, telephone number ▆▆▆▆▆▆▆▆▆▆▆▆▆ was interviewed at the office of her attorney, P. DAVID GAVIN, 220 Monroe Street, Suite A, Rockville, Maryland. Present in the room during the interview was GAVIN, as well as Assistant United States Attorney Glen Donath. After being properly advised of the identity of the interviewing Agent and the nature of the interview, ILUPEJU provided the following information:

ILUPEJU was previously employed by DR. MARTIN R. MCLAREN at the PAIN MANAGEMENT CENTER (PMC) in Hyattsville, Maryland from approximately August, 2004, to January, 2006. ILUPEJU described her job position at PMC as the billing manager only, and stated that she had no other job responsibilities beyond that.

ILUPEJU knew MCLAREN from when they both worked at the METROPOLITAN AMBULATORY CARE CENTER (MACC) in Maryland (NFI) in previous years. MCLAREN left MACC to start his own practice, and ILUPEJU did not stay in touch with him, until one day in mid-2004 he called to offer ILUPEJU a job at PMC. MCLAREN explained that his previous billing manager left PMC, and he (MCLAREN) needed someone to take over that job.

ILUPEJU stated that she had some basic on-the-job training in medical billing from a previous job she held, but that it had been years since she had actually worked in that area. ILUPEJU did not work for many years while she was married and raising her children. However, recently she has ben going through a lengthy divorce from her husband, and had to re-enter the workforce to support herself and her children.

ILUPEJU accepted the billing manager job with PMC, and stated that once she showed up at the office she was trained for a few days by LAKEAL ELLIS, the previous billing manager. ELLIS showed ILUPEJU how to operate the computer that contained the commercial software used to submit the billing, and which Common Procedural Terminology (CPT) codes to use when submitting billing for MCLAREN'S pain management practice. ILUPEJU stated that these CPT codes were already "hard coded" into the

---

Investigation on ___05/11/2006___ at _Rockville, Maryland_____

File # _209A-WF-233005 SUB 302_____      Date dictated _____

by _SA Mark B. Dargis_____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Veronica Ilupeju_____ , On 05/11/2006 , Page ___2___

software, and that all she had to do was select the necessary
codes from a pre-programmed list on the computer in order to do
her job.  ILUPEJU stated that she received no other training
from ELLIS, or from anyone else, on how to do her job.  However,
ILUPEJU did note that ELLIS would sometimes visit the office and
would answer occasional questions from ILUPEJU related to
billing procedures and use of the computer.

        The interviewing Agent asked ILUPEJU to briefly
identify and discuss the key office staff at PMC.  ILUPEJU
responded as follows:

- ILUPEJU described MCLAREN as a good doctor and
  expressed surprise that he was the subject of a
  federal investigation.
- ROSEMARY INGADO is a Physician's Assistant (PA) at
  PMC.  ILUPEJU did not know if INGADO is licensed in
  the State of Maryland as a PA.  INGADO would perform
  procedures on patients at PMC when MCLAREN was not
  in the office.
- MONIFA AHMED is a Medical Assistant at PMC.  ILUPEJU
  did not know if AHMED was licensed as a medical
  professional of any kind in the State of Maryland.
  AHMED would also perform procedures on patients at
  PMC when MCLAREN was not in the office.  ILUPEJU
  stated that AHMED "ran the office" after ELLIS left.
- NEKITA MARSHALL is a receptionist at PMC.  When
  questioned about any of MARSHALL'S other job
  functions, ILUPEJU stated that MARSHALL is not a
  Medical Assistant.  ILUPEJU recalled that MARSHALL
  sat at the front desk in the office reception area
  and answered the telephone and checked in patients.
- ILUPEJU described ELLIS as the former billing
  manager and office manager at PMC.  ELLIS left her
  job because she gave birth and there were some
  complications with the baby being prematurely
  delivered.  ILUPEJU stated that she knew from
  talking with other staff members that ELLIS was
  previously in control of the office and made
  decisions about personnel and assignments.  ILUPEJU
  denied knowledge of ELLIS participating in a scheme
  to embezzle money from MCLAREN or PMC.

        Further discussing ELLIS, ILUPEJU stated that she knew
there was some sort of personal relationship between MCLAREN and
ELLIS, based on conversation she overheard from the other office

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____ , On _05/11/2006__ , Page ___3___

employees.  However, ILUPEJU insisted she did not know the
nature of the personal relationship and did not ever hear either
MCLAREN or ELLIS discuss anything in that context.  ILUPEJU
stated that she did not know who the father of ELLIS' recent
child was.

ILUPEJU further stated that ELLIS would come by the
office once every few months with the baby to visit the staff.
ELLIS made sure to visit only when MCLAREN was not present at
PMC.  There would be a lot of loud gossip and bantering between
the staff and ELLIS, which ILUPEJU tried to avoid becoming
involved in because she was not comfortable with such
discussions.  ILUPEJU expressed some frustration that a lot of
the staff would sit and talk most of the day rather than
working, especially when ELLIS visited.  ILUPEJU did overhear
gossip among the staff after ELLIS' visits about ELLIS'
continued involvement in PMC and the fact that MCLAREN was
making less money now that ELLIS was no longer working there.

ILUPEJU stated that ELLIS remarked to her during one
visit that she (ELLIS) wanted to resume working at PMC again,
and would even consider coming back onboard as a subordinate to
ILUPEJU.  ILUPEJU was not comfortable with that potential
working relationship, which she attributed to ELLIS' loud
personality and the fact that ELLIS still obviously exerted a
large amount of influence on the staff at PMC.

Returning to a discussion of her job responsibilities,
ILUPEJU stated that she worked at PMC five days a week, but
MCLAREN was only there one day a week, usually on Tuesday.  The
other days, MCLAREN would conduct patient services at offsite
locations in the area.  The main offsite location that ILUPEJU
recalled MCLAREN working out of was CIVISTA SURGERY CENTER in
Waldorf, Maryland.  When MCLAREN returned to PMC weekly, he
would drop off a stack of billing statements for ILUPEJU to
enter into the computer and submit to the appropriate insurance
company.  ILUPEJU stated that MCLAREN would usually submit
billing statements for myelography and flouroscopy procedures
after he had seen patients at an offsite location.

The interviewing Agent asked ILUPEJU to describe in
more detail how the actual CPT codes were entered into the
billing software.  The commercial software package that ILUPEJU
used at PMC was called "Physician's Billing".  The software
program was set-up so that when creating a new billing

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____ , On 05/11/2006 , Page ___4___

submission, ILUPEJU would enter a CPT code for a procedure performed by MCLAREN, and automatically a range of other CPT codes related to the original would populate the form. ILUPEJU stated that she understood this to mean that she should always bill for the related codes that were entered automatically, even if they were not found on the "superbill" provided by MCLAREN. ILUPEJU did not know who programmed the software to automatically bring up the related codes. ILUPEJU stated that once she had a problem operating the software, but was able to resolve the problem by having a technical support phone call with ELLIS. Based on this experience, and from the previous training conducted by ELLIS, ILUPEJU knew that ELLIS was very knowledgeable about how to operate the "Physician's Billing" software program.

Only one computer in the PMC office space contains the actual software program and saved billing files. ILUPEJU identified that computer as being located in the back of the office, away from the main reception area. ILUPEJU further stated that other computers located in the office were networked together, and therefore an employee could access the billing program files from any workstation.

ILUPEJU explained that a superbill is the document prepared by MCLAREN which lists all services provided by MCLAREN to individual patients. The superbills are handwritten by MCLAREN and then delivered to the billing manager for entry into the computer. ILUPEJU stated that she would never question the superbills provided by MCLAREN because she did not think there was any reason to doubt the truthfulness of the information contained in them. Also, ILUPEJU has no formal medical training whatsoever, so she has no professional basis for questioning the procedures listed by MCLAREN. ILUPEJU stated that she would only question MCLAREN about a superbill if she had trouble reading his handwriting, which occurred frequently. ILUPEJU further stated that the superbills were stored loosely in file cabinets at PMC.

At this point in the interview, ILUPEJU began to discuss what she referred to as the "Aetna Incident". The interviewing Agent asked ILUPEJU to clarify what she meant by that term. ILUPEJU informed that she was referring to an episode in mid-2005 whereby ILUPEJU became aware that MCLAREN was being sued by AETNA INSURANCE COMPANY (AETNA) for improper billing of services.

D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____, On _05/11/2006___, Page __5__

     ILUPEJU stated that when she started working at PMC, she immediately discovered that there were multiple letters from AETNA requesting repayment of funds due to billing errors. MCLAREN refused to respond to these letters, and ILUPEJU never followed up because she was not very experienced in billing matters. However, over time, ILUPEJU noticed the letters from AETNA continued to arrive at PMC and she decided to actually review the issues discussed in them and take action. ILUPEJU identified from memory the CPT code 64483 and stated that code was at the center of AETNA'S complaints to MCLAREN. ILUPEJU could not further describe CPT code 64483 in detail, other than to say it was a pain control injection. After conducting research into the proper use of CPT code 64483 by reading available manuals, ILUPEJU concluded that CPT code 64475 was the more appropriate code and brought this to MCLAREN'S attention. ILUPEJU stated that MCLAREN was reluctant to change CPT codes used in the billing, but eventually relented and told ELLIS to use 64475 from that point forward. ILUPEJU estimated that this occurred in approximately July or August, 2005.

     ILUPEJU stated that after the "Aetna Incident", she developed the confidence to examine more closely the CPT codes used when submitting billing to Medicare and insurance companies. However, when ILUPEJU would try to institute more changes with MCLAREN, he told her very specifically, "Don't change anything." ILUPEJU stated that ELLIS' cousin, MARCELLA WHITE, was another employee at PMC and got word to ELLIS that ILUPEJU was attempting to make changes in the billing. As a result, ELLIS angrily confronted ILUPEJU during a visit to PMC and told her, "You don't need to understand the codes. Just use what you're taught to use." ILUPEJU further stated that ELLIS would routinely indicate that she (ELLIS) had a direct interest in how PMC was operated and said of MCLAREN, "we're partners."

     Despite the objections of MCLAREN and ELLIS, ILUPEJU nonetheless made another change to a CPT code commonly used in the billing. When asked to describe the code, ILUPEJU recited from memory the CPT code 64479 and described it as a "cervical transforaminal" procedure. ILUPEJU identified a more appropriate CPT code to be used as 64470. ILUPEJU stated that the use of 64470 resulted in a lower reimbursement rate, and as a result she heard from the office staff that ELLIS was very mad. ILUPEJU further heard that ELLIS was concerned that billing revenue at PMC was "falling off".

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____ , On _05/11/2006_ , Page ___6___

     Following the news of ELLIS' ongoing concerns, ILUPEJU became convinced that ELLIS was more than just a former employee of PMC, and that she had some amount of control over MCLAREN and the business.  ILUPEJU stated that she thinks ELLIS was paid by MCLAREN during the time that ELLIS was supposedly not working at PMC.  When asked to clarify why she held that belief, ILUPEJU recalled that she was once asked by MCLAREN to certify with the State of Maryland unemployment office that ELLIS was no longer working at PMC.  However, when ILUPEJU actually spoke with an unemployment office employee, she learned that ELLIS was not collecting unemployment benefits.

     Additionally, ILUPEJU stated that MCLAREN assigned her a project which involved reviewing copies of payment checks allegedly stolen by ELLIS and creating a spreadsheet listing dates of issuance and amounts.  ILUPEJU recalled that all the checks she reviewed were made payable to MCLAREN, but were endorsed on the back by ELLIS with a stamp and then deposited in ELLIS' bank account.  These checks were issued in large amounts, thus ILUPEJU knew that ELLIS had a significant income as a result.  ILUPEJU suspected that MCLAREN had given the checks to ELLIS, instead of ELLIS stealing them.  There was a lot of gossip among the office staff about this particular incident.

     The interviewing Agent asked ILUPEJU about other rumors she had heard in the office regarding MCLAREN and any other employee.  ILUPEJU responded that she did not like to discuss rumors and gossip from the office because it was usually mean-spirited, and it was a significant time waster among the staff.  ILUPEJU herself denied participating in the many discussions held by the office staff about MCLAREN, ELLIS, or other employees.  However, ILUPEJU did admit that she had heard a specific rumor about MCLAREN having a sexual relationship with an employee named CATHY HOLROYD (phonetic).  ILUPEJU denied any direct knowledge of such a relationship.

     ILUPEJU was next asked about the patients seen directly at PMC and how they were managed for billing.  ILUPEJU stated that she would observe approximately between 45 and 60 patients a day lined up in the office waiting area and out into the hallway.  There were more patients observed when ILUPEJU first started working at PMC, but fewer once ELLIS was further removed from the day-to-day running of the office over time.  ILUPEJU stated that she did not directly observe the patients being cycled through their examinations and did not know how much time

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____, On 05/11/2006__, Page ___7___

was spent with each. ILUPEJU reiterated that INGADO and AHMED would treat patients when MCLAREN was not in the office.

AHMED was in charge of the office on a day-to-day basis and would provide ILUPEJU with a daily list of patients treated. ILUPEJU would use this list to conduct the appropriate billing. ILUPEJU stressed that she never saw the original patient sign-in list. When asked to explain, ILUPEJU stated that all patients were required to fill out their name on a daily sign-in list at the reception desk when they arrived. Instead of receiving this list, or a copy of it, ILUPEJU stated that she would instead receive a patient list from AHMED that was prepared by an office employee. ILUPEJU knew this was occurring because the list would always contain names written in the same handwriting style from start to finish. ILUPEJU thought this was unusual and on three or four occasions asked AHMED for the original list. In response, AHMED would give ILUPEJU a list that had been clearly photocopied with the date altered. ILUPEJU suspected that AHMED was simply recycling a previously dated sign-in list, but her complaints to AHMED about it were ignored.

ILUPEJU stated that she was aware that several patients traveled to PMC from Virginia Beach, Virginia on a regular basis. ILUPEJU also recalled that certain patients were "friends of the doctor", and she was specifically told by MCLAREN not to bill for the office visits of these individuals. ILUPEJU identified one such individual as RICHARD HESS, who was not only a patient but also a "tech support guy" who helped occasionally maintain the computers in the office. The interviewing Agent recited more names to ILUPEJU and she confirmed that each was also known to her as a friend of the doctor: MELVIN GALE, ERIN JOHNSON, and MARK WEINSTEIN.

The interviewing Agent asked ILUPEJU if she knew of any patients who had died while under treatment at PMC. ILUPEJU stated that she knew of one such individual, whose name she did not recall but was described as a black male. ILUPEJU knew this individual had died because he had come to ILUPEJU'S desk in the office on a Friday with a question about his billing. The following Monday, ILUPEJU heard from AHMED that the same man had died over the weekend, and ILUPEJU recalled being shocked by the news.

ILUPEJU was asked why she left her job at PMC. ILUPEJU stated that she quit because of ongoing complications related to

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Veronica Ilupeju_____ , On _05/11/2006_ , Page __8__

the divorce from her husband, and also because of the difficult traffic congestion she experienced every day commuting to work. ILUPEJU denied quitting because of any personal or professional difficulties with MCLAREN or any of the office staff at PMC.

ILUPEJU stated that she provided a two-week notice of her departure to MCLAREN, and that MCLAREN was "not happy" with her resignation. ILUPEJU further stated that within 48 hours of her notification, ELLIS was back at PMC as the billing manager. ILUPEJU trained ELLIS on changes to the computerized billing system and then left PMC permanently at the end of the two-week period. ILUPEJU denied leaving PMC suddenly one day with no notice to MCLAREN. ILUPEJU stated that she had no communication with either MCLAREN or ELLIS after her departure until she was contacted by MCLAREN a few weeks prior to the current interview date.

ILUPEJU was asked to describe the contact by MCLAREN. ILUPEJU responded that MCLAREN had called her recently and asked that she (ILUPEJU) talk to ELLIS. MCLAREN did not specify why ILUPEJU needed to speak with ELLIS. ILUPEJU stated that she thought MCLAREN'S phone call was very unusual, so she did not call ELLIS as requested. A few days later, ELLIS called ILUPEJU directly and asked to meet with her, but ILUPEJU refused. Finally, ILUPEJU received a voicemail from a man claiming to be a lawyer for MCLAREN, and who asked to talk with her. ILUPEJU was now very concerned about why she was being contacted and did not respond to the UNSUB lawyer's voicemail.

ILUPEJU stated that she still occasionally receives phone calls from some of the PMC office staff who want to talk with her about office gossip. One such person is INGADO, who called ILUPEJU very recently and told her that MCLAREN was mad that ILUPEJU would not talk with ELLIS and the UNSUB lawyer. ILUPEJU has had no further contact with MCLAREN, ELLIS, or the UNSUB lawyer since the above described incidents.

**EXHIBIT 2**

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___01/18/2007___

    Erin Lee Sheehan-Johnson, white female, date of birth
██████████, Social Security Account Number (SSAN) ██████████
home address ██████████████████████████████
██, home telephone number ██████████, cellular telephone
number ██████████, beeper number ██████████ was arrested in her
home at approximately 6:15 a.m. after Federal agents served an
Arrest Warrant upon Johnson for conspiring to commit prescription
drug fraud.

    After placing Johnson under arrest, Special Agent (SA)
Neiger informed Johnson she would be transported to Federal Bureau
of Investigation (FBI) offices for questioning and further
processing. Johnson was also advised she would be read her Miranda
rights upon arrival at FBI offices at the beginning of her interview
and that she would not be asked any questions during the course of
the trip to FBI offices. When asked by FBI SA Sherri Queener if
Johnson was on any medications, Johnson responded "yes" but that she
was feeling fine and did not need to take any medications along.

    Subsequent to transporting Johnson to FBI offices and
while still in her home, Johnson said she had a lot to say and was
ready to talk now. After attempting to locate clothing and shoes
for Johnson, Johnson told SA Neiger she was okay with wearing her
robe and house shoes.

    After escorting Johnson outside and placing her in Health
and Human Services SA Slease's vehicle, SA Neiger was joined by SA
Queener at which time Johnson was read her Miranda rights by SA
Neiger. After agreeing to waive her Miranda rights, Johnson signed
the Advice of Rights form, a copy of which is attached. At this
point, SA Slease joined SA Neiger in the vehicle. SA Queener then
exited the vehicle.

    Before being asked any questions, Johnson told the
interviewing Agents the handwriting on the two prescriptions looked
similar to Johnson's or looked like handwriting from a family member
of Johnson's. Johnson also told the interviewing Agents that Lakeal
Ellis was trying to set her up. Johnson again stated that someone
was trying to set her up. When asked why anyone would be trying to
set her up, Johnson responded she did not know. Johnson then began

---

Investigation on ___01/17/2007___ at Washington, District of Columbia

File # 209A-WF-233005 SUB 302          Date dictated ___01/18/2007___
       SA Robert J. Slease, OIG HHS
by     SA Julie E. Neiger                        (018jen01.302)

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Erin Lee Sheehan-Johnson_____, On _01/17/2007___, Page ___2____

crying and told the interviewing Agents that the drugs were destroying her life. SA Neiger then offered Johnson a tissue.

At this point it was decided to continue Johnson's interview at FBI offices. While en route to FBI offices, SA Neiger obtained Johnson's identifying information and learned that Johnson was currently unemployed.

Upon arrival at FBI offices at approximately 7:00 a.m., Johnson was escorted into an interview room and provided with a bottled water and some tissues.

After SA Slease explained to Johnson her rights with regard to an attorney, Johnson was read her Miranda rights by SA Neiger for a second time. After agreeing to waive her Miranda rights, Johnson initialed each statement on the form and signed a second copy of the Advice of Rights form, a copy of which is attached.

SA Slease then provided Johnson copies of two prescriptions written on Martin R. McLaren, M.D. (Dr. McLaren) prescription stationary. SA Slease pointed out to Johnson that the signatures for Dr. McLaren on both prescriptions did not match and that the handwriting on the prescriptions actually prescribing the Oxycontin and Adderall did not match. Johnson agreed with SA Slease and stated "they don't match" (referring to the various styles of handwritings found on the two prescriptions).

Johnson told the interviewing Agents she had been to Dr. McLaren's office with no paperwork. Johnson also explained that she had been to Dr. McLaren's office to have prescriptions "exchanged" with no paperwork. Johnson remembers having to go back to Dr. McLaren's office several times to get changes made to her prescriptions.

According to Johnson, Ellis, an office employee at Dr. McLaren's office, was fired after being caught embezzling money from the office. This occurred approximately one and a half to two years ago. After being fired, Ellis stole Johnson's medical file from Dr. McLaren's office. According to Johnson, Ellis never liked Johnson.

Johnson began treatment with Dr. McLaren approximately three or four years ago. During this time, Ellis was rehired by Dr. McLaren and has been employed by Dr. McLaren for the past six months. Johnson told the interviewing Agents for a second time that

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of _____Erin Lee Sheehan-Johnson_____, On 01/17/2007 , Page ___3___

Ellis did not like Johnson. Johnson also told the interviewing Agents that Johnson helped Dr. McLaren with several real estate deals when she was working for a local title company.

Johnson believes Ellis has feelings for Dr. McLaren. Johnson remembers on one occasion telephoning Dr. McLaren on his cell phone to discuss a real estate matter when a woman answered his phone. When Johnson asked for Dr. McLaren, the unidentified woman shouted into the phone "Who is this?" After Johnson identified herself to the woman and the nature of the call, Johnson asked the unidentified woman if she was speaking with Pat McLaren, Dr. McLaren's wife. The woman who then identified herself as Pat McLaren told Johnson that Dr. McLaren was not available. Johnson remembers telling Dr. McLaren she had spoken to his wife earlier that day. After Dr. McLaren told Johnson there was no way in which his wife could have answered his cell phone when Johnson had called, Dr. McLaren and Johnson determined that the woman who answered his phone was Ellis.

According to Johnson, her problems with Ellis started when Johnson began having billing problems. After confronting Ellis regarding the billing problems, Ellis hated Johnson. Johnson told the interviewing Agents that Ellis was overbilling Johnson and several other patients seen by Dr. McLaren.

According to Johnson, Dr. McLaren is seventy years old. Johnson is currently twenty-six years old. When asked why Ellis was rehired by Dr. McLaren, Johnson told the interviewing Agents that the office was a mess and that everything was in chaos. Dr. McLaren needed Ellis to run and manage the office because Dr. McLaren was busy seeing patients.

When asked why the office was in chaos, Johnson responded that when Ellis was fired and left Dr. McLaren's office, Ellis took billing, accounting and patient records.

According to Johnson, Ellis controlled the office and oversaw everything that went on in the office. Ellis was so powerful that patients had to pay off Ellis to get their prescriptions or to make an appointment to see Dr. McLaren. Ellis intimidated many of Dr. McLaren's patients. She preyed on the weaker patients. When asked if Johnson ever had to pay Ellis in order to make an appointment with Dr. McLaren, Johnson responded she "never paid for appointments." Since Johnson talked to Dr. McLaren, she did not have to pay Ellis. Johnson would call Dr. McLaren



FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson_____, On _01/17/2007__, Page __4__

directly to make her appointments. When Johnson showed up for an appointment with Dr. McLaren, she "went the back way to avoid [Ellis]."

When asked why Johnson continued to see Dr. McLaren and not transfer her medical records to another office, Johnson responded that it would have been virtually impossible to leave Dr. McLaren's office because her medical files would have never been transferred due to Ellis' control over the office records.

The co-pay for Dr. McLaren's office was $15.00 per office visit. According to Johnson, not all patients were required to pay the $15.00 co-pay each time they saw Dr. McLaren. Seventy-five percent of Dr. McLaren's patients pay the $15.00 co-pay. The remaining twenty-five percent do not pay the $15.00 co-pay. When asked about being on Dr. McLaren's "do not pay" list, Johnson told the interviewing Agents that her name was not on the list.

Although Johnson was not on Dr. McLaren "do not pay" list, Johnson did not always pay the $15.00 co-pay. According to Johnson, Dr. McLaren knew Johnson's money situation was tight because she was no longer working for the title company. Since Johnson was owed money from Dr. McLaren for title work performed, Dr. McLaren periodically told Johnson she did not need to pay the $15.00 co-pay. Johnson told the interviewing Agents Dr. McLaren owns a lot of real estate.

According to Johnson, the cost for a full title search was $125.00. Johnson remembers conducting two full title searches and one update title search for Dr. McLaren. One of the title searches conducted by Johnson for Dr. McLaren was a property located in Loudoun county.

Johnson told the interviewing Agents that Dr. McLaren likes Johnson. Johnson described her relationship with Dr. McLaren as social. Johnson and Dr. McLaren talk on the telephone on a daily basis. When asked if Johnson thought it was strange that she talked with Dr. McLaren on a daily basis, Johnson responded "no" because she views Dr. McLaren as more of a father figure. Johnson denied several times having a sexual relationship of any kind with Dr. McLaren. Johnson has never had sex with Dr. McLaren. Johnson told the interviewing Agents she has never given Dr. McLaren a blow job nor has Dr. McLaren ever touched Johnson in a sexual way. Johnson and Dr. McLaren do not have that type of relationship. Johnson is friends with Dr. McLaren's wife, Pat.



FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Erin Lee Sheehan-Johnson____ , On 01/17/2007  , Page __5__

     Johnson admitted Dr. McLaren has provided her extra prescriptions when Johnson needed them in the past to deal with her pain. Johnson also admitted losing prescriptions and dumping pills down the drain. Dr. McLaren benefits from providing Johnson with these prescriptions because of the title work Johnson provides Dr. McLaren.

     Johnson has had a lot of problems in the past with getting her prescriptions filled at area pharmacies. Johnson has taken numerous prescriptions to be filled but has been turned away because the prescriptions have not been correctly filled out by Dr. McLaren's office. Johnson is not using her medications for any reason other than for pain management. When asked if Johnson or anyone else was selling her prescriptions to make a profit, Johnson responded "I am not selling these." Johnson went on to say "How can I be selling them? I have bad credit!"

     According to Johnson, her prescriptions from Dr. McLaren's office were screwed up because the office was screwed up. Johnson had to keep going over her prescriptions with Dr. McLaren's office so that they would get the prescriptions right. When asked why Johnson continued to go to Dr. McLaren's office, Johnson responded "it would have been impossible to get [her] file transferred." Johnson went on to say that she would not have been able to take the "lapse" in transferring from one doctor to another doctor in reference to getting her medications.

     Johnson is "very close" to Dr. McLaren but "not close in a bad way." When asked what she meant by "not close in a bad way", Johnson responded Dr. McLaren was more like a father to her. According to Johnson, her relationship with Dr. McLaren "never evolved" into a sexual relationship. Johnson again told the investigating Agents she never had sex with Dr. McLaren. Dr. McLaren never gave Johnson any financial assistance or any help whatsoever with her financial problems.

     Johnson was then asked to described what went on during a typical visit to Dr. McLaren's office. When a patient left Dr. McLaren's office, the patient's next appointment would be set up at that time. The appointment would usually but not always be set up by one of Dr. McLaren's nurses.

     At approximately 8:00 a.m., SA Neiger asked Johnson how she was doing and at this point Johnson asked to use the restroom. At approximately 8:15 a.m., the interviewing Agents returned to the

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Erin Lee Sheehan-Johnson_____ , On _01/17/2007_ , Page __6__

interview room and provided Johnson with additional tissues and asked if she needed anything. Johnson responded she was fine.

Johnson then continued to describe a typical visit to Dr. McLaren's office. Johnson admitted she would set up her next appointment when she left the office. However, when Johnson needed to reschedule her appointments, Dr. McLaren was more flexible in fitting Johnson into his schedule. Since Dr. McLaren saw patients in different offices, he would tell Johnson when to come in to see him. Dr. McLaren has offices in Waldorf, Maryland, Oxon Hill, Maryland and Hyattsville, Maryland. Johnson saw Dr. McLaren about ten times at his Oxon Hill office and about eight times at his Waldorf office. Johnson's visits to Dr. McLaren's Oxon Hill office were "not frequent." All of the remaining visits Johnson had with Dr. McLaren were at his Hyattsville office.

When Johnson rescheduled her appointments with Dr. McLaren and was told to come to the Hyattsville office, Johnson would usually go through the back door. Johnson would then meet Monifa Ahmed or Nikki (Last Name Unknown) (LNU) to get her temperature and blood pressure taken. Johnson remembers the nurse coming in the room and asking how she was doing and if there were any changes Dr. McLaren needed to know. The nurse also asked whether or not Johnson would be getting her same prescription.

After meeting with Dr. McLaren, Johnson would either get her prescription from Dr. McLaren himself or she would be escorted out of the office and into the lobby to pick up her prescription from the person who was sitting at the desk in the lobby. When asked why she would sometimes get her prescription directly from Dr. McLaren or would sometimes need to pick it up from the lobby area, Johnson told the interviewing Agents she did not know. According to Johnson, there was no rhyme or reason to their method of picking up prescriptions. Sometimes Dr. McLaren would write out the prescriptions; sometimes the person at the desk in the lobby would write them out. Many times the prescription was already prepared when Johnson came out of Dr. McLaren's office.

When Johnson came in for a typical appointment (not a rescheduled appointment), Johnson would most of the time enter the office using the second door. Johnson described the second door as being near a couple of offices. When Johnson came in using the second door, nine times out of ten, she would be required to fill out a form. Johnson referred to the form as the "update form." The update form included a pain scale which patients needed to complete.

D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson___ , On _01/17/2007_ , Page ___7___

Johnson would then give the completed update form to the nurse who would give it to Dr. McLaren. The average amount of time Johnson would spend with Dr. McLaren was five to ten minutes. Johnson never spent thirty to forty minutes with Dr. McLaren.

Johnson told the interviewing Agents she was given the wrong prescription by Dr. McLaren's office about ten times. When asked what was wrong with the prescriptions, Johnson responded the prescriptions would sometimes have the wrong name on it or would be for the wrong drug. The wrong prescriptions might also be for the wrong dosage or have the wrong milligrams listed.

According to Johnson, the prescriptions were filled out by Dr. McLaren himself or by his nurses. There were always different people filling out the prescriptions. The people were always changing because new people were always being hired. The person writing out the prescriptions would be in the "far desk area" not with the rest of the nurses. Johnson described the desk area as being a separate area.

When asked who Johnson saw sitting at the desk writing out prescriptions, Johnson responded Ahmed, Nikki LNU, Ellis, Marian LNU, a black male, a Hispanic girl, Melissa LNU and possibly four other individuals. Johnson believes she has seen a total of ten different people sitting at the desk writing out prescriptions. Johnson described the black male she saw at the desk as being tall (approximately six feet tall) with corn rows. Although Johnson saw the black man sitting at the desk, she never saw him writing out a prescription. According to Johnson, the Hispanic girl Johnson saw at the desk has since died. Johnson believed Marian LNU was Dr. McLaren's physician's assistant but was not certain.

According to Johnson, her missing patient file was never found however, the office started a new file for Johnson. When Johnson received her prescriptions, she would sometimes but not always check to make sure they were correct.

Johnson received her prescriptions either by picking them up in person or by having the office mail the prescriptions to Johnson. If Johnson was picking up her prescriptions in person, she would talk to Dr. McLaren to make arrangements. Johnson always picked up her prescriptions on the same day she talked with Dr. McLaren. Johnson never waited until the next day. When Johnson picked up her prescriptions in person, she would not typically have an appointment to see Dr. McLaren.

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson_____, On _01/17/2007___, Page __8__

Johnson, Johnson's husband, Alex, and Johnson's mother-in-law picked up prescriptions for Johnson at Dr. McLaren's office. Johnson remembers one time when Heather LNU went with Johnson to pick up her prescription. Heather LNU worked with Johnson at the title company as an assistant.

Most of the time Johnson picked up her prescriptions from Dr. McLaren, she would do so at his office. However, Johnson remembers meeting Dr. McLaren several times outside the office to pick up her prescriptions. Johnson remembers two separate occasions during the spring/summer of 2006 when she met Dr. McLaren at a gas station to pick up her prescriptions. Johnson remembers on both occasions Dr. McLaren was on his way to play golf.

Although Dr. McLaren never came to Johnson's home to deliver prescriptions to her, Johnson did pick up prescriptions from Dr. McLaren's home. Johnson remembers one time in October of 2006 taking bread to Dr. McLaren's home when she picked up her prescriptions. Dr. McLaren's wife, Pat, was home at the time. According to Johnson, Dr. McLaren knew Johnson was coming to his home. Johnson also remembers coming to Dr. McLaren's home in November of 2006 to fix his computer. Johnson did not pick up a prescription during this visit to Dr. McLaren's home. Dr. McLaren's wife and daughter were home when Johnson came to fix the computer.

Johnson also picked up prescriptions from Dr. McLaren on two separate occasions when he was playing golf. Johnson did not remember the name of the golf course but remembers it was located on River Road. The first time Johnson met Dr. McLaren at the golf course, she picked up a prescription. This occurred approximately a year and a half ago. The second time Johnson was at the golf club with Dr. McLaren, she picked up some patches. The second meeting occurred about two years ago.

Johnson remembers receiving her prescriptions once or twice by mail. Johnson again told interviewing Agents that she sometimes needed to reschedule appointments with Dr. McLaren because he was traveling. A nurse in the office would always mail the prescription to Johnson; it was never Dr. McLaren. When asked who requested the prescription be mailed, Johnson responded she or one of the nurses would direct the prescription be mailed. Johnson told the interviewing Agents that the decision to either pick up or mail the prescription would depend on how quickly Johnson needed to get it or if the office would be closed for a number of days. One example given by Johnson involved the office closing on a Thursday

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson___, On 01/17/2007, Page ___9___

and not reopening until the next week. In this case, Johnson would have received her prescription in the mail.

When Johnson rescheduled her appointments with Dr. McLaren, it would be because Dr. McLaren was leaving to go out of town or Johnson was sick or caught in traffic.

When asked about faxing Ahmed instructions on how to fill out Johnson's prescriptions, Johnson told the interviewing Agents she needed to do it because the prescriptions she had been getting from Dr. McLaren's office were "so screwed up" that Johnson could not get the prescriptions filled at area pharmacies. According to Johnson, she was trying to correct the prescriptions before they were written out and sent to Johnson at the title company.

Johnson described her relationship with Dr. McLaren's office workers as social. Johnson was "most friendly" with Ahmed. Johnson described Ahmed as being a "pleaser" but not actually helpful when it came to Johnson's health. In Johnson's opinion, Dr. McLaren's office had a "very racist attitude."

In 2005 Johnson got paid once by Dr. McLaren after working in his office a couple of days. Johnson thought she was paid about $1,000.00. When SA Slease pointed out to Johnson she actually got paid $1,500.00, Johnson responded Dr. McLaren was wrong when he reported her income.

Johnson described Dr. McLaren's office as being a "very hostile" office in which to work. It was always a "he said/she said" situation with the office workers. When Johnson worked in Dr. McLaren's office, her duties included working with the computer, customer relations and answering the phones. It was Dr. McLaren who told Johnson that Ellis had taken Johnson's file.

Regardless of whether Johnson received her prescription in person or by mail, she always received an Explanation of Benefits Statement. When Johnson picked up her prescriptions in person without actually being seen by Dr. McLaren, Johnson was charged as if she had seen the doctor. Johnson was also charged for an office visit when her prescriptions were mailed to her. When Johnson first began to notice she was getting charged an office visit when she picked up her prescriptions, Johnson approached Ellis. After talking with Ellis, Ellis got mad. Johnson talked to Ellis several times about getting billed an office visit when she only received a prescription. Eventually, Johnson talked to Dr. McLaren about the

D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson_____ , On _01/17/2007___ , Page ___10___

billing practice. Dr. McLaren told Johnson he would take care of the issue. Shortly thereafter, Johnson lost her health insurance.

According to Johnson, she was getting four to five Explanation of Benefit Statements every week. Johnson told the interviewing Agents that there were at least three times when she received a bill without getting any services or having any procedures performed on her behalf. Johnson remembers one time during the summer of 2005 when she received a bill but did not actually receive any services. Johnson knows she did not receive the services as shown on the bill because she was out of town. The date shown on the statement was when Johnson was visiting the Florida Keys.

When asked why Dr. McLaren's staff was constantly changing, Johnson did not know if the staff members were leaving because they were fired or because they were quitting on their own.

Johnson described any white patients seeing Dr. McLaren as "uneducated white trash." In Johnson's opinion, patients seeing Dr. McLaren at the Waldorf and Oxon Hill locations seemed to be better educated. There were two types of patients seen at the Hyattsville office. The two types were elderly patients and patients who were not in pain. Johnson told the interviewing Agents she knew when people were in pain because she had stomach cancer and felt real pain. According to Johnson, the patients coming into Dr. McLaren's Hyattsville office were not in pain. These patients just wanted the pain medications.

Nurses from Dr. McLaren's office constantly told patients not to talk to each other about their conditions or why they were seeing the doctor. Johnson remembers Ellis telling her first hand not to talk with the other patients. Johnson also directly overheard Nikki LNU telling patients not to talk to each other.

According to Johnson, co-pays were used by Dr. McLaren's nurses to pay for their lunches. Johnson also knew the nurses were using the co-pays to pay for gasoline and car washes. When a patient paid their $15.00 co-pay in cash, the money went straight into the pockets of the nurses.

Although some patient files were stored in file cabinets, most patient files in Dr. McLaren's Hyattsville office were stuffed in boxes on the floor. Dr. McLaren was always trying to make excuses for why his office was always a mess.



D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Erin Lee Sheehan-Johnson____ , On _01/17/2007_ , Page ___11___

    Johnson does not know the names of any of the patients Dr. McLaren is currently seeing. Dr. McLaren has never told Johnson if any of his patients who are getting prescriptions are selling the pills on the street.

    When asked if Johnson has noticed anything else strange about Dr. McLaren's office, Johnson thought it was strange that Ellis would be answering Dr. McLaren's personal cell phone and posing as his wife.

    While sitting in Dr. McLaren's waiting room, Johnson has seen other patients walk in and pick up a prescription without seeing the doctor.

    Johnson is currently taking Adderall, Percocet and Oxycontin. She also has been prescribed Lidoderm and Duragesic patches. Dr. McLaren is Johnson's only prescribing physician at the current time. Johnson does not currently receive any injections for her pain management. Johnson did receive one injection after a surgery but did not like it. Johnson's psychiatrist, Dr. Roath, was the first doctor to prescribe Johnson Adderall. Johnson no longer sees Dr. Roath. Johnson's husband, Alex, also saw Dr. Roath. Alex Johnson did not receive any prescriptions from Dr. Roath for pain management. When asked if Johnson has ever given any of her pain pills to her husband, Johnson responded "I'm sure I have." Johnson and her husband were married in 1999.

    Johnson has also given her mom some of her Adderall. Johnson's brother, sister and nephew (all of whom live with Johnson's mom) have Attention Deficit Disorder (ADD). Johnson remembers giving her mom some Adderall to give to Johnson's brother, sister and nephew. Johnson always gave her mom an even amount of pills because Adderall is taken two pills at a time. Johnson remembers giving her mom twelve pills at a time on a couple of occasions. Johnson only did this when her brother, sister and nephew were running low on their Adderall prescriptions. The twelve pills would cover her brother, sister and nephew for two days if they each took two pills three times a day.

    Johnson also told the interviewing Agents several people were stealing her pain pills. An old roommate by the name Kewin (phonetic spelling) Greenhill who lived with Johnson and her husband between 1999 and 2003 or 2004 was stealing her pills. A man by the name George Champ, who was also living with Johnson and her husband, was also stealing her pills. Because Champ was stealing her pills,

D-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson_____, On _01/17/2007_, Page ___12___

Johnson had a special lock put on the door.  Champ has been in jail
since November, 2006.  Johnson's mother-in-law, who lives across the
street from Johnson, has stolen Johnson's pills.  According to
Johnson, she and her husband have never given Johnson's mother-in-
law any of Johnson's pills.  Johnson concluded by saying that her
husband's grandfather currently lives with them.  Johnson then asked
if she would be charged for these statements since the bottle states
not to give out the prescription to others.

       At approximately 9:40 a.m., SA Neiger asked Johnson if she
needed a break.  After being escorted to the restroom, Johnson was
returned to the interview room.  At approximately 9:50 a.m., the
interviewing Agents returned to the interview room and again
provided Johnson with additional tissues and asked if she needed
anything.  Johnson again responded she was fine.

       SA Slease then referred Johnson to copies of the two
prescriptions written on Dr. McLaren's stationary which SA Slease
had previously shown to Johnson earlier in the interview.  Johnson
did not know off hand whether she saw Dr. McLaren on June 26, 2006
but knew she was due to receive another prescription from him.  At
that time, Johnson and her husband were having some personal issues
which resulted in Johnson staying at either her mom's house or a
friend's house.  Johnson remembers "bouncing" between the two homes.
Johnson, however, remembers specifically receiving these two
prescriptions in the mail at her mom's house in Springfield,
Virginia.  Johnson thinks the prescriptions were mailed to her mom's
house by Dr. McLaren's office using regular mail and not Federal
Express.  Johnson also remembers being "very sick" at that time.

       Although Johnson was living with her mom at this time, she
remembers she was not home when the envelope arrived.  According to
Johnson, the envelope mailed by Dr. McLaren's office to her mom's
house was never opened by Johnson.

       Johnson told the interviewing Agents, she remembers
leaving a message on her husband's voice mail on June 27, 2006
asking him to pick up the prescriptions from her mom's house and get
them filled for Johnson.  According to Johnson, Alex Johnson drove
from the District to Springfield and picked up the prescriptions
from her mom's house.

       Although Johnson's mom was not home at the time Alex
Johnson came to pick up the prescriptions, Johnson told the
interviewing Agents that mail at her mom's house is always kept on

FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ____Erin Lee Sheehan-Johnson_____ , On 01/17/2007 , Page ___13__

the front table.  Although she is not sure, Johnson thinks her
husband picked up the envelope mailed by Dr. McLaren's office from
the front table and took it to the pharmacy.  After getting the
prescriptions filled, Alex Johnson was to drop off the medicine at
Johnson's mom's house.  However, after giving the prescriptions to
the pharmacist along with their insurance card, Alex Johnson was
arrested.

Johnson remembers talking to her husband several days
later after he was released from jail.  Johnson also remembers her
husband wanting to know what was going on and why he was arrested.
Johnson told her husband she did not know.

Johnson thought the two prescriptions were "maybe a cut
and paste job" and wanted to know if the original prescriptions
existed.  SA Slease again referred Johnson to Dr. McLaren's two
signatures.  Johnson agreed with SA Slease that the two signatures
for Dr. McLaren were very different.

Johnson's prescriptions are always written for Johnson to
receive either thirty or sixty tablets.  Johnson told the
interviewing Agents she could never have written out these
prescriptions because they did not match what she was currently
getting.  Johnson pointed out that the prescriptions she was shown
were for twenty-two and thirty-four tablets which did not make any
sense to her.

Approximately one month after Johnson's husband was
arrested, Johnson asked Dr. McLaren to show her the prescriptions
the next time she saw the doctor.  After seeing the two
prescriptions, Johnson remembers saying "Wow, that looks like my
handwriting!"  Johnson also remembers Dr. McLaren telling Johnson
"It's not your signature.  I know your signature."  According to
Johnson, she then asked Dr. McLaren "Why did they do it?"  Dr.
McLaren responded "I will look into this."

When asked why anyone would try to copy another person's
handwriting, Johnson speculated someone may want to do it if they
wanted to set up the other person.  Johnson thought this may be the
case with her because people in Dr. McLaren's office did not like
her.

When asked if Johnson would be willing to take a polygraph
and a handwriting exemplar, Johnson responded "yes" to both.
Johnson also told the interviewing Agents she would do it today.



FD-302a (Rev. 10-6-95)

209A-WF-233005 SUB 302

Continuation of FD-302 of ___Erin Lee Sheehan-Johnson___ , On 01/17/2007 , Page 14

      Johnson then began to become upset with the interviewing Agents saying she did not want to talk to them anymore.  When the interviewing Agents asked Johnson if they could ask her a few questions about some prescriptions she recently had filled, Johnson began shouting "I don't want to talk anymore.  I want an attorney."

      The interview then ended at approximately 10:30 a.m. After further processing which included being photographed and fingerprinted, at approximately 11:45 a.m., Johnson was transported from FBI offices to the Eastern District of Northern Virginia in Alexandria, Virginia to be turned over to the United States Marshal's Service.

# EXHIBIT 3

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE OF INSPECTOR GENERAL**
**OFFICE OF INVESTIGATIONS**
**REPORT OF INTERVIEW**

CS-3-82 was interviewed on April 26, 2006 at approximately 5:30PM by Special Agents (S/As) Robert Slease & LaTonya Tucker. After being advised of the nature of the interview and the identity of the Special Agents, CS-3-82 provided the following information, in substance:

## Lakeal Ellis

Ellis is the Billing Manager. Ellis was told to leave by McLaren in 2004 after she stole money from him. McLaren told her not to come around the business because he had notified the bank about the theft. Ellis would steal checks from the mailbox, sign them and deposit them into her account. McLaren conducted his own investigation and told Ellis to leave. Ellis was having her baby at this time and was gone for about a year before she came back. Ellis and McLaren stayed in close contact while she was gone.

CS-3-82 does not think that McLaren and Ellis were having a relationship. Ellis is very manipulative and has power over McLaren. Ellis has a hold on McLaren because she knows about the fraud in the office. Ellis has committed fraud in the past and knows how to control McLaren. In the recent weeks, four people have been fired because Ellis thought that it was a waste of money to have them on the payroll.

Ellis read the affidavit from the recent search warrant and told the staff it was not her problem that things were billed while McLaren was out of the country. Staff members had to set Ellis straight and remind her that she was in fact there and doing the billing. CS-3-82 wanted it to be known that Ellis is very aware of what she is doing. Ellis has made it known that if any blame is put on her she will try to blackmail McLaren. Sometime between the search at McLaren's home and his office, Ellis went to the office and took the desktop computers so we could not seize the billing data. Ellis also took other incriminating evidence (NFI). After the search warrant, Ellis brought all the materials back. McLaren was asked about the documents being taken out of the office and he responded that *you need to keep your enemies close*. CS-3-82 thinks that McLaren fears what Ellis will do.

## Billing for services not rendered

A new billing employee was brought in while Ellis was gone. CS-3-82 knew her first name was Veronica and that her last name was African. Veronica was overwhelmed by the billing problems and spoke to McLaren on a regular basis about the issues. Veronica was billing correctly and McLaren did not want the problems to be fixed because that meant less money coming into the

| | |
|---|---|
| Interview Conducted on  April 26, 2006 | At  4521 Kenilworth Avenue, Bladensburg, MD 20710 |
| By S/A Robert Slease & LaTonya Tucker | SA Phone Number  202-357-3606 |
| Date Prepared     April 27, 2006 | By  S/A Robert Slease | Case Number 3-05-00457-9(0049) |

This report is the property of the Office of Investigations and is loaned to your agency; it and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability shall be determined under 5 U.S.C. 552.

OI-3  (7/2002)

CS-3-82                                              Case number:   3-05-00457-
Interview Date:   April 26, 2006                                    9(0049)

business. McLaren knew that services were being billed for procedures he was not performing. Some patients were aware of the billing issues. CS-3-82 believes that some of these patients' procedures were billed to two separate insurance companies. CS-3-82 believed that some of the patients were getting money back from Medicare and McLaren allowed them to keep it.

CS-3-82 is aware that the office is billing for Myelography procedures and not performing them. CS-3-82 is not sure how much Toradol a patient receives, but knows that a patient could be injected with Toradol today and come back the next day and get another injection.

McLaren sees approximately 60 patients per day. The patient's visit last five (5) minutes at the most. If the patient is not out of McLaren's office within 5 minutes, the standard procedure is to knock on McLaren's door to let him know of the many other patients waiting. A new patient may stay more than 5 minutes but the time they stay varies. The office is open for patients Tuesday through Thursday from 8:30pm to 1:30pm. The office may stay open until 2:00pm or until the last person is seen. On Monday the staff prepares for patients and on Friday the staff finishes up the work for the week. The majority of the patients are billed for procure code 99214 even though they only stay in the office for 5 minutes.

McLaren and the staff do no perform vital sign examinations on the patients. The office does not have a scale to calculate weight or height. The office does not have a blood pressure monitor either. The vital signs that are in the files are made up and are the same for all patients. The majority of the notes in the file are copied from the last visit and a few things are changed like the date of the visit. There is no one designated employee in the office to do blood pressure, weight, pulse, etc.

## Prescriptions

A patient comes in the office and gets whatever amount and dose of prescription they want. For example, patients come in all the time and say they want 80 tabs of Oxycontin. After a five-minute visit they come out with the prescription they asked for. CS-3-82 knows of one person who is selling pills that he gets from the office. His name is Melvin Gale. The whole office including McLaren knows that Gale is selling his pills. Gale used to come into the office and bring 4 or 5 people with him to get prescriptions. Gale will also come in by himself and pick up prescriptions for 4 or 5 people at the same time. Gale's wife is also a patient of McLaren and receives large amounts of prescriptions. CS-3-82 has not seen Gale's wife in at least 3 months but prescriptions keep going to Melvin for his wife.

Erin Johnson is not an employee of McLaren. McLaren hired her to do dictations at one time but that only lasted a week due to her poor performance. Johnson has an alleged relationship with McLaren outside the office. Ellis has told CS-3-82 that McLaren and Johnson are sleeping together. Johnson hardly goes to the office for visits but the staff keeps getting copies of prescriptions to put in her file. McLaren is known to have several other relationships outside the office and some of those relationships could include patients.

Most of the patients that come in know each other and sit there and talk the whole time. The patients have referred others to McLaren to get their prescriptions. The staff wanted everything to appear legitimate so they told patients to get a referral before coming back to the office.

Karen Lee comes into the office and does not have to pay for visits and prescriptions. CS-3-82 does not know why this is the case and McLaren told him/her not to worry about it.

Several different pharmacies call the office each day to verify prescriptions and warn of doctor shopping. The staff will try to stop the patients from getting the prescription filled but when the pharmacist talk to McLaren the prescription gets filled anyway. McLaren has reprimanded the staff in the past for trying to stop patients from coming in after overusing. CS-3-82 does not know of one time when McLaren told a patient no or ever discharged a patient. Patients will come in and say they are going out of town. McLaren will give them prescriptions in advance. The staff will try to give appointments in a timely manner, but somehow they come in when they want and get prescriptions. The staff does not try to stop patients anymore from having too many prescriptions because McLaren will just overrule them.

On various occasions family members have come into the office and told McLaren their family member is taking too many pills. The last person to do this was Patricia Webb's husband. The husband returned later and told the staff he was lying about everything. When a patient dies and the office is notified, McLaren wants to know right away how and why that person died.

## Billing while out of the country

In December 2003, Ellis gave injections to patients while McLaren was out of the county. For the trips in 2005, the Physician Assistant (PA) performed the procedures. The PA's name is Rosemary. Dr. Uy does not help McLaren when he is away from the office. Dr. Uy assists McLaren on Mondays for surgery. If McLaren is away on a Monday, Dr. Uy performs the surgery. CS-3-82 thinks Dr. Uy is on the payroll. In cases where patients need prescriptions while McLaren is out of the office the staff fills out the prescription for patients based on what they received during their last visit. The doctor will pre-sign the prescriptions.

## Insurance billed

Some of the insurance companies that McLaren bills for services include Blue Cross, M.D.IPA, Optimum Choice, Alliance, Workers Compensation, Aetna, TriCare, GEHA, and Mail Handlers.

CS-3-82
Interview Date:    April 26, 2006

# EXHIBIT 4

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE OF INSPECTOR GENERAL**
**OFFICE OF INVESTIGATIONS**
**REPORT OF INTERVIEW**

Monifa S. Ahmed was interviewed on August 4, 2006 by Special Agents (SAs) Robert Slease –
HHS-OIG & Christopher Gleason- OPM-OIG during the execution of a search warrant on the Pain
Management Center- 6475 New Hampshire Avenue, Suites 420 & 430, Hyattsville, MD 20783.
After being advised of the nature of the interview and the identity of the Special Agents, Monifa S.
Ahmed provided the following information, in substance:

## Background

Maryland Driver's License Information:

## Current Employment

Monifa Ahmed (hereafter "Ahmed") is the Office Manager for the Pain Management Center. Her
job duties include dealing with complaints, ordering supplies and scheduling surgeries. Ahmed has
very little contact with the patients other than when they call in for appointments.

## Lakeal Ellis

| | | | |
|---|---|---|---|
| Interview Conducted on  August 4, 2006 | At  6475 New Hampshire Ave, Hyattsville, MD | | |
| By SAs Robert Slease & Christopher Gleason | | SA Phone Number  202-357-3606 | |
| Date Prepared   August 7, 2006 | By  Robert Slease | | Case Number 3-05-00457-9(0126) |

This report is the property of the Office of Investigations and is loaned to your agency; it and its contents may not be
reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized
persons is prohibited. Public availability shall be determined under 5 U.S.C. 552.

OI-3  (7/2002)

Lakeal Ellis (hereafter "Ellis") left the Pain Management Center between the end of April and beginning of May. No one has been billing insurance companies since Ellis left. The office is in the process of hiring a new billing employee. The bills are stacked in the office waiting to be sent to the appropriate insurance companies.

The computers used to do billing include the (3) three computers in the back room and (1) one computer at the front desk near the corner. [**Agent's notes:** The three billing computers were located in Room B as labeled on the search warrant sketch and the other billing computer is in Room A. The second computer from the wall is the billing computer. ]

## Day-to-day operation

The office sees between 40-60 patients per day. Martin McLaren (hereafter "McLaren") sees patients for up to 15 minutes and will only see them longer if they are a new.

McLaren sees patients for prescription management.

The office has stopped giving injections to people since the last search warrant in April 2006. Ahmed knows the injections stopped because she and the Physician Assistant (PA), Rosemary Ingado (hereafter "Ingado"), were giving most of the injections to patients. Ahmed gave injections to patients in their cervical and lower lumbar area only. If an injection needs performed on another area of the patient's body then McLaren gives the injection.

Ingado saw patients while McLaren was seeing patients. Ingado would write prescriptions but if they patient needed to change dosage then McLaren would write the prescription.

Ingado no longer works at the Pain Management Center. Ingado left approximately 2-3 weeks ago for another PA position.

## New employees

In the past 2-3 weeks the Pain Management Center has hired the following individuals:
- Derek Byas- Byas is in charge of handling all the paperwork for referrals.
- Brenda Wilburn- Wilburn does medical record work and dictation.
- Tarina Ashby- Ashby works at the front desk with Nekita Marshal.

## Signed blank prescription pad

Monifa S. Ahmed

Interview Date:    August 4, 2006

McLaren gives Nekita Marshall, Tarina Ashby and Ahmed the signed blank prescription pad to fill out. McLaren would tell them what to fill out or they could look at the patient chart and fill out the prescription based on what the patient received on their last visit.

# EXHIBIT 5

## DVD Being Filed With the Court

# EXHIBIT 6

*Sir Paul And Lady Scoon*
*Tel. (473) 440-2180*

*"Croton Villa"*
*P. O. Box 180*
*St. George's*
*Grenada, West Indies*

### TO WHOM IT MAY CONCERN

Dr. Martin R. McLaren is well known to me. I came to know him well during my sojourn as a teacher at the Grenada Boys' Secondary School, his alma mater. Further young McLaren was a boarder at the Boys' Hostel, the school's boarding establishment of fifty-two students, where I was the Master in charge for some ten years. Therefore I had an opportunity to see McLaren grow spiritually, mentally and physically from day to day in his adolescent years. From those early days he displayed academic brilliance as well as prowess in sport, drama and public speaking. He always showed leadership qualities which pleased so many of his teachers. He won the prestigious Grenada Island Scholarship in 1960 and this took him to the University of the West Indies where he read medicine. He later did further studies in the U.S.A.

McLaren has always struck me as a man of good character- honest, responsible, kind, truthful and always willing to help others. Over the years he has been particularly kind and generous to the less fortunate in his homeland and has always readily responded to cries for help from his alma-mater particularly after the destruction caused by Hurricane Ivan in 2004 and the fires which gutted the administrative block and one of the science laboratories.

It therefore came to me as a bolt from the blue when I learnt that Dr. McLaren had to face trial for fraudulent behaviour in his professional activities. My initial reaction was that he would be the last person to indulge in such sordid behaviour. However, I am confident that Dr. McLaren will take full responsibility for any fraudulent practices which occurred in his office. This is the nature of the man.

As one engaged in public life in Grenada at the highest level, I have come to understand the foibles of man.

I therefore ask the court to season justice with mercy and to be as lenient as possible. For me, McLaren will always be a good man, mindful of the plight his fellowman. I feel sure that he is truly sorry for what he has done. For his own sake and for the sake of his wife and two daughters, I humbly seek on his behalf, forgiveness and leniency.

I shall be willing to write further about him.

_____
Sir Paul Scoon GCMG GCVO OBE
Former Governor General of Grenada

Note:

Sir Paul Scoon has had a long and distinguished career in public service both as educator and administrator. After teaching at the Grenada Boys Secondary School, he became Chief Education Officer. He then headed the Grenada Civil Service in the office of Secretary to the Cabinet. In 1973 he became the Deputy Director of the Commonwealth Foundation in London. In 1978 he was appointed by Her Majesty the Queen as Grenada's 2nd Governor General – a post he held for 14 years during one of the most turbulent periods in Grenada's history. Since demitting office Sir Paul has served on the Board of Grenada Industrial Development Corporation, Chairman of the Grenada Board of Tourism, and Chairman of the local St. John Ambulance Association.

# EXHIBIT 7

12/09/2006  00:02  6233223957    WJPHILLIPS    PAGE  01

Dr. Winston J. Phillips
9252 W. Morrow Dr.
Peoria, AZ 85382

## TO WHOM IT MAY CONCERN

11 March 2008

Dear Sir,

I have known Martin Roosvelt McLaren for over fifty years. McLaren and I attended the Grenada Boys Secondary School (GBSS), and were colleague boarders at the GBSS Boys Hostel. We were also from the same Parish in Grenada. In consequence, I have had such interactions with him that have confirmed him as a true, loyal and trustworthy friend. We had such training and direction in our young lives that led us to have a great respect and caring especially for elders and for authority. It was no surprise to me that he specialized in pain management; it is consistent with his earlier penchant to talk with and comfort those in need in the town in which he lived. As a young man he was very popular with older people; often he had to make two to three stops to say hello, before we as boys could get him to ourselves. He was a very bright student, but he considered knowledge as something to be shared, not hoarded.

McLaren won the coveted, single Grenada Island Scholarship in 1960. In that year our school, the GBSS, won the first three places, yours truly in third place. The competition was stiff but honorable; there was no acrimony among us at any time. McLaren has never forgotten his alma mater and the sound base it provided him. A consistent supporter of our school, he (and his colleagues) has generously contributed time and resources especially during periods of distress (fire or hurricane). As President of the GBSS Old Boys Association from 1987-1990, I was always confident in requesting McLaren's general or specific assistance to our alma mater; in real terms, critical support to the boys of the school.

Every human being is susceptible to temptation; some are more exposed than others; some fall prey in weakness. This, of course, does not mean that the fallen do not 'hearts of gold', as does McLaren. And that is why human beings like McLaren are redeemable. I would hazard that his patients have nothing but good to say of him.

Should I offer an appeal, it would be with lines from Shakespeare's justice with mercy:
"The quality of mercy is not strain'd,
'Tis mightiest in the mightiest
When mercy seasons justice."

Yours Sincerely,

Dr. Winston J. Phillips (PhD)
Former Food and Agriculture (UN) Representative
to the State of Eritrea, East Africa.

P.1    301496973Z    McLaren    Mar 14 08 03:00p

# EXHIBIT 8



**JOHN J. CHRISTIE & ASSOCIATES, P.C.**
CONSULTING ENGINEERS
MECHANICAL • ELECTRICAL • CIVIL • STRUCTURAL
PROJECT/CONSTRUCTION MANAGEMENT & CAD SERVICES

March 5, 2008

To:    Ms. Kelley Kremer-Soares
       U.S. Probation Officer

Dear Ms. Kelley Kremer-Soares,

Dr. Martin McLaren is a loyal and trustworthy friend of some 30 years. He is an excellent doctor, dedicated to his profession, passionate about his work, concerned for his patients, and a strong and supportive family man.

I have been a personal friend and associate of Dr. Martin McLaren for several decades and have known his as a person of impeccable character. He possesses a high degree of integrity consistently reflected in his personal interactions with friends, family members, colleagues, and patients alike. He treats others with the greatest of respect; a respect that comes from only the heart. As a friend, he has been most supportive and dependable on numerous occasions.

I have witnessed Dr. McLaren in a professional setting on numerous occasions and have shared conversations about his work. He possesses a passion for what he does; a passion reflected in his brilliant approach to pain management, a passion evident in the degree of expertise and training he pursues in order to remain highly qualified and relevant in his field, a passion witnessed in the way he interacts with his patients and the concern he shows for their conditions. Dr. McLaren's expertise in acute and chronic pain is driven by his compassion for those who endure pain and suffering. He understands the connection between pain-free living and "quality of life" and has pursued a career dedicated to offering both.

Dr. Mclaren is a dedicated husband and loving father who consistently demonstrates his commitment to family and who has instilled in his children the importance of strong discipline, impeccable character, hard work, and education.

I have no doubt concerning Dr. McLaren's contribution to the community as a doctor and as a friend. I have no reason to doubt his honesty and integrity. He shows consistent reliability, excellent judgment, and has earned my respect and admiration.

Sincerely,
JOHN J. CHRISTIE AND ASSOCIATES, P.C.

John J. Christie, P.E.
President

---

8380 Colesville Rd Suite 400 Silver Spring, MD 20910 • Tel: (301) 608-0005 • Fax (301) 608-0075

# EXHIBIT 9

# John P.A. George, MD Chartered
# Gynecologic Endoscopy
6323 Georgia Avenue NW
Suite 201
Washington, DC 20011
Tel (202) 291-0039 Fax (202) 829-4009
E-mail <JGeorge585@aol.com>
March 6, 2008.

To Whom It May Concern

I have known Dr. Martin McLaren for more than fifty years. We attended the same High School. As a student, he excelled scholastically and athletically. He was awarded the prestigious Island scholarship, a distinction reserved for the top student in Grenada based upon an examination set by Cambridge University. He also represented Grenada, his homeland in Cricket a sport in which he excelled. I make mention of the foregoing to indicate that Dr. McLaren was outstanding, well known and highly respected in his community at a young age.

I lost contact with Dr. McLaren for several years during which time he pursued his medical studies at the University of the West Indies and later at Yale in Connecticut. Thereafter he came to the Washington Metropolitan area and joined the anesthesiology staff at the Howard University Hospital and the friendship that we had as young boys was rekindled. After a year in the Department he was appointed chairman. The department flourished during his tenure as he developed the residency program. As a devoted teacher, he not only trained residents to become anesthesiologists but taught students from other disciplines including Obstetrics and Gynecology and General Surgery. On many an occasion he provided anesthesia for my obstetrical and gynecologic patients.

Even though Dr. McLaren excelled in his profession, he never lost touch with his roots. He maintained close ties with his Alma Mater the Grenada Boys Secondary School. Not only was he held in high esteem, but he gave freely of his time and resources to enhance the programs at the school. I recall his donations to the school when the physical plant was devastated by a fire. On a more personal level, Dr. McLaren learned of my financial needs a few years ago and without my asking; he volunteered to assist me in a way that I will never forget. He provided a personal loan at a time of crisis. Without that I may not have been able to continue my practice.

The foregoing serves as the basis for my high regard for him. I knew him to be a kind and honest man with a sharp wit and great sense of humor. Perhaps his greatest weakness was his lack of attention to detail at times. I never had reason to question his honesty and sincerity, however.

Sincerely,

*John P.A. George MD*

# EXHIBIT 10

March 14, 2008

Irvin Richardson
7005 Nimitz Dr.
District Heights, MD 20747

To Whom It May Concern:

I just learned that Dr. McLaren might not be able to treat me in the near future. Because of the medical help he has given me in the past, I feel obligated to say something to someone who may be able to help him. He is trully a very caring and concerned doctor, who is not only interested in my physical pain, but in me as a person.

What stands out in my mind about Dr. Mclaren is that: In 2000, I saw him in his office, I was in a depressed state of mind as well as much physical pain. My wife and I were in a lot of debt and much pressure as to how we were going to pay our mortgage and other bills. I had been injured and could not work and all of the burden of trying to pay the bills and make ends meet was upon my wife. This really placed a hardship on us. Dr. McLaren was able to see and understand my personal pain as well. I told him that I needed a loan but wasn't sure if I could get one. Out of his concern for me, he gave me three thousand dollars and then said don't worry about paying me back.

Later at my request, he loaned me twenty thousand dollars to make repairs on my home when I shared with him my desire to use my home to provide a stable home for foster children. He doesn't know if I'll ever be able to repay all of his money back, but he made this loan to me out of his concern not only for my physical health but also for my personal well being. Dr. McLaren is a very special person who puts his patients first. My wife and I are heathier and certainly happier today because he cared. Whatever shortfalls he may have is only because he cares so much about people. Dr. McLaren is committed to helping the total person. We need doctors who put their patients first.

God looked beyond our faults and saw our need. Dr. McLaren's need is to be there for his patients. We need him. Dr. McLaren is a great asset to his profession as a doctor and is doing a great service for his patients. It is within your power to extend mercy to him. I ask you to give him the chance to continue to help people like me who are hurting. He is a doctor who deserves to have patients. Thank you for allowing me to share my concern with you. May God continue to bless your work.

Sincerely,

Irvin Richardson
A Patient

# EXHIBIT 11

To Whom It May Concern;

RE: Martin R. McClaren, MD

This is to certify that I have known Dr. Martin R. McClaren for the past 40 years in a variety of capacities ranging from high-school student, Medical Student, Intern, Resident, Chief of Anesthesia at Howard University Medical Center, colleague, mentor and most especially, as a friend.

I first met Martin who was affectionately known as "Sticks" (because of his spindly physique) in 1960 when he came to St. Lucia to participate in the biennial Windward Island Inner-School Tournament. He was a spin bowler at that time and his expertise in that sport of cricket and his usually warm affability easily made him the clear favorite athlete of that tournament.

In 1962, he won a Grenada Government scholarship to study medicine at the University of the West Indies. I, at the space time, won a St. Lucia government scholarship and we began our careers together. Thus, I literally saw Sticks everyday for 6 years. I was able to observe him in good times, in bad times and in indifferent times. Fundamentally, he is a decent, fun-loving, kind, unusually bright and talented individual. If any criticism can be leveled at him it is that his knowledge and academic instincts were so sharp and perceptive that he was able to maintain high grades and remain in the upper ten percent of his class without having to work too hard. In short, his academic success was stunning and it appeared to be achieved relatively effortlessly. Thus, good fortune almost gave Sticks a feeling of academic invincibility.

Throughout his medical school period, Dr. McClaren actively participated in competitive sports. He rapidly reversed his spindly stature by regular aerobic and body-building exercise and he underwent a metamorphosis to a sturdy and well developed physique making him to the envy of his peers not only for his academic but also his physical process. After we both graduated from Medical School in 1968, we both did rotating Internships in Internal Medicine, General Surgery, Pediatrics and Obstetrics and Gynecology at Princess Margaret Hospital in Nassau, Bahamas. He was, by this time, well respected and highly regarded by his colleagues and had distinguished himself as a competent, very reliable and dedicated physician.

Dr. McClaren completed his Internship with distinction and began his residency in Anesthesia at Upstate Medical Center in Syracuse and completed at Yale University Medical Center in New Haven. He was generally regarded as one of the brighter residents who passed through these programs. He easily passed the American Board of Anesthesiology examination on the first attempt and became certified as a Diplomate of that board. Within a few months of that accomplishment he joined the Anesthesia faculty at Howard University Medical Center and rapidly rose through the ranks to become the Chairman of the Department of Anesthesia. He remains one of the youngest physicians to have achieved that high honor. He served in that capacity with distinction for many

years and his students have gone on to occupy many positions of authority through the United States and well beyond.

In the past ten years, Dr. McClaren developed an interest in Pain Medicine and did some preliminary training into the fundamental of Pain Medicine and also in the principles of Therapeutic options of Pain Management under my direction at Vanderbilt University in Nashville, Tennessee. Dr. McClaren proceeded to further his knowledge and that process culminated in his becoming a Diplomate of the American Board of Pain Medicine. Dr. McClaren opened a successful Pain Management practice in the Washington, DC area and has helped very successfully to relieve the pan and suffering of hundreds of chronic pain patients

He is admired by his peers; respected by his colleagues and loved by his patients. I would therefore submit, that Dr. McClaren is a dedicated and caring physician with superlative academic talents and he is a valuable member of the medical community.

If I can be of any further assistance to Dr. McClaren, please do not hesitate to contact me.

Best Wishes,
Sincerely,


Winston C. V. Parris, MD, FACPM, CMG.
Professor of Anesthesiology,
Director, Pain Programs,
Duke University Medical Center,
Durham, NC, 27705.

# EXHIBIT 12

May 30, 2008

<u>Testimonial</u>

My name is Patricia McLaren and I am writing this on behalf of my husband Martin McLaren. My husband and I have been together for what others may call "a lifetime". We met in college at the University of the West Indies in Jamaica on a blind date in 1965. I was a bright-eyed freshman and he was the attractive medical student. Next month, we will celebrate 38 years of marriage and have not been apart for any great length of time during those years. I attribute this longevity to our deep respect and love for each other. I am very proud of our achievement in this regard, since we all know that life's ups and downs often wreak havoc on a marriage.

My husband is the most honest person I know. His biggest fault, and this is not a crime, is that he is too trusting of everyone to the point of being naïve. He gives everyone the benefit of the doubt. We are now faced with a quagmire of financial problems because he trusted an employee to process and manage the billing for his medical practice. He gave this person full reign. In retrospect, he should have been more involved, with checks and balances. However, this never occurred to him since he trusted that the job was being handled properly. When good money was coming in, I was told that the business was doing well. In hindsight, gross errors were being made.

My husband did not set out to defraud the insurance companies. There was no intent. That is not his character. From our history, you can see that our lifestyle has remained consistently average, as ever before. No luxury vacations, no expensive purchases. This is not the act of someone who set out to defraud and rack up millions of dollars unlawfully.

We are now faced with paying back millions of dollars, including the stiffest penalties and fees. My husband will lose his medical license and will be unable to practice medicine and make a living after this. This does not bode well for our future.

-2-

My husband is a good husband and father. Our girls know him to be a disciplinarian, when it comes to getting good grades and building character. They also know him to be a softy. I remember the day we went to Atlanta for our older daughter Candace's graduation from Spelman College. She graduated Summa Cum Laude with a 4.0 average and was Valedictorian of her class. During her valedictorian speech, my husband cried like a baby. He tried stuffing a hanky into his mouth to curtail himself, to no avail. Poor Candace had to steel herself and look away from him for fear of not being able to deliver her speech. Tara, our younger daughter is now married and recently delivered our first grandchild, a girl, in late March. We are so in love with her. My husband shows off her picture on his cell phone every chance he gets. He is so looking forward to being a Grandpa.

Your Honor, I beseech you; when you look at all the facts of this case, including the arguments for the defense, please find it in your heart to deliver justice tempered with mercy. I can't tell you the anxiety, the fear, the panic I feel whenever I think of the possibility of having to do without my husband - my rock - for even the shortest period of time. My husband is a decent, decent human being.

Patricia McLaren

# EXHIBIT 13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

            Plaintiff,

    -against-

STEVEN WOGHIN,

            Defendant.
--------------------------------------------------x

MEMORANDUM AND ORDER
04 CR 847 (ILG)

GLASSER, United States District Judge:

    Steven Woghin pleaded guilty to Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371 and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2). The sentence imposed was a term of imprisonment for 24 months to be followed by 3 years of supervised release. A special assessment of $200 was required and ordered to be paid. It is hereby directed that, for the reasons that follow, that sentence shall be served in the custody of the Bureau of Prisons for a year and a day and the balance thereof in home confinement.

    The factors set out in 18 U.S.C. § 3553(a) were considered in informing the court's determination regarding sentence imposed and were discussed at some length as the minutes of the sentencing proceeding will reflect.

    Steven Woghin is 59 years old and, prior to the offenses to which he pleaded guilty, had an unblemished record. He was a practicing lawyer for 33 years, 10 of which were in the service of the United States Department of Justice in various capacities. The two offenses to which he pleaded guilty were committed during his tenure as General Counsel and Senior Vice President of Computer Associates. A thick volume of letters from persons in all walks of life portray a gentle, sensitive, generous person, loyal friend

and very capable lawyer. Virtually all express disbelief that he would be standing before a court awaiting the imposition of a sentence.

"The enhanced scope of a sentencing judge's discretion in the post-<u>Booker</u> world of advisory Guidelines," <u>United States v. Jones</u>, 460 F.3d 191 (2d Cir. 2006) needs no elaboration. The Court was mindful of the statutory direction that the sentence imposed <u>shall</u> be sufficient but not greater than necessary and obeyed it. The Court is also mindful that in imposing sentence it shall consider "the kinds of sentences available" § 3553(a)(4). In this regard, the Court is mindful, too, of 28 U.S.C. § 994(d), which directs the Sentencing Commission in determining the <u>nature</u>, <u>extent</u> and <u>place</u> of serving a sentence to consider the following factors with respect to a defendant: age; education; vocational skills; physical condition; mental and emotional condition; previous employment record; family ties and responsibilities; community ties; role in the offense and criminal history. Although the statute is directed at the Sentencing Commission, it is infinitely more appropriate that it should be addressed to the Court. Surely, the Court who has had the defendant before him, who is intimately familiar with the circumstances of and, in a case such as this, the complexity of the environment in which the offenses were committed, a sense of the defendant provided by voluminous letters on his behalf and the extent to which the government has described his cooperation in the successful prosecution of others is far better positioned to determine the nature, extent and place of serving a sentence. In this post-<u>Booker</u> world the Guidelines scheme being advisory, Guidelines ranges themselves are no more binding on the sentencing judge than the Guidelines themselves. The historic role of sentencing judges in exercising their own sense of what is reasonable, fair and just borne out of many years of

2

experience and literally hundreds if not thousands of sentences imposed, may still continue to be exercised. See United States v. Jones, *supra*, at 195.

In a letter addressed to the Court dated January 31, 2007, the government "agrees that the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005), renders U.S.S.G. § 5C1.1 advisory, as it does all federal sentencing Guidelines. Accordingly, the Court has the discretion to fashion a split sentence for Mr. Woghin if it believes such a sentence appropriate."

The Court deems such a sentence to be appropriate. "Without such options, the current sentencing regime fails to accomplish its retributive, deterrent and rehabilitative goals." Demleitner, Smart Public Policy: Replacing Imprisonment With Targeted Nonprison Sentences and Collateral Sanctions, 59 Stanford Law Review 339, 345 (2005).

It is recommended that the sentence be served at the federal prison camp in Otisville, New York.

SO ORDERED.

Dated:      Brooklyn, New York
            February 6, 2007


                                        _____S/_____
                                        I. Leo Glasser

# EXHIBIT 14

## Capital Reporting Company

Page 1

1

2

3                                    ⬚ ORIGINAL

4

5

6

7                        SWORN STATEMENT

8                                OF

9                        MONIFA AHMED

10

11              Conducted by Kirby D. Behre

12             Tuesday, February 27, 2007

13                        4:13 p.m.

14

15      Paul, Hastings, Janofsky & Walker, LLP

16                 875 15th Street, NW

17                 Washington, DC 20005

18                   (202)551-1719

19

20

21

22

# Capital Reporting Company

Page 2

A P P E A R A N C E S

1

2      Q   OK. Could you just state your name for the

3  record and spell the last name?

4      A   Monifa Ahmed. A-H-M-E-D.

5      Q   And are you presently employed?

6      A   Yes.

7      Q   Can you tell us where you work?

8      A   Pay Management Center.

9      Q   And where's-- what location do you work at?

10     A   I work at all the locations - Hyattsville,

11  Waldorf, Oxon Hill, Largo.

12     Q   And who is the head of that business?

13     A   Doctor Martin McLaren.

14     Q   How long have you worked at the Pay Management

15  Center?

16     A   Four and a half, five years.

17     Q   Do you know a woman by the name of Lakeal?

18     A   Yes.

19     Q   What's her last name?

20     A   Ellis.

21     Q   And how long have you known Lakeal?

22     A   Over ten years.

Page 3

1    Q   Where did you first meet her?

2    A   We grew up in a neighborhood, we went to um--

3  high school together.

4    Q   Is that a locally or in some other area?

5    A   Locally, in DC.

6    Q   Can you spell her first name for the court

7  reporter?

8    A   Lakeal.

9    Q   Have you talked to Ms. Ellis recently?

10    A   Last time I talked to her was maybe a month or

11  so ago.

12    Q   And do you recall who called who?

13    A   She called me.

14    Q   And do you recall what she discussed with you?

15    A   That conversation was about Dr. McLaren and

16  Lakeal, and Lakeal being offered a plea bargain for her

17  to tell on Dr. McLaren or to try get back at Dr. McLaren

18  for her to get a lower sentencing--

19    Q   Hm.

20    A   I think she was offered maybe four or five

21  years and three suspended or four suspended and she was

22  just offered a year time.

## Capital Reporting Company

Page 4

1      Q    Hm. How would you characterize Lakeal's

2   attitude toward's the Doctor during that call?

3      A    Very angry. Very, very angry.

4      Q    Anything else? You just-- describe her

5   attitude towards him?

6      A    Um-- she just seem like she was just out for

7   revenge with him, just, like, really irate, like, hatred

8   towards him.

9      Q    Do you have any idea why she would have such

10  strong negative feelings towards the Doctor?

11     A    No.

12     Q    I wanna ask you about a patient by the name of

13  Brenda Butler. Are you familiar with her?

14     A    Yes.

15     Q    And how do you know Ms. Butler?

16     A    She is a patient.

17     Q    Do you know how long she's been coming to the

18  Pay Management Center?

19     A    She's been there since I started there, so it

20  had to be about over four years or so--

21     Q    Do you recall any particular discussion that

22  Lakeal had with Brenda Butler about prescriptions?

## Capital Reporting Company

Page 5

1        A    When Lakeal first came back which was, like,

2    maybe a year ago--

3        Q    Hm.

4        A    ---and Brenda Butler was seen -- came in for a

5    office visit and saw Lakeal there and made that gesture

6    'Oh, you're back', blah, blah, blah. And she said, let

7    me I talk to you for a minute, I need to talk to you

8    about my scripts. Lakeal told her to come on back and

9    talk to her and they went in the office.

10       Q    And what do you believe happened when they

11   were back in the office?

12       A    I believe Lakeal and Brenda Butler discussed

13   prescriptions or either Brenda Butler paid Lakeal for

14   her visit, things like that. 'Cause she normally would

15   get payments from patients.

16       Q    And by 'she' who do you mean normally got

17   payments from patients?

18       A    Lakeal.

19       Q    And by payments do you mean just co-pays or

20   something else?

21       A    No. Brenda Butler is a self-pay patient and

22   her visits are normally $150 or $200 depending on what

## Capital Reporting Company

Page 6

1    she came in for, so it would be that or whatever she

2    probably would give her that day.

3        Q    Was there ever a time when Lakeal asked for,

4    or received payments from patients that were over and

5    above what they really owed? In other words, you know,

6    more than their co-pay or more than their visit.

7        A    Yes.

8        Q    Do you recall any specific examples of that?

9    0500 A    For example-- you can use Jacob Smith for an

10   example. Um-- until maybe a year or so ago we were under

11   the assumption that Jacob Smith was a self-pay patient,

12   and Jacob Smith came into the office and told us that he

13   came in to be seen, Lakeal was no longer working there

14   with us. And we asked for his office visit payment, he

15   said he wasn't a self-pay patient, he had insurance.

16       Q    Hm.

17       A    So, the time before that Lakeal was there and

18   Lakeal would call Jacob Smith in the office and say,

19   come in, let me pat your pockets, give me what's in your

20   pockets. You know you owe me. Like, in the middle of

21   patients, would pat his pockets, things like that. And

22   she-- he would give her the money that he had in his

Page 7

1    pockets.

2        Q    Do you have any information as to whether

3    Lakeal actually took that money and deposited it in the

4    Pay Management Center accounts, or did she keep it for

5    her personal use?

6        A    That I'm not sure. Um, I don't think we even

7    had a Pay Management Center account. She was just

8    responsible for all the payments. When the patients came

9    in, the payments would go to Lakeal, Lakeal would get

10    the payments and disperse them.

11        Q    Was that the case even after she came back to

12    work the second time?

13        A    No.

14        Q    And was that incident where she patted down

15    Jacob Smith and said 'Give me more money' -- was that

16    during her first time working with the doctor, or the

17    second time?

18        A    The first time.

19        Q    What about uh, Theresa Sufford and Phyllis

20    Lazerow? Do you know them?

21        A    Yes.

22        Q    And how do you know them?

Page 8

1      A    They're patients.

2      Q    And do they -- are they patients together, or

3    are they --

4      A    They're patients together.

5      Q    Ok, and are you familiar with them having any

6    contact with Lakeal Ellis regarding payments, cash

7    payments --

8      A    Yes, she would demand --

9      Q    --they were requested to make?

10     A    Mmhmm, she would demand payments from them

11   when they came into the office as well. And she would

12   only take cash payments. Only.

13     Q    And did you ever witness any of these demands

14   for cash payments?

15     A    Yes.

16     Q    And what was the explanation, if any, Lakeal

17   gave to Theresa and Phyllis as to why she was demanding

18   this money?

19     A    She just did. She would never give a reason as

20   to why, or anything.

21     Q    Did you see this behavior on the part of Ms.

22   Ellis with regard to certain patients, or was it all

## Capital Reporting Company

Page 9

1  patients, or what?

2      A   It was certain patients. No it wasn't all

3  patients, it was just certain patients that she'd

4  pinpoint for some reason, and would do that.

5      Q   Is there any kind of common theme you saw

6  running through the patients she picked on?

7      A   No, there's no, wasn't no type of -- sounds or

8  anything she'd say 'I'll pick on this one' or 'Pick that

9  one'. No.

10      Q   Ok, let me ask you about another patient,

11  Donald Smith.

12      A   Ok.

13      Q   Are you familiar with Mr. Smith?

14      A   Yes.

15      Q   And how do you know him?

16      A   He's a patient.

17      Q   Do you recall a time when he came to the

18  office to speak about his billing statement?

19      A   Yes.

20      Q   And do you recall when that was?

21      A   I don't recall the actual date, I just recall

22  the incident.

## Capital Reporting Company

Page 10

1      Q   Ok, do you recall the year, maybe?

2      A   No, I can't recall the year either.

3      Q   Ok. What do you recall happening?

4      A   Mr. Smith addressed Lakeal in the waiting

5 area; he came in to be seen. And he had a statement,

6 like a billing statement or something, and he was

7 discussing it with Lakeal. Um -- well, actually before

8 that he mentioned it to the front desk that he had to

9 discuss this bill. So Neki went to Lakeal and let Lakeal

10 know that Mr. Smith had a question about billing. So

11 they both went into the office and talked to the doctor

12 about the billing statement. And they came out -- um,

13 Lakeal came out. Donald Smith was still in with the

14 doctor. And Lakeal gave Neki her bank card and told her

15 to go to the bank --

16      Q   And you say her bank card, whose bank card?

17      A   Lakeal's bank card.

18      Q   So Lakeal gave Neki Lakeal's bank card?

19      A   Lakeal's bank card. And Neki went down to the

20 bank to withdraw money out of Lakeal's account, and

21 Lakeal gave money to Mr. Smith.

22      Q   Do you know how much money was given to Mr.

Page 11

1   Smith?

2       A   I don't recall.

3       Q   And do you know why money was given to Mr.

4   Smith out of Lakeal's bank account?

5       A   No, I have no idea.

6       Q   Are you aware that at one point the police

7   executed a search warrant at at least one of the Pay

8   Management Center locations?

9       A   Yes.

10      Q   Do you know which location that was?

11      A   6475 New Hampshire Avenue.

12      Q   And did Lakeal ever tell you what she did

13  immediately before the police arrived at the scene?

14      A   Um --I'm not sure immediately before the

15  police arrived if there was um -- but before the search

16  warrant -- I'm not sure if it was before or -- I can't

17  remember the date exactly but Lakeal removed items from

18  the office.

19      Q   How do you know this?

20      A   She said it. She told us.

21      Q   And did she tell you what she removed?

22      A   No, well you can see her, what she was taking.

Page 12

1    She had scanned disks and copied charts on the computer.

2    She took patient charts, she took medication, she took

3    prescription pads. She took basically whatever she

4    wanted to take out of the office.

5         Q    And when she took those things out of the

6    office, was it before or after the search?

7         A    That was before the search. Actually, let me

8    think real quick, because -- I'm trying to recall

9    because there was two incidents. One incident, there

10   were scan disks involved, so I'm trying to remember if

11   it was before or after, because she copied -- it was

12   after, the seizure, it was.

13        Q    Ok, just so we make it clear, after the

14   location was searched by the police --

15        A    Mm-hmm.

16        Q    She came into the office. Do you recall

17   whether the doctor was there or not?

18        A    The doctor wasn't there.

19        Q    Who was there?

20        A    Myself, Neki, Rosemary, who was the physician

21   assistant at the time, and I'm not sure if Melissa was

22   there or not, but it was everybody from the office

## Capital Reporting Company

Page 13

1    there.

2        Q    Ok, and what did you see her taking, or

3    leaving the office with?

4        A    A box.

5        Q    Ok, could you tell what was in the box?

6        A    Yes, well you can tell from what she was

7    taking putting in the box.

8        Q    Ok.

9        A    And that's the same box that she took out of

10   the office.

11       Q    What did you see her put in the box and take

12   with her?

13       A    Patient charts, prescription pads,

14   medication, um, the scan disks that she copied the

15   charts with. Um --

16       Q    When you say prescription pads, were they

17   blank or filled out, or --

18       A    Blank prescription pads.

19       Q    And when you say medicine, do you know what

20   kind of medecine that would have been?

21       A    Demerol and Toradol.

22       Q    And how do you know that was what the meds

## Capital Reporting Company

Page 14

1    were?

2        A    Because you can see the box that she took.

3        Q    And did anybody try to stop her or tell her

4    not to do it?

5        A    Yeah, we told her, you know, not to do it.

6    Actually Rosemary was the one who first made the initial

7    'Lakeal what are you doing, you can't do that, you're

8    stealing'. And her-- Lakeal's response was 'I can do

9    whatever I wanna do'.

10       Q    Uh-huh. OK, so you indicated that there were

11   two incidents. So that's one that you actually

12   witnessed.

13       A    Mmhmm.

14       Q    Did you ever have a discussion with Lakeal

15   where she told you anything else about removing things

16   from the office, such as computers?

17       A    That was a second incident where Lakeal

18   mentioned that she took the computers out of the office.

19       Q    And, was that before or after the search?

20       A    After.

21       Q    And did she say where she put them?

22       A    She didn't say.

## Capital Reporting Company

Page 15

1    Q    Did there ever come a time when you were aware

2    that Lakeal made an insurance claim for some jewelry?

3    A    Yes.

4    Q    What do you know about that?

5    A    She said she had a break-in at her home, and

6    some jewelry or pieces of jewelry and things were stolen

7    out of her house. One of the pieces of jewelry that she

8    said was stolen, she said that I was with her when she

9    purchased, which I'm not even sure what the piece of

10    jewelry is, or was. And she wanted me to come to court

11    because she, the insurance people realized that she was

12    telling a story about it; that it was all made-up. And

13    she wanted me to come to court and testify, and I

14    didn't. And I wouldn't so --

15    Q    Well, was she asking you to testify to the

16    truth?

17    A    No, a lie. That I knew what she took, that I

18    went with her to purchase the jewelry, and things like

19    that.

20    Q    And so at the time she was asking you to

21    testify in a criminal case that was brought against her?

22    A    Yes.

## Capital Reporting Company

Page 16

1       Q    Was Ms. Ellis responsible for billing?

2       A    Yes.

3       Q    And just generally describe her role in the

4  office, I mean how much authority she had and what she

5  did.

6       A    She was the office manager. She basically was

7  in control of the office when Dr. McLaren wasn't there.

8  She would make sure the office, I guess, was ran

9  appropriately, and she also handled all of the billing.

10      Q    And even when Dr. McLaren was there, was she

11  in charge?

12      A    Yes.

13      Q    And give us some examples of why you say that.

14      A    Um, basically Dr. McLaren was there just to

15  see patients. Anything else that went on was handled

16  through Lakeal. Any liens that anybody would need would

17  also go through Lakeal. Lakeal did payroll. Lakeal did

18  everything. Dr. McLaren was just there to see patients.

19      Q    And what about with specific regard to the

20  billing? Who was in charge of that?

21      A    Lakeal.

22      Q    Is it your understanding that Dr. McLaren was

## Capital Reporting Company

Page 17

1    familiar with billing procedures and rules and

2    regulations?

3        A    No.

4        Q    Why do you conclude that?

5        A    Because Dr. McLaren would -- if you're placed

6    for, to do something, he would never check behind you.

7    If your job description is to schedule appointments, you

8    scheduled appointments. He wouldn't check behind that.

9    If you're to schedule surgeries, you scheduled

10   surgeries. He wouldn't check behind that. You do

11   billing, you do billing; he wouldn't check behind that.

12       Q    Did there come a time when you learned that

13   there was an allegation that the billing for Toradol was

14   extremely excessive and too high?

15       A    Yes.

16       Q    Do you recall when that was? Not the day - the

17   actual day - but just a general time frame.

18       A    That was when Lakeal was no longer working at

19   the office, and Dr. McLaren had a new person come in to

20   do billing, which was Veronica. And she brought it to

21   everyone's attention.

22       Q    And are you aware whether prior to that time

**Capital Reporting Company**

Page 18

1   if Dr. McLaren was aware of these overbillings?

2        A    No.

3        Q    No you weren't aware --

4        A    No, I wasn't aware.

5        Q    What about Dr. McLaren, was he aware?

6        A    I don't think he was aware either.

7        Q    And why do you say that?

8        A    Because like I said, Dr. McLaren would allow

9   the person who was responsible for that jo--for their

10  job, to do their job and that was it.

11       Q    Just one minute, OK?

12       A    OK.

13       Q    Can you just describe your general impression

14  with regard to Dr. McLaren and his level of trust of

15  people?

16       A    Dr. McLaren is very trustworthy of people. Dr.

17  McLaren believes -- I think he wants everybody to really

18  like him. Um -- if you ever did anything wrong, he would

19  give you a chance, you know, to apologize -- you can say

20  I'm sorry, and he'll 'OK', forgive you. Um, he's just an

21  all-around nice guy.

22       Q    Um, you said that Ms. Ellis took at some point

## Capital Reporting Company

Page 19

1   after the search warrant, or was it before I'm not sure,

2   some patient files? Was it after the search warrant?

3          A    After the search warrant.

4          Q    Do you know which patient files those were?

5          A    No, I don't.

6          Q    Do you know what reason she'd have for taking

7   patient files?

8          A    I have no reason -- no idea.

9          Q    And you're here today testifying for her, so I

10  just wanna ask you a couple of background questions

11  about that. Has anybody required you to be here?

12         A    No.

13         Q    Has anybody threatened you in order to get you

14  to be here?

15         A    No.

16         Q    Has anybody told you to say anything but the

17  honest truth?

18         A    No.

19         Q    And has anybody promised you anything in

20  exchange for you being here to testify?

21         A    No.

22         Q    OK, that's all I have. Thanks for coming in.

## Capital Reporting Company

Page 20

1        A    No problem.

2             (Whereupon, at 4:31 p.m., the sworn statement of

3             MONIFA AHMED was

4    concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**Capital Reporting Company**

Page 21

1       CERTIFICATE OF COURT REPORTER

2           I, NATASHA KORNILOVA, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the witness whose testimony appears in the

5    foregoing deposition was duly sworn; that the

6    testimony of said witness was taken by me in

7    stenotypy and thereafter reduced to typewriting by

8    me; that said deposition is a true record of the

9    testimony given by said witness; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken; and, further, that I am not a relative or

13   employee of any counsel or attorney employed by the

14   parties hereto, nor financially or otherwise

15   interested in the outcome of this action.

16

17

18                   *Natasha Kornilova*

19                   NATASHA KORNILOVA

20                   NOTARY/COURT REPORTER

21

22

**Capital Reporting Company**

Page 22

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3

4    I, MONIFA AHMED, do hereby acknowledge I

5    have read and examined the foregoing pages of

6    testimony, and the same is a true, correct and

7    complete transcription of the testimony given by me,

8    and any changes or corrections, if any, appear

9    in the attached errata sheet signed by me.

10

11

12

13

14

15

16

17

18    _____          _____

19        Date                      MONIFA AHMED

20

21

22

## Capital Reporting Company

Page 23

1    Kirby D. Behre, Esquire

2    Paul, Hastings, Janofsky & Walker, LLP

3    875 15th Street, NW

4    Washington, DC 20005

5

6    IN RE:  Sworn Statement of Monifa Ahmed

7

8    Dear Mr. Behre:

9         Enclosed please find your copy of the

10   deposition of MONIFA AHMED, along with the

11   original signature page.  As agreed, you will

12   be responsible for contacting the witness

13   regarding signature.

14        If you have any questions, please do not

15   hesitate to call.   Thank you.

16

17   Yours,

18

19

20   Natasha Kornilova

21   Reporter/Notary

22

**Capital Reporting Company**

Page 24

1    Capital Reporting Company

2    1821 Jefferson Place, Northwest

3    Third Floor

4    Washington, D.C. 20036

5    (202) 857-DEPO

6              E R R A T A    S H E E T

7    IN RE:  Sworn Statement of Monifa Ahmed

8    Witness Name: MONIFA AHMED

9    Deposition Date:  Tuesday, February 27, 2007

10   Page No.    Line No.          Change

11

12

13

14

15

16

17

18

19

20

21   _____        _____

22   Signature                       Date

**Capital Reporting Company**

## A

account 7:7 10:20 11:4
accounts 7:4
acknowledge 22:4
action 21:11,15
actual 9:21 17:17
addressed 10:4
ago 3:11 5:2 6:10
agreed 23:11
Ahmed 1:9 2:4 20:3
  22:4,19 23:6,10 24:7
  24:8
allegation 17:13
allow 18:8
all-around 18:21
angry 4:3,3
anybody 14:3 16:16
  19:11,13,16,19
apologize 18:19
appear 22:8
appears 21:4
appointments 17:7,8
appropriately 16:9
area 3:4 10:5
arrived 11:13,15
asked 6:3,14
asking 15:15,20
assistant 12:21
assumption 6:11
attached 22:9
attention 17:21
attitude 4:2,5
attorney 21:13
authority 16:4
Avenue 11:11
aware 11:6 15:1 17:22
  18:1,3,4,5,6
A-H-M-E-D 2:4

## B

back 3:17 5:1,6,8,11
  7:11
background 19:10
bank 10:14,15,16,16
  10:17,18,19,20 11:4
bargain 3:16
basically 12:3 16:6,14
behavior 8:21
Behre 1:11 23:1,8
believe 5:10,12

believes 18:17
bill 10:9
billing 9:18 10:6,10,12
  16:1,9,20 17:1,11,11
  17:13,20
blah 5:6,6,6
blank 13:17,18
box 13:4,5,7,9,11 14:2
break-in 15:5
Brenda 4:13,22 5:4,12
  5:13,21
brought 15:21 17:20
business 2:12
Butler 4:13,15,22 5:4
  5:12,13,21

## C

C 2:1 22:1
call 4:2 6:18 23:15
called 3:12,13
Capital 24:1
card 10:14,16,16,17,18
  10:19
case 7:11 15:21
cash 8:6,12,14
Cause 5:14
Center 2:8,15 4:18 7:4
  7:7 11:8
certain 8:22 9:2,3
CERTIFICATE 21:1
certify 21:3
chance 18:19
Change 24:10
changes 22:8
characterize 4:1
charge 16:11,20
charts 12:1,2 13:13,15
check 17:6,8,10,11
claim 15:2
clear 12:13
come 5:8 6:19 15:1,10
  15:13 17:12,19
coming 4:17 19:22
common 9:5
Company 24:1
complete 22:7
computer 12:1
computers 14:16,18
conclude 17:4
concluded 20:4

Conducted 1:11
contact 8:6
contacting 23:12
control 16:7
conversation 3:15
copied 12:1,11 13:14
copy 23:9
correct 22:6
corrections 22:8
counsel 21:10,13
couple 19:10
court 3:6 15:10,13 21:1
co-pay 6:6
co-pays 5:19
criminal 15:21

## D

D 1:11 22:1,1 23:1
date 9:21 11:17 22:19
  24:9,22
day 6:2 17:16,17
DC 1:17 3:5 23:4
Dear 23:8
demand 8:8,10
demanding 8:17
demands 8:13
Demerol 13:21
depending 5:22
deposited 7:3
deposition 21:3,5,8,11
  23:10 24:9
describe 4:4 16:3 18:13
description 17:7
desk 10:8
discuss 10:9
discussed 3:14 5:12
discussing 10:7
discussion 4:21 14:14
disks 12:1,10 13:14
disperse 7:10
doctor 2:13 4:2,10 7:16
  10:11,14 12:17,18
doing 14:7
Donald 9:11 10:13
Dr 3:15,17,17 16:7,10
  16:14,18,22 17:5,19
  18:1,5,8,14,16,16
duly 21:5
D.C 24:4

## E

E 2:1,1 22:1,1,1,1,1
  24:6,6,6
either 5:13 10:2 18:6
Ellis 2:20 3:9 8:6,22
  16:1 18:22
employed 2:5 21:10,13
employee 21:13
Enclosed 23:9
errata 22:9
Esquire 23:1
everybody 12:22 18:17
everyone's 17:21
exactly 11:17
examined 22:5
example 6:9,10
examples 6:8 16:13
excessive 17:14
exchange 19:20
executed 11:7
explanation 8:16
extremely 17:14

## F

F 22:1
familiar 4:13 8:5 9:13
  17:1
February 1:12 24:9
feelings 4:10
files 19:2,4,7
filled 13:17
financially 21:14
find 23:9
first 3:1,6 5:1 7:16,18
  14:6
five 2:16 3:20
Floor 24:3
foregoing 21:3,5 22:5
forgive 18:20
four 2:16 3:20,21 4:20
frame 17:17
front 10:8
further 21:12

## G

G 22:1
general 17:17 18:13
generally 16:3
gesture 5:5
give 6:2,19,22 7:15

**Capital Reporting Company**

Page 2

| | | | |
|---|---|---|---|
| 8:19 16:13 18:19 | 15:18 | **Management** 2:8,14 | **office** 5:5,9,11 6:12,14 |
| **given** 10:22 11:3 21:9 | **jo** 18:9 | 4:18 7:4,7 11:8 | 6:18 8:11 9:18 10:11 |
| 22:7 | **job** 17:7 18:10,10 | **manager** 16:6 | 11:18 12:4,6,16,22 |
| **go** 7:9 10:15 16:17 | | **Martin** 2:13 | 13:3,10 14:16,18 |
| **grew** 3:2 | _____ **K** _____ | **McLaren** 2:13 3:15,17 | 16:4,6,7,8 17:19 |
| **guess** 16:8 | **K** 22:1 | 3:17 16:7,10,14,18,22 | **officer** 21:2 |
| **guy** 18:21 | **keep** 7:4 | 17:5,19 18:1,5,8,14 | **Oh** 5:6 |
| | **kind** 9:5 13:20 | 18:16,17 | **Ok** 2:2 8:5 9:10,12 10:1 |
| _____ **H** _____ | **Kirby** 1:11 23:1 | **mean** 5:16,19 16:4 | 10:3 12:13 13:2,5,8 |
| **H** 24:6 | **knew** 15:17 | **medecine** 13:20 | 14:10 18:11,12,20 |
| **half** 2:16 | **know** 2:17 4:15,17 6:5 | **medication** 12:2 13:14 | 19:22 |
| **Hampshire** 11:11 | 6:20 7:20,22 9:15 | **medicine** 13:19 | **order** 19:13 |
| **handled** 16:9,15 | 10:10,22 11:3,10,19 | **meds** 13:22 | **original** 23:11 |
| **happened** 5:10 | 13:19,22 14:5 15:4 | **meet** 3:1 | **outcome** 21:15 |
| **happening** 10:3 | 18:19 19:4,6 | **Melissa** 12:21 | **overbillings** 18:1 |
| **Hastings** 1:15 23:2 | **known** 2:21 | **mentioned** 10:8 14:18 | **owe** 6:20 |
| **hatred** 4:7 | **Kornilova** 21:2,19 | **middle** 6:20 | **owed** 6:5 |
| **head** 2:12 | 23:20 | **minute** 5:7 18:11 | **Oxon** 2:11 |
| **hereto** 21:14 | | **Mhmhm** 8:10 14:13 | |
| **hesitate** 23:15 | _____ **L** _____ | **Mm-hmm** 12:15 | _____ **P** _____ |
| **he'll** 18:20 | **L** 22:1 | **money** 6:22 7:3,15 8:18 | **P** 2:1,1 22:1 |
| **high** 3:3 17:14 | **Lakeal** 2:17,21 3:8,16 | 10:20,21,22 11:3 | **pads** 12:3 13:13,16,18 |
| **Hill** 2:11 | 3:16 4:22 5:1,5,8,12 | **Monifa** 1:9 2:4 20:3 | **page** 23:11 24:10 |
| **Hm** 3:19 4:1 5:3 6:16 | 5:13,18 6:3,13,17,18 | 22:4,19 23:6,10 24:7 | **pages** 22:5 |
| **home** 15:5 | 7:3,9,9 8:6,16 10:4,7 | 24:8 | **paid** 5:13 |
| **honest** 19:17 | 10:9,9,13,14,18,21 | **month** 3:10 | **part** 8:21 |
| **house** 15:7 | 11:12,17 14:7,14,17 | | **particular** 4:21 |
| **Hyattsville** 2:10 | 15:2 16:16,17,17,17 | _____ **N** _____ | **parties** 21:11,14 |
| | 16:21 17:18 | **N** 2:1 22:1,1,1,1 | **pat** 6:19,21 |
| _____ **I** _____ | **Lakeal's** 4:1 10:17,18 | **name** 2:2,3,17,19 3:6 | **patient** 4:12,16 5:21 |
| **idea** 4:9 11:5 19:8 | 10:19,20 11:4 14:8 | 4:12 24:8 | 6:11,15 9:10,16 12:2 |
| **immediately** 11:13,14 | **Largo** 2:11 | **Natasha** 21:2,19 23:20 | 13:13 19:2,4,7 |
| **impression** 18:13 | **Lazerow** 7:20 | **need** 5:7 16:16 | **patients** 5:15,17 6:4,21 |
| **incident** 7:14 9:22 12:9 | **learned** 17:12 | **negative** 4:10 | 7:8 8:1,2,4,22 9:1,2,3 |
| 14:17 | **leaving** 13:3 | **neighborhood** 3:2 | 9:3,6 16:15,18 |
| **incidents** 12:9 14:11 | **level** 18:14 | **neither** 21:9 | **patted** 7:14 |
| **indicated** 14:10 | **lie** 15:17 | **Neki** 10:9,14,18,19 | **Paul** 1:15 23:2 |
| **information** 7:2 | **liens** 16:16 | 12:20 | **Pay** 2:8,14 4:18 7:4,7 |
| **initial** 14:6 | **Line** 24:10 | **never** 8:19 17:6 | 11:7 |
| **insurance** 6:15 15:2,11 | **LLP** 1:15 23:2 | **new** 11:11 17:19 | **payment** 6:14 |
| **interested** 21:15 | **locally** 3:4,5 | **nice** 18:21 | **payments** 5:15,17,19 |
| **involved** 12:10 | **location** 2:9 11:10 | **normally** 5:14,16,22 | 6:4 7:8,9,10 8:6,7,10 |
| **irate** 4:7 | 12:14 | **Northwest** 24:2 | 8:12,14 |
| **items** 11:17 | **locations** 2:10 11:8 | **NOTARY/COURT** | **payroll** 16:17 |
| | **long** 2:14,21 4:17 | 21:20 | **people** 15:11 18:15,16 |
| _____ **J** _____ | **longer** 6:13 17:18 | **NW** 1:16 23:3 | **person** 17:19 18:9 |
| **Jacob** 6:9,11,12,18 | **lower** 3:18 | | **personal** 7:5 |
| 7:15 | | _____ **O** _____ | **Phyllis** 7:19 8:17 |
| **Janofsky** 1:15 23:2 | _____ **M** _____ | **O** 22:1,1,1 | **physician** 12:20 |
| **Jefferson** 24:2 | **M** 22:1 | **offered** 3:16,20,22 | **pick** 9:8,8 |
| **jewelry** 15:2,6,6,7,10 | **made-up** 15:12 | | |

**Capital Reporting Company**

Page 3

picked 9:6
piece 15:9
pieces 15:6,7
pinpoint 9:4
Place 24:2
placed 17:5
plea 3:16
please 23:9,14
pockets 6:19,20,21 7:1
point 11:6 18:22
police 11:6,13,15 12:14
prescription 12:3
   13:13,16,18
prescriptions 4:22 5:13
presently 2:5
prior 17:22
probably 6:2
problem 20:1
procedures 17:1
promised 19:19
purchase 15:18
purchased 15:9
put 13:11 14:21
putting 13:7
p.m 1:13 20:2

**Q**
question 10:10
questions 19:10 23:14
quick 12:8

**R**
R 2:1 24:6,6
ran 16:8
read 22:5
real 12:8
realized 15:11
really 4:7 6:5 18:17
reason 8:19 9:4 19:6,8
recall 3:12,14 4:21 6:8
   9:17,20,21,21 10:1,2
   10:3 11:2 12:8,16
   17:16
received 6:4
record 2:3 21:8
reduced 21:7
regard 8:22 16:19
   18:14
regarding 8:6 23:13
regulations 17:2

related 21:10
relative 21:12
remember 11:17 12:10
removed 11:17,21
removing 14:15
reporter 3:7 21:1,20
Reporter/Notary 23:21
Reporting 24:1
requested 8:9
required 19:11
response 14:8
responsible 7:8 16:1
   18:9 23:12
revenge 4:7
role 16:3
Rosemary 12:20 14:6
rules 17:1
running 9:6

**S**
S 2:1 24:6
saw 5:5 9:5
scan 12:10 13:14
scanned 12:1
scene 11:13
schedule 17:7,9
scheduled 17:8,9
school 3:3
scripts 5:8
search 11:7,15 12:6,7
   14:19 19:1,2,3
searched 12:14
second 7:12,17 14:17
see 8:21 11:22 13:2,11
   14:2 16:15,18
seen 5:4 6:13 10:5
seizure 12:12
self-pay 5:21 6:11,15
sentencing 3:18
sheet 22:9
she'd 9:3,8 19:6
signature 23:11,13
   24:22
signed 22:9
Smith 6:9,11,12,18
   7:15 9:11,13 10:4,10
   10:13,21 11:1,4
sorry 18:20
sounds 9:7
speak 9:18

specific 6:8 16:19
spell 2:3 3:6
started 4:19
state 2:2
statement 1:7 9:18
   10:5,6,12 20:2 23:6
   24:7
stealing 14:8
stenotypy 21:7
stolen 15:6,8
stop 14:3
story 15:12
Street 1:16 23:3
strong 4:10
Sufford 7:19
sure 7:6 11:14,16 12:21
   15:9 16:8 19:1
surgeries 17:9,10
suspended 3:21,21
sworn 1:7 20:2 21:5
   23:6 24:7

**T**
T 22:1,1 24:6,6
take 8:12 12:4 13:11
taken 21:3,6,12
talk 5:7,7,9
talked 3:9,10 10:11
tell 2:7 3:17 11:12,21
   13:5,6 14:3
telling 15:12
ten 2:22
testify 15:13,15,21
   19:20
testifying 19:9
testimony 21:4,6,9
   22:6,7
Thank 23:15
Thanks 19:22
theme 9:5
Theresa 7:19 8:17
things 5:14 6:21 12:5
   14:15 15:6,18
think 3:20 7:6 12:8
   18:6,17
Third 24:3
threatened 19:13
three 3:21
time 3:10,22 6:3,17
   7:12,16,17,18 9:17

12:21 15:1,20 17:12
   17:17,22
today 19:9
told 5:8 6:12 10:14
   11:20 14:5,15 19:16
Toradol 13:21 17:13
toward's 4:2
transcription 22:7
true 21:8 22:6
trust 18:14
trustworthy 18:16
truth 15:16 19:17
try 3:17 14:3
trying 12:8,10
Tuesday 1:12 24:9
two 12:9 14:11
type 9:7
typewriting 21:7

**U**
uh 7:19
Uh-huh 14:10
um 3:2 4:6 6:10 7:6
   10:7,12 11:14,15
   13:14,15 16:14 18:18
   18:20,22
understanding 16:22
use 6:9 7:5

**V**
Veronica 17:20
visit 5:5,14 6:6,14
visits 5:22

**W**
W 22:1
waiting 10:4
Waldorf 2:11
Walker 1:15 23:2
wanna 4:12 14:9 19:10
wanted 12:4 15:10,13
wants 18:17
warrant 11:7,16 19:1,2
   19:3
Washington 1:17 23:4
   24:4
wasn't 6:15 9:2,7 12:18
   16:7 18:4
went 3:2 5:9 10:9,11,19
   15:18 16:15
weren't 18:3

**Capital Reporting Company**

**withdraw** 10:20
**witness** 8:13 21:4,6,9
  23:12 24:8
**witnessed** 14:12
**woman** 2:17
**words** 6:5
**work** 2:7,9,10 7:12
**worked** 2:14
**working** 6:13 7:16
  17:18
**wouldn't** 15:14 17:8,10
  17:11
**wrong** 18:18

**Y**

**Yeah** 14:5
**year** 3:22 5:2 6:10 10:1
  10:2
**years** 2:16,22 3:21 4:20

**$**

**$150** 5:22
**$200** 5:22

**0**

**0500** 6:9

**1**

**15th** 1:16 23:3
**1821** 24:2

**2**

**20005** 1:17 23:4
**20036** 24:4
**2007** 1:12 24:9
**202** 24:5
**202)551-1719** 1:18
**27** 1:12 24:9

**4**

**4:13** 1:13
**4:31** 20:2

**6**

**6475** 11:11

**8**

**857-DEPO** 24:5
**875** 1:16 23:3

# EXHIBIT 15

1

1

2

3    IN RE:

4    DR. McCLAREN                    ORIGINAL

5

6

7

8                    SWORN STATEMENT OF

9                    MELISSA JOSEPH

10                    Washington, D.C.

11              Thursday, July 26, 2007

12                    3:05 p.m.

13

14

15

16

17

18

19

20

21    Job No.:  1-108505

      Pages 1 through 29

22    Reported by:  John L. Harmonson, RPR



1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

2

1

2

3              Sworn Statement of

4               MELISSA JOSEPH

5

6

7  Held at the offices of:

8          PAUL, HASTINGS, JANOFSKY & WALKER

9          875 15th Street, N.W.

10         Washington, D.C.   20005

11          (202)551-1700

12

13

14

15      Taken pursuant to agreement, before John L.

16  Harmonson, Registered Professional Reporter, Notary

17  Public in and for the District of Columbia, who

18  officiated in administering the oath to the witness.

19

20

21

22

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

APPEARANCES

ON BEHALF OF PLAINTIFF:

STEPHANIE K. ROSENTHAL, ESQ.

PAULA KATZ, ESQ.

Paul, Hastings, Janofsky & Walker

875 15th Street, N.W.

Washington, D.C.  20005

(202)551-1700

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007



4

EXAMINATION INDEX

PAGE

EXAMINATION BY MS. ROSENTHAL                               5

\*   \*   \*   \*   \*

EXHIBIT INDEX

(No exhibits identified.)

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

5

P R O C E E D I N G S

1
2
3        MELISSA JOSEPH,
4  after having been first duly sworn, was examined
5  and did testify under oath as follows:
6                      EXAMINATION
7  BY MS. ROSENTHAL:
8      Q.   Hi, Melissa.  I'm Stephanie Rosenthal, and
9  I'm going to be asking you a few questions.  I'll just
10  start out by asking you if you're here of your own
11  free will.
12      A.   Yes.
13      Q.   Did anyone promise you anything in exchange
14  for your testimony today?
15      A.   No.
16      Q.   Did anyone force you to be here?
17      A.   No.
18      Q.   My colleague, Paula Katz, may interrupt
19  with questions, but I'll primarily be doing the
20  questioning.  If you have a question about anything I
21  asked you, feel free to stop me and ask me to repeat
22  the question or clarify what I'm trying to ask you.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

6

1    Can you please spell your full name for the

2    record.

3        A.    M-e-l-i-s-s-a, and J-o-s-e-p-h.

4        Q.    And what is your address?

5        A.    2114 -- I'm sorry, 11700 Old Columbia Pike,

6    Apartment 2114, Silver Spring, Maryland, 20904.

7        Q.    I'd like to just briefly go through your

8    employment history.  I understand you worked at the

9    Pain Management Center for Dr. McClaren.

10        A.    Yes.

11        Q.    What was your job before you started at the

12    Pain Management Center?

13        A.    I worked at a dental office.

14        Q.    Okay.  And what was the name of that dental

15    office?

16        A.    College Park Dental.

17        Q.    And what was your job title at that office?

18        A.    Data entry.

19        Q.    Okay.  Did you do billing at the office?

20        A.    Yes.  I entered charges.

21        Q.    And when did you start at the Pain

22    Management Center?

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

7

1    A.    February 2003.

2    Q.    And who was your supervisor?

3    A.    Lakeal Ellis.

4    Q.    And what was your job title?

5    A.    Billing assistant.

6    Q.    Did you have any other supervisors other

7    than Ms. Ellis?

8    A.    No.

9    Q.    What were your job duties?

10   A.    I entered charges, posted payments, mailed

11   out the bills.  And any time that I was needed as a

12   receptionist or assisting with patients, I also helped

13   out.

14   Q.    What type of training did you receive when

15   you started at the Pain Management Center?

16   A.    Lakeal basically showed me what charges we

17   used and how to enter them in the computer.

18   Q.    Okay.  Did she explain to you how you chose

19   which code to put into the computer?

20   A.    We basically -- The doctor, when he would

21   see a patient, there was a form where he would circle

22   what was done, and then we would enter that in the

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

8

1    computer, and she showed me, you know, how to go about

2    entering and how, you know, everything worked.

3        Q.    Who was in charge of billing at the Pain

4    Management Center?

5        A.    Lakeal.

6        Q.    And who trained Lakeal?

7        A.    From my understanding, she knew billing for

8    years.

9        Q.    And what do you base your understanding on?

10       A.    What she said.

11       Q.    Okay.  And so when she started, do you know

12   if Dr. McClaren trained her at all?

13       A.    No.

14       Q.    Was he familiar with billing?

15       A.    According to Lakeal, he didn't know

16   billing, and she was in charge of billing.

17       Q.    And why do you say that?

18       A.    Because that's what she would always say.

19       Q.    What specifically would she say?

20       A.    "Dr. McClaren doesn't know billing.  I'm in

21   charge of billing."

22       Q.    Did you ever see Dr. McClaren use a billing

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

9

1    computer?

2        A.    Never.

3        Q.    Did you ever hear him instruct Lakeal or

4    any other billing assistant on what code to enter?

5        A.    No.  Lakeal dictated what was going to be

6    done.

7        Q.    And did he have a manual telling him how to

8    bill?

9        A.    No.

10        Q.    Was there a manual in the office telling

11    you how to bill?

12        A.    We have -- there's -- In every doctor's

13    office there's a manual with all the different codes

14    and what they mean.

15        Q.    And where was that manual kept?

16        A.    In the billing office.

17        Q.    So would you say that Dr. McClaren

18    supervised Lakeal?

19        A.    No.

20        Q.    And how did Lakeal know what to bill?

21        A.    She would -- she would always say that

22    she's been doing billing for years.  And we also

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

10

1   followed -- I forget what this sheet is called.

2        Q.    A super bill?

3        A.    Yeah.  We followed whatever the doctor

4   circled on the super bill.

5        Q.    Okay.  And so, for example, if you put in a

6   billing code, how would the computer system know how

7   much to bill for that code?

8        A.    Because Lakeal entered the different prices

9   for the different codes.  So when you would enter a

10  code, you know, the prices would automatically come

11  up.

12       Q.    Okay.

13            MS. KATZ:  Was there any way for anyone to

14  modify the price that came up?

15            THE WITNESS:  Lakeal did that.

16  BY MS. ROSENTHAL:

17       Q.    Did Lakeal ever instruct you to bill

18  something that was not indicated on the super bill?

19       A.    Sometimes when she did review the super

20  bill, she would, you know, adjust it, circle something

21  that she would say, "Oh, he forgot to do this."

22       Q.    And then if she circled something and told

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

11

1   you the doctor forgot to circle it, would she ask you

2   to submit that code into the billing computer?

3       A.    Yes.

4       Q.    And then you would end up billing a

5   provider for that code even though the doctor had not

6   circled it?

7       A.    Yes.

8       Q.    Did she say that the doctor had told her to

9   do this?

10      A.    Yes.  She basically always let it be known

11  that she was in charge of billing, and the doctor was

12  aware of everything that she did, and she was

13  basically in charge and in control of the billing.

14      Q.    So she said that he said it was okay for

15  her to do this?

16      A.    Right.

17      Q.    Was it your impression that the doctor knew

18  that she was doing this?

19      A.    Yes.

20      Q.    Did he instruct her to do this?

21      A.    I'm not sure if he did.  I mean, he did let

22  her be in charge of the billing because of according

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

12

1    to the experience she said she had. But as far as

2    what she was charging, I don't know if he was aware of

3    that.

4        Q.    Is it your impression that he knew that she

5    would go back over his bills and ask the billing

6    assistants to bill for things he had not indicated on

7    the form?

8        A.    I don't think he knew that.

9        Q.    Did he generally know that she was

10   overbilling?

11       A.    I don't know.

12       Q.    Do you have any idea why Lakeal would want

13   to bill more than what the doctor had indicated on his

14   forms?

15       A.    To get more money.

16       Q.    How would that help her?

17       A.    Well, at the end, it was found out that she

18   had stolen thousands of dollars from him from the

19   insurance checks that was being sent to him.

20       Q.    Did she do this with the doctor's

21   permission?

22       A.    I don't think he was aware of it.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

13

1    Q.    When did Lakeal leave the Pain Management

2  Center?

3    A.    2005.

4    Q.    And who replaced her?

5    A.    Veronica.

6    Q.    Do you know Veronica's last name?

7    A.    I can't pronounce it.

8    Q.    Is it Ilupeju?

9    A.    Yes.

10    Q.    And do you know who trained Veronica?

11    A.    She already knew billing.  She had billing

12  experiences.

13    Q.    So when she came to the Pain Management

14  Center, did she ever express concern to you or to

15  anyone else that the billing was being done

16  incorrectly?

17    A.    She was outraged at the prices that we were

18  charging the insurance companies.

19    Q.    And what did she say?

20    A.    That it was a lot.

21    Q.    And did she bring this up with

22  Dr. McClaren?

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

14

1    A.    They would talk behind closed doors, but I

2  don't know what was said.

3    Q.    Did she -- Do you know if Dr. McClaren told

4  her to correct the billing?  Did she ever say anything

5  to you about that?

6    A.    She didn't say if Dr. McClaren said to

7  correct it, but the bills were corrected, because we

8  started billing at a lower amount.

9        MS. KATZ:  I'm sorry.  So Veronica

10  discovered that the billing was messed up, right?

11        THE WITNESS:  Yes.

12        MS. KATZ:  And you're not sure whether she

13  talked to the doctor or not?

14        THE WITNESS:  Well, I suppose she did talk

15  to the doctor.  And, you know, the doctor was probably

16  concerned about all the money that, you know, was

17  coming in, and money that he obviously didn't see,

18  because Lakeal did steal.  So I suppose that he did

19  tell her, you know, correct it as much as she possibly

20  could, because then we started billing less.

21        MS. KATZ:  And so then what did she do?

22  She went in and fixed the billing?

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

15

1        THE WITNESS:  As much as possible.

2        MS. KATZ:  And then the doctor knew about

3    the fact that she had done the repairs to the billing

4    system, right?

5        THE WITNESS:  Yes.

6    BY MS. ROSENTHAL:

7        Q.    Do you know why Veronica left the Pain

8    Management Center?

9        A.    I think it's because she started her own

10   business from home.

11       Q.    And do you know where she works presently?

12       A.    I think that's what she does, from home.

13       Q.    Did anyone in the office say anything about

14   her -- about why she left?

15       A.    No.

16       Q.    Did she say anything to you about why she

17   left?

18       A.    No.

19       Q.    Did the doctor ever say anything to you

20   about why she left?

21       A.    No.

22       Q.    And to the best of your knowledge, when

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

16

1    Veronica left, was the billing in pretty good shape?

2         A.    It seemed to be, yes.

3         Q.    Did it more accurately reflect what the

4    doctor was actually performing?

5         A.    Yes.

6         Q.    Did Veronica ever tell you to bill

7    something different from what the doctor had indicated

8    on the form?

9         A.    No.

10        Q.    So after Veronica left, then who replaced

11   Veronica?

12        A.    Lakeal came back.

13        Q.    Do you know why she came back?

14        A.    I have no idea.

15        Q.    What did she do when she saw that the

16   billing had been corrected?

17        A.    Lakeal claimed that the billing was a mess,

18   that Dr. McClaren wasn't making money.  And she

19   changed the prices up higher again.

20        Q.    Did she tell Dr. McClaren that she was

21   changing the prices?

22        A.    I don't know.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

17

1    Q.    Did anyone in the billing office say

2  anything to her, that the billing had been correct and

3  ask her why she was changing it?

4    A.    No.

5    Q.    And did she just change everything back to

6  her old way of billing?

7    A.    Yes.

8         MS. KATZ:  Do you have any reason to think

9  that the doctor would have known that Lakeal had

10  changed things that Veronica had done to the billing

11  system?

12         THE WITNESS:  At that point, I had no idea

13  what the doctor was thinking, honestly.

14  BY MS. ROSENTHAL:

15    Q.    Did he ever oversee the billing that Lakeal

16  did?

17    A.    No.

18    Q.    Did she have to run bills by him for

19  approval?

20    A.    No.

21    Q.    Did he come back and have to sign anything

22  when she did a bill?

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

18

1    A.    No.

2    Q.    Did he ever look over her shoulder as she

3    did her work?

4    A.    No.

5    Q.    Did he even know where the billing

6    computers were in the office?

7    A.    Yes, he did.

8    Q.    But did he ever go onto the billing

9    computer?

10   A.    No.

11   Q.    Are you aware of Lakeal stealing anything

12   from the Pain Management Center?

13   A.    Yes.

14   Q.    Can you explain that?

15   A.    She stole -- on several occasions she stole

16   medication.

17   Q.    Which medications did she take?

18   A.    I think it's Demerol.

19   Q.    And do you know what she would do with the

20   Demerol when she stole it?

21   A.    I would suppose she would sell it

22   elsewhere.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

19

1    Q.    Did you ever see her take the Demerol?

2    A.    Yes.

3    Q.    Did other people in the office see her take

4    the Demerol?

5    A.    I don't know.

6    Q.    Do you think Dr. McClaren knew she was

7    stealing drugs?

8    A.    I don't know.

9    Q.    Would he have been in the office to see her

10    removing the drugs from the office?

11    A.    No.

12    Q.    When would she take them?

13    A.    At the end of the day, probably when the

14    doctor is gone for the day.

15    Q.    Okay.  And what else did you -- what other

16    drugs did you see her steal?

17    A.    That was about it.

18    Q.    Did she ever call in her own prescriptions?

19    A.    Yes.

20    Q.    What prescriptions would she call in for

21    herself?

22    A.    Xanax.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

20

1     Q.    And how would she do that if she's not a

2   doctor?

3     A.    She would use the doctor's DEA number.

4     Q.    Did he tell her that she could do this?

5     A.    I don't think so.

6     Q.    And do you know if she ever filled

7   prescriptions for someone who wasn't alive?

8     A.    Her mother, her dead mother.

9     Q.    And can you explain that a little bit?

10    A.    Whatever medications her dead mother was

11  taking while she was alive, she continued to get them

12  filled for a couple of months after she passed away.

13    Q.    And how would she do that?

14    A.    Just using the doctor's DEA number.

15    Q.    And so to your knowledge, did Dr. McClaren

16  know that she was doing this sort of stuff with the

17  prescriptions?

18    A.    No.

19    Q.    Are you aware of any situation in which

20  Lakeal was involved in insurance fraud?

21    A.    Yes.

22    Q.    What do you know about that?

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

21

1      A.    She had claimed that her house got robbed

2    and a couple of items, a PlayStation and some jewelry,

3    had gotten stolen.  And basically she was trying to

4    get money from her homeowner's insurance for these

5    things.

6      Q.    Okay.  And how do you know that her house

7    wasn't really robbed?

8      A.    Because no one ever heard about her being

9    hysterical and that her house was robbed.

10      Q.    And how did you find out that she was

11    making these claims?

12      A.    I remember on one occasion she wanted

13    Monifa to go to court with her and testify, and Monifa

14    refused, and she got mad at Monifa because Monifa

15    wouldn't go and lie for her in court about the jewelry

16    that supposedly had gotten stolen.

17      Q.    Do you know anything else about Lakeal

18    stealing anything from the Pain Management Center?

19      A.    Also before -- Years ago I heard about some

20    computers that had gotten stolen, and everyone says,

21    you know, the word was that she had stolen the

22    computers out of the office.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

22

1    Q.    And when was this?

2    A.    Maybe six years ago.  Before he was at the

3    Hyattsville office.

4    Q.    Did anyone know why she would steal the

5    computers?

6    A.    No.

7    Q.    In your opinion, did Lakeal try to hide

8    things from Dr. McClaren?

9    A.    Yes.

10    Q.    Was she secretive?

11    A.    She's a compulsive liar.

12    Q.    Okay.  And so when she would do things, for

13    example, asking you to bill things that he hadn't

14    indicated on the billing form, would she ever tell you

15    not to tell the doctor?

16    A.    No.  She said -- she would always confirm

17    that the doctor knew about it and he just forgot.

18    Q.    Did she encourage you to ask the doctor?

19    A.    No, she never wanted no one to ask the

20    doctor anything, because she said that the doctor

21    didn't like to hear complaints.

22    Q.    As this just office staff that she told not

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

23

1    to talk to the doctor?

2        A.    Everyone, yes.

3        Q.    And what about patients?

4        A.    Sometimes, like if she tried to get money

5    out of the patients, she would tell them, "Well, you

6    know, if you go to Dr. McClaren, he already knows.

7    I'm in charge of the billing, and he always backs me

8    up with everything that I do."

9        Q.    You just said she would try to get money

10   from the patients.  Can you explain what you mean by

11   that?

12       A.    If -- We never charged patients.  We would

13   just collect whatever the insurance would pay us.  But

14   sometimes she would take a certain patient into the

15   billing office by herself and try to get money out of

16   them for outstanding bills that we never billed

17   patients.  And several patients did complain about

18   that.

19       Q.    Do you remember the names of any of those

20   patients?

21       A.    I only remember two patients.  It was

22   Theresa Stafford and Phyllis Lazerow that had

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

24

1    complained about her doing that.

2        Q.    And do you have any idea how much money she

3    would take from the patients?

4        A.    No.

5        Q.    And could other people in the office hear

6    the conversations she was having with these patients

7    when she would try to take money from them?

8        A.    Not that I know of.

9        Q.    Would a patient waiting in the waiting room

10   be able to hear what she was saying to these patients

11   in the billing office?

12       A.    Not that I know of, because it was behind

13   closed doors.

14       Q.    Okay.  When we were talking before about

15   the billing codes, were you talking about just billing

16   codes for the office, for visits in the office?  Or

17   were you also talking about billing at the surgery

18   center where Dr. McClaren performed surgery?

19       A.    All of the billing.

20       Q.    Okay.  And so would you enter billing codes

21   for procedures he did at the surgery center?

22       A.    Only Lakeal did that.

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

25

1    Q.    And why was she the only one who did that?

2    A.    I don't know.  She didn't want no one else

3    to do it.  She wanted to be in charge of entering

4    those codes for surgery.

5    Q.    Do you know whether she would enter codes

6    for procedures that Dr. McClaren did not perform at

7    the surgery center?

8    A.    Probably.

9    Q.    And what makes you think that?

10   A.    If she did it with regular visits, it's

11   likely that she did it with procedure codes when that

12   is a more -- you know, the price is more expensive,

13   and she probably jacked up the price on that, too.

14   Q.    Okay.  And in the office visits, about how

15   long was each patient visit?

16   A.    Five to ten minutes.

17   Q.    Is there any other information that you

18   want to tell us about Lakeal?

19   A.    Sometimes she would give injections.  If a

20   patient would come in and say, "Oh, I really don't

21   have to see the doctor, I just want my medicines," she

22   would give injections also and give them their

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

26

1    prescriptions.

2        Q.    Was she supposed to do that?

3        A.    Well, as far as I know, she supposedly is a

4    nurse.

5        Q.    Would other billing staff normally give a

6    patient an injection and send them away with their

7    script without confirming it with Dr. McClaren?

8        A.    No.  She was the only one who did that

9    because, again, she said she was in charge and she was

10   the manager and Dr. McClaren was okay with everything

11   that she did.

12       Q.    Did anyone question her ability to do this?

13       A.    No.  Because she always said that she was a

14   nurse.

15       Q.    Do you have anything else that you think we

16   need to know that we left out?

17       A.    No.

18            MS. ROSENTHAL:  Well, thank you again,

19   Melissa, very much for coming down and talking to us.

20            THE WITNESS:  You're welcome.

21       (Whereupon, the sworn statement was concluded at

22   3:28 p.m.)

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

27

WITNESS CERTIFICATE

1

2

3      I, MELISSA JOSEPH, have read or have had the

4  foregoing testimony read to me and hereby certify that

5  it is a true and correct transcription of my testimony

6  with the exception of any attached corrections or

7  changes.

8

9                              _____

10                             MELISSA JOSEPH

11  [ ] No corrections

12  [ ] Correction sheet(s) enclosed

13

14      SUBSCRIBED AND SWORN TO BEFORE ME, the

15  undersigned authority, by the witness, MELISSA JOSEPH,

16  on this the _____ day of _____, _____.

17

18

19                              _____

20                             NOTARY PUBLIC IN AND FOR

21                             THE STATE OF _____

22  My Commission Expires: _____

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

28

REPORTER'S CERTIFICATE

1

2

3      I, the undersigned Registered Professional

4  Reporter and Notary Public, do hereby certify that

5  MELISSA JOSEPH, after having been first duly sworn

6  by me to testify to the truth, did testify as set

7  forth in the foregoing pages, that the testimony was

8  reported by me in stenotype and transcribed under my

9  personal direction and supervision, and is a true

10  and correct transcript.

11      I further certify that I am not of

12  counsel, not related to counsel or the parties

13  hereto, and not in any way interested in the outcome

14  of this matter.

15      SUBSCRIBED AND SWORN TO under my hand and

16  seal this 26th day of July, 2007.

17

18  _____

19  JOHN L. HARMONSON, RPR

    Notary Public in and for

20  the District of Columbia

    My Commission Expires:  10/14/2010

21

22

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

29

CHANGES AND SIGNATURE

1

2    PAGE LINE                    CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   DATE                          SIGNATURE

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

30

**A**

ability 26:12
able 24:10
about 5:20 8:1
 14:5,16 15:2,13
 15:14,16,20
 19:17 20:22
 21:8,15,17,19
 22:17 23:3,17
 24:1,14,15,17
 25:14,18
according 8:15
 11:22
accurately 16:3
actually 16:4
address 6:4
adjust 10:20
administering
 2:18
after 5:4 16:10
 20:12 28:5
again 16:19 26:9
 26:18
ago 21:19 22:2
agreement 2:15
alive 20:7,11
already 13:11
 23:6
always 8:18 9:21
 11:10 22:16
 23:7 26:13
amount 14:8
anyone 5:13,16
 10:13 13:15
 15:13 17:1 22:4
 26:12
anything 5:13,20
 14:4 15:13,16
 15:19 17:2,21
 18:11 21:17,18
 22:20 26:15
Apartment 6:6
APPEARANCES
 3:1
approval 17:19
asked 5:21
asking 5:9,10

22:13
assistant 7:5 9:4
assistants 12:6
assisting 7:12
attached 27:6
authority 27:15
automatically
 10:10
aware 11:12 12:2
 12:22 18:11
 20:19
away 20:12 26:6

**B**

back 12:5 16:12
 16:13 17:5,21
backs 23:7
base 8:9
basically 7:16,20
 11:10,13 21:3
before 2:15 6:11
 21:19 22:2
 24:14 27:14
BEHALF 3:3
behind 14:1
 24:12
being 12:19 13:15
 21:8
best 15:22
bill 9:8,11,20 10:2
 10:4,7,17,18,20
 12:6,13 16:6
 17:22 22:13
billed 23:16
billing 6:19 7:5
 8:3,7,14,16,16
 8:20,21,22 9:4
 9:16,22 10:6
 11:2,4,11,13,22
 12:5 13:11,11
 13:15 14:4,8,10
 14:20,22 15:3
 16:1,16,17 17:1
 17:2,6,10,15
 18:5,8 22:14
 23:7,15 24:11
 24:15,15,17,19

24:20 26:5
bills 7:11 12:5
 14:7 17:18
 23:16
bit 20:9
briefly 6:7
bring 13:21
business 15:10

**C**

C 5:1
call 19:18,20
called 10:1
came 10:14 13:13
 16:12,13
center 6:9,12,22
 7:15 8:4 13:2,14
 15:8 18:12
 21:18 24:18,21
 25:7
certain 23:14
CERTIFICATE
 27:1 28:1
certify 27:4 28:4
 28:11
change 17:5 29:2
changed 16:19
 17:10
changes 27:7 29:1
changing 16:21
 17:3
charge 8:3,16,21
 11:11,13,22
 23:7 25:3 26:9
charged 23:12
charges 6:20 7:10
 7:16
charging 12:2
 13:18
checks 12:19
chose 7:18
circle 7:21 10:20
 11:1
circled 10:4,22
 11:6
claimed 16:17
 21:1

claims 21:11
clarify 5:22
closed 14:1 24:13
code 7:19 9:4
 10:6,7,10 11:2,5
codes 9:13 10:9
 24:15,16,20
 25:4,5,11
colleague 5:18
collect 23:13
College 6:16
Columbia 2:17
 6:5 28:20
come 10:10 17:21
 25:20
coming 14:17
 26:19
Commission
 27:22 28:20
companies 13:18
complain 23:17
complained 24:1
complaints 22:21
compulsive 22:11
computer 7:17,19
 8:1 9:1 10:6
 11:2 18:9
computers 18:6
 21:20,22 22:5
concern 13:14
concerned 14:16
concluded 26:21
confirm 22:16
confirming 26:7
continued 20:11
control 11:13
conversations
 24:6
correct 14:4,7,19
 17:2 27:5 28:10
corrected 14:7
 16:16
Correction 27:12
corrections 27:6
 27:11
counsel 28:12,12
couple 20:12 21:2

court 21:13,15

**D**

D 5:1
Data 6:18
DATE 29:22
day 19:13,14
 27:16 28:16
DEA 20:3,14
dead 20:8,10
Demerol 18:18,20
 19:1,4
dental 6:13,14,16
dictated 9:5
different 9:13
 10:8,9 16:7
direction 28:9
discovered 14:10
District 2:17
 28:20
doctor 7:20 10:3
 11:1,5,8,11,17
 12:13 14:13,15
 14:15 15:2,19
 16:4,7 17:9,13
 19:14 20:2
 22:15,17,18,20
 22:20 23:1
 25:21
doctor's 9:12
 12:20 20:3,14
doing 5:19 9:22
 11:18 20:16
 24:1
dollars 12:18
done 7:22 9:6
 13:15 15:3
 17:10
doors 14:1 24:13
down 26:19
Dr 1:4 6:9 8:12,20
 8:22 9:17 13:22
 14:3,6 16:18,20
 19:6 20:15 22:8
 23:6 24:18 25:6
 26:7,10
drugs 19:7,10,16

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

31

**duly** 5:4 28:5
**duties** 7:9
**D.C** 1:10 2:10 3:6

**E**

**E** 5:1,1
**each** 25:15
**Ellis** 7:3,7
**elsewhere** 18:22
**employment** 6:8
**enclosed** 27:12
**encourage** 22:18
**end** 11:4 12:17
 19:13
**enter** 7:17,22 9:4
 10:9 24:20 25:5
**entered** 6:20 7:10
 10:8
**entering** 8:2 25:3
**entry** 6:18
**ESQ** 3:4,4
**even** 11:5 18:5
**ever** 8:22 9:3
 10:17 13:14
 14:4 15:19 16:6
 17:15 18:2,8
 19:1,18 20:6
 21:8 22:14
**every** 9:12
**everyone** 21:20
 23:2
**everything** 8:2
 11:12 17:5 23:8
 26:10
**EXAMINATION**
 4:1,3 5:6
**examined** 5:4
**example** 10:5
 22:13
**exception** 27:6
**exchange** 5:13
**EXHIBIT** 4:7
**exhibits** 4:8
**expensive** 25:12
**experience** 12:1
**experiences** 13:12
**Expires** 27:22

28:20
**explain** 7:18
 18:14 20:9
 23:10
**express** 13:14

**F**

**fact** 15:3
**familiar** 8:14
**far** 12:1 26:3
**February** 7:1
**feel** 5:21
**few** 5:9
**filled** 20:6,12
**find** 21:10
**first** 5:4 28:5
**Five** 25:16
**fixed** 14:22
**followed** 10:1,3
**follows** 5:5
**force** 5:16
**foregoing** 27:4
 28:7
**forget** 10:1
**forgot** 10:21 11:1
 22:17
**form** 7:21 12:7
 16:8 22:14
**forms** 12:14
**forth** 28:7
**found** 12:17
**fraud** 20:20
**free** 5:11,21
**from** 8:7 12:18,18
 15:10,12 16:7
 18:12 19:10
 21:4,18 22:8
 23:10 24:3,7
**full** 6:1
**further** 28:11

**G**

**G** 5:1
**generally** 12:9
**give** 25:19,22,22
 26:5
**go** 6:7 8:1 12:5

18:8 21:13,15
 23:6
**going** 5:9 9:5
**gone** 19:14
**good** 16:1
**gotten** 21:3,16,20

**H**

**hand** 28:15
**Harmonson** 1:22
 2:16 28:19
**Hastings** 2:8 3:5
**having** 5:4 24:6
 28:5
**hear** 9:3 22:21
 24:5,10
**heard** 21:8,19
**Held** 2:7
**help** 12:16
**helped** 7:12
**her** 8:12 11:8,15
 11:20,22 12:16
 13:4 14:4,19
 15:9,14 17:2,3,6
 18:2,3 19:1,3,9
 19:16,18 20:4,8
 20:8,10 21:1,4,6
 21:8,9,13,15
 24:1 26:12
**hereto** 28:13
**herself** 19:21
 23:15
**Hi** 5:8
**hide** 22:7
**higher** 16:19
**him** 9:3,7 12:18
 12:19 17:18
**history** 6:8
**home** 15:10,12
**homeowner's**
 21:4
**honestly** 17:13
**house** 21:1,6,9
**Hyattsville** 22:3
**hysterical** 21:9

**I**

**idea** 12:12 16:14
 17:12 24:2
**identified** 4:8
**Ilupeju** 13:8
**impression** 11:17
 12:4
**incorrectly** 13:16
**INDEX** 4:1,7
**indicated** 10:18
 12:6,13 16:7
 22:14
**information**
 25:17
**injection** 26:6
**injections** 25:19
 25:22
**instruct** 9:3 10:17
 11:20
**insurance** 12:19
 13:18 20:20
 21:4 23:13
**interested** 28:13
**interrupt** 5:18
**involved** 20:20
**items** 21:2

**J**

**jacked** 25:13
**Janofsky** 2:8 3:5
**jewelry** 21:2,15
**job** 1:21 6:11,17
 7:4,9
**John** 1:22 2:15
 28:19
**JOSEPH** 1:9 2:4
 5:3 27:3,10,15
 28:5
**July** 1:11 28:16
**just** 5:9 6:7 17:5
 20:14 22:17,22
 23:9,13 24:15
 25:21
**J-o-s-e-p-h** 6:3

**K**

**K** 3:4
**Katz** 3:4 5:18

10:13 14:9,12
 14:21 15:2 17:8
**kept** 9:15
**knew** 8:7 11:17
 12:4,8 13:11
 15:2 19:6 22:17
**know** 8:1,2,11,15
 8:20 9:20 10:6
 10:10,20 12:2,9
 12:11 13:6,10
 14:2,3,15,16,19
 15:7,11 16:13
 16:22 18:5,19
 19:5,8 20:6,16
 20:22 21:6,17
 21:21 22:4 23:6
 24:8,12 25:2,5
 25:12 26:3,16
**knowledge** 15:22
 20:15
**known** 11:10 17:9
**knows** 23:6

**L**

**L** 1:22 2:15 28:19
**Lakeal** 7:3,16 8:5
 8:6,15 9:3,5,18
 9:20 10:8,15,17
 12:12 13:1
 14:18 16:12,17
 17:9,15 18:11
 20:20 21:17
 22:7 24:22
 25:18
**last** 13:6
**Lazerow** 23:22
**leave** 13:1
**left** 15:7,14,17,20
 16:1,10 26:16
**less** 14:20
**let** 11:10,21
**liar** 21:15
**lie** 21:15
**like** 6:7 22:21
 23:4
**likely** 25:11
**LINE** 29:2

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

32

**little** 20:9
**long** 25:15
**look** 18:2
**lot** 13:20
**lower** 14:8

**M**

**mad** 21:14
**mailed** 7:10
**makes** 25:9
**making** 16:18
  21:11
**Management** 6:9
  6:12,22 7:15 8:4
  13:1,13 15:8
  18:12 21:18
**manager** 26:10
**manual** 9:7,10,13
  9:15
**Maryland** 6:6
**matter** 28:14
**may** 5:18
**Maybe** 22:2
**McCLAREN** 1:4
  6:9 8:12,20,22
  9:17 13:22 14:3
  14:6 16:18,20
  19:6 20:15 22:8
  23:6 24:18 25:6
  26:7,10
**mean** 9:14 11:21
  23:10
**medication** 18:16
**medications**
  18:17 20:10
**medicines** 25:21
**Melissa** 1:9 2:4
  5:3,8 26:19 27:3
  27:10,15 28:5
**mess** 16:17
**messed** 14:10
**minutes** 25:16
**modify** 10:14
**money** 12:15
  14:16,17 16:18
  21:4 23:4,9,15
  24:2,7

**Monifa** 21:13,13
  21:14,14
**months** 20:12
**more** 12:13,15
  16:3 25:12,12
**mother** 20:8,8,10
**much** 10:7 14:19
  15:1 24:2 26:19
**M-e-l-i-s-s-a** 6:3

**N**

**N** 5:1
**name** 6:1,14 13:6
**names** 23:19
**need** 26:16
**needed** 7:11
**never** 9:2 22:19
  23:12,16
**normally** 26:5
**Notary** 2:16
  27:20 28:4,19
**number** 20:3,14
**nurse** 26:4,14
**N.W** 2:9 3:5

**O**

**O** 5:1
**oath** 2:18 5:5
**obviously** 14:17
**occasion** 21:12
**occasions** 18:15
**office** 6:13,15,17
  6:19 9:10,13,16
  15:13 17:1 18:6
  19:3,9,10 21:22
  22:3,22 23:15
  24:5,11,16,16
  25:14
**offices** 2:7
**officiated** 2:18
**Oh** 10:21 25:20
**okay** 6:14,19 7:18
  8:11 10:5,12
  11:14 19:15
  21:6 22:12
  24:14,20 25:14
  26:10

**old** 6:5 17:6
**one** 21:8,12 22:19
  25:1,2 26:8
**only** 23:21 24:22
  25:1 26:8
**onto** 18:8
**opinion** 22:7
**other** 7:6,6 9:4
  19:3,15 24:5
  25:17 26:5
**out** 5:10 7:11,13
  12:17 21:10,22
  23:5,15 26:16
**outcome** 28:13
**outraged** 13:17
**outstanding**
  23:16
**over** 12:5 18:2
**overbilling** 12:10
**oversee** 17:15
**own** 5:10 15:9
  19:18

**P**

**P** 5:1
**PAGE** 4:2 29:2
**pages** 1:21 28:7
**Pain** 6:9,12,21
  7:15 8:3 13:1,13
  15:7 18:12
  21:18
**Park** 6:16
**parties** 28:12
**passed** 20:12
**patient** 7:21
  23:14 24:9
  25:15,20 26:6
**patients** 7:12 23:3
  23:5,10,12,17
  23:17,20,21
  24:3,6,10
**Paul** 2:8 3:5
**Paula** 3:4 5:18
**pay** 23:13
**payments** 7:10
**people** 19:3 24:5
**perform** 25:6

**performed** 24:18
**performing** 16:4
**permission** 12:21
**personal** 28:9
**Phyllis** 23:22
**Pike** 6:5
**PLAINTIFF** 3:3
**PlayStation** 21:2
**please** 6:1
**point** 17:12
**possible** 15:1
**possibly** 14:19
**posted** 7:10
**prescriptions**
  19:18,20 20:7
  20:17 26:1
**presently** 15:11
**pretty** 16:1
**price** 10:14 25:12
  25:13
**prices** 10:8,10
  13:17 16:19,21
**primarily** 5:19
**probably** 14:15
  19:13 25:8,13
**procedure** 25:11
**procedures** 24:21
  25:6
**Professional** 2:16
  28:3
**promise** 5:13
**pronounce** 13:7
**provider** 11:5
**Public** 2:17 27:20
  28:4,19
**pursuant** 2:15
**put** 7:19 10:5
**p.m** 1:12 26:22

**Q**

**question** 5:20,22
  26:12
**questioning** 5:20
**questions** 5:9,19

**R**

**R** 5:1

**RE** 1:3
**read** 27:3,4
**really** 21:7 25:20
**reason** 17:8 29:2
**receive** 7:14
**receptionist** 7:12
**record** 6:2
**reflect** 16:3
**refused** 21:14
**Registered** 2:16
  28:3
**regular** 25:10
**related** 28:12
**remember** 21:12
  23:19,21
**removing** 19:10
**repairs** 15:3
**repeat** 5:21
**replaced** 13:4
  16:10
**reported** 1:22
  28:8
**Reporter** 2:16
  28:4
**REPORTER'S**
  28:1
**review** 10:19
**right** 11:16 14:10
  15:4
**robbed** 21:1,7,9
**room** 24:9
**Rosenthal** 3:4 4:3
  5:7,8 10:16 15:6
  17:14 26:18
**RPR** 1:22 28:19
**run** 17:18

**S**

**S** 5:1
**saw** 16:15
**saying** 24:10
**says** 21:20
**script** 26:7
**seal** 28:16
**secretive** 22:10
**see** 7:21 8:22
  14:17 19:1,3,9

SWORN STATEMENT OF MELISSA JOSEPH
CONDUCTED ON THURSDAY, JULY 26, 2007

33

19:16 25:21
seemed 16:2
sell 18:21
send 26:6
sent 12:19
set 28:6
several 18:15
  23:17
shape 16:1
sheet 10:1
sheet(s) 27:12
shoulder 18:2
showed 7:16 8:1
sign 17:21
SIGNATURE
  29:1,22
Silver 6:6
situation 20:19
six 22:2
some 21:2,19
someone 20:7
something 10:18
  10:20,22 16:7
sometimes 10:19
  23:4,14 25:19
sorry 6:5 14:9
sort 20:16
specifically 8:19
spell 6:1
Spring 6:6
staff 22:22 26:5
Stafford 23:22
start 5:10 6:21
started 6:11 7:15
  8:11 14:8,20
  15:9
STATE 27:21
statement 1:8 2:3
  26:21
steal 14:18 19:16
  22:4
stealing 18:11
  19:7 21:18
stenotype 28:8
Stephanie 3:4 5:8
stole 18:15,15,20
stolen 12:18 21:3

21:16,20,21
stop 5:21
Street 2:9 3:5
stuff 20:16
submit 11:2
SUBSCRIBED
  27:14 28:15
super 10:2,4,18
  10:19
supervised 9:18
supervision 28:9
supervisor 7:2
supervisors 7:6
suppose 14:14,18
  18:21
supposed 26:2
supposedly 21:16
  26:3
sure 11:21 14:12
surgery 24:17,18
  24:21 25:4,7
sworn 1:8 2:3 5:4
  26:21 27:14
  28:5,15
system 10:6 15:4
  17:11

T
take 18:17 19:1,3
  19:12 23:14
  24:3,7
Taken 2:15
taking 20:11
talk 14:1,14 23:1
talked 14:13
talking 24:14,15
  24:17 26:19
tell 14:19 16:6,20
  20:4 22:14,15
  23:5 25:18
telling 9:7,10
ten 25:16
testify 5:5 21:13
  28:6,6
testimony 5:14
  27:4,5 28:7
thank 26:18

their 25:22 26:6
Theresa 23:22
things 12:6 17:10
  21:5 22:8,12,13
think 12:8,22
  15:9,12 17:8
  18:18 19:6 20:5
  25:9 26:15
thinking 17:13
though 11:5
thousands 12:18
through 1:21 6:7
Thursday 1:11
time 7:11
title 6:17 7:4
today 5:14
told 10:22 11:8
  14:3 22:22
trained 8:6,12
  13:10
training 7:14
transcribed 28:8
transcript 28:10
transcription
  27:5
tried 23:4
true 27:5 28:9
truth 28:6
try 22:7 23:9,15
  24:7
trying 5:22 21:3
two 23:21
type 7:14

U
under 5:5 28:8,15
undersigned
  27:15 28:3
understand 6:8
understanding
  8:7,9
use 8:22 20:3
used 7:17
using 20:14

V
Veronica 13:5,10

14:9 15:7 16:1,6
  16:10,11 17:10
Veronica's 13:6
very 26:19
visit 25:15
visits 24:16 25:10
  25:14

W
waiting 24:9,9
Walker 2:8 3:5
want 12:12 25:2
  25:18,21
wanted 21:12
  22:19 25:3
Washington 1:10
  2:10 3:6
wasn't 16:18 20:7
  21:7
way 10:13 17:6
  28:13
welcome 26:20
Well 12:17 14:14
  23:5 26:3,18
went 14:22
were 7:9 13:17
  14:7 18:6 24:14
  24:15,17
while 20:11
witness 2:18
  10:15 14:11,14
  15:1,5 17:12
  26:20 27:1,15
word 21:21
work 18:3
worked 6:8,13
  8:2
works 15:11
wouldn't 21:15

X
Xanax 19:22

Y
Yeah 10:3
years 8:8 9:22
  21:19 22:2

1
1 1:21
1-108505 1:21
10/14/2010 28:20
11700 6:5
15th 2:9 3:5

2
20005 2:10 3:6
2003 7:1
2005 13:3
2007 1:11 28:16
202)551-1700
  2:11 3:6
20904 6:6
2114 6:5,6
26 1:11
26th 28:16
29 1:21

3
3:05 1:12
3:28 26:22

5
5 4:3

8
875 2:9 3:5

# EXHIBIT 16

## Capital Reporting Company

Page 1

1

2

3                                                    ORIGINAL

4                      SWORN  STATEMENT

5                              OF

6                    NEKI  DAMANSHU

7

8        Conducted by Stephanie K. Rosenthal

9

10              Tuesday, February 27, 2007

11                      3:45 p.m.

12

13        Paul, Hastings, Janofsky & Walker, LLP

14              875 15th Street, NW

15              Washington, DC 20005

16                  (202)551-1719

17

18

19

20

21

22

## Capital Reporting Company

Page 2

1                    P R O C E E D I N G S

2          Q    Neki, can you, please, state your full name

3    and address?

4          A    Neki Damanshu. 6237 Fernwood Terrace,

5    Apartment 202, Riverdale, Maryland, zipcode 20737.

6          Q    And what is your date of birth?

7          A    7.9.1984.

8          Q    OK. Ah-- Neki, are you here on your own free

9    will?

10         A    Yes.

11         Q    Did anyone promise you anything in exchange

12   for being here?

13         A    No.

14         Q    Did anyone threaten you if you refused to come

15   here?

16         A    No.

17         Q    Where are you currently employed?

18         A    Pay Management Center.

19         Q    OK. And how long have you been at the Pay

20   Management Center?

21         A    Ah-- about four to five years.

22         Q    OK. What's your job title?

**Capital Reporting Company**

Page 3

1      A    Medical receptionist.

2      Q    And have you had that position since you

3    started?

4      A    Yes, it's um expanded to some more duties, but

5    yes.

6      Q    And what do you-- what are you responsible for

7    in the office?

8      A    The front office, the front desk, just making

9    sure everything is ran correctly, when seeing patients,

10   and when not seeing patients, as well as a-- files.

11     Q    OK. And can you briefly describe your

12   employment history before you began working at Pay

13   Management Center?

14     A    I graduated from high school and was in

15   college. So-- I mean, I had, like, seasonal jobs,

16   nothing major.

17     Q    OK. What other employees do you work with at

18   the Pay Management Center?

19     A    Right now? Monifa, Demetria and we just hired

20   a new person, Tracy.

21     Q    And-- who are-- when you first started at the

22   Pay Management Center-- who was responsible for billing?

## Capital Reporting Company

Page 4

1       A    Ahm-- Lakeal.

2       Q    And what's Lakeal's last name?

3       A    Ellis.

4       Q    And-- ah-- is she currently still responsible

5    for billing?

6       A    No.

7       Q    Who is currently doing the billing?

8       A    We have an outside billing company right now.

9       Q    OK. Ah-- are patients required to sign a

10   Narcotics Administration Contract when they start with

11   Dr. McLaren?

12      A    Yes.

13      Q    And what briefly does the contract say?

14      A    Um-- that you are to see, like, no other

15   doctors, but Dr. McLaren to get narcotics; no exchange

16   of narcotics with other patients or discussing your

17   medicine with other patients: you are to go to only one

18   pharmacy. We don't cover lost or stolen prescription.

19   It's a-- couple other things. I'm not quite sure.

20      Q    Um-- what-- how well did you know Lakeal

21   Ellis?

22      A    I didn't know her prior to working in the

## Capital Reporting Company

Page 5

1    office.

2         Q    OK. And once you started working with her,

3    what was your general impression of her?

4         A    Um-- just trying to help people, 'cause she

5    hired me.

6         Q    OK.

7         A    So-- just trying to help people out.

8         Q    What's your impression of her honesty?

9         A    Um-- She can't be honest.

10        Q    OK. Can you give me a specific example of

11   something she's done that led you to believe that she

12   was dishonest?

13        A    Um-- She stole money from the Doctor. Just her

14   whole personality demeanor of knowing her over the past

15   year.

16        Q    Mmmhmmm.

17        A    Just not an honest person.

18        Q    Um-- Have you spoken to Lakeal since she

19   stopped working at the Pay Management Center?

20        A    No, only in office.

21        Q    What was her um-- the title of her position

22   when she worked with Dr. McLaren?

**Capital Reporting Company**

Page 6

1        A    She was the-- I thought she was the manager,

2    the doctor, but she was the billing and office manager

3    at first.

4        Q    Did-- how did she act around the office?

5        A    She ran the office, like, anything was through

6    Lakeal and everything was through Lakeal.

7        Q    Ah-- are you aware of any issues regarding

8    Lakeal billing too much for certain procedures or

9    offices at--

10       A    Um--

11       Q    -- insurance?

12       A    Not hands on, but just hearsay around the

13   office that that's what was going on.

14       Q    Are you aware of Lakeal taking cash directly

15   from any of Dr. McLaren's patients?

16       A    Ahm-- yes. We recieve co-pays in the office as

17   well as self-pays which patients are cash paying

18   patients whatever they have to pay for the office visit.

19       Q    Hm.

20       A    And she used to collect the money until Dr.

21   McLaren asked me to collect the money.

22       Q    And when she collected the money what did she

## Capital Reporting Company

Page 7

1  do with it?

2       A   I have no idea.

3       Q   Did she record it in anything--

4       A   No, It wasn't recorded. Um--

5       Q   Did she give it to the Doctor?

6       A   I don't know. Um-- not sure, but I know he did

7  ask me to start collecting it and to record it, so I

8  don't know if it was based on suspicion or--

9       Q   Do you think that she took that money for her

10 personal use?

11      A   Probably sometimes.

12      Q   Did she have expensive clothes and jewelry?

13      A   Mmmhmm. Jewelry most though. I don't know

14 about her clothes.--jewelry--

15      Q   Like what?

16      A   Um-- she wore Tiffany's all the time, went to

17 Tiffany's all the time.

18      Q   Did she have expensive houses or cars?

19      A   Mmhmm. She had two houses and two cars.

20      Q   And-- did she generally seem like she was

21 living a high life style?

22      A   Definitely.

Page 8

1    Q    Did anyone who you worked with in the front

2    desk tried to stop Lakeal from taking cash with her?

3    A    No, because like I said, she ran the office,

4    it was like whatever she fared or whatever she did, we

5    just thought it was OK. You know, that's what her

6    authority was.

7    Q    OK. To your knowledge, did Dr. McLaren ask her

8    to take money from the patients?

9    A    No, not to my knowledge.

10    Q    Do you know if Lakeal ever did anything at the

11    Pay Management Center to interfere with um-- a federal

12    investigation of the office?

13    A    Not factually, but when the FBI came to the

14    office for the first time when she was employed there --

15    you know, everyone knew, like, when we got there, you

16    know, she came and told us, well, they're in the office,

17    but you know I tried to take as much stuff as I could or

18    whatever and just everyone knew and it was the talk

19    around the office that she had went to the office I

20    guess early that morning, maybe, like, four or five

21    o'clock that morning and went to the office and took

22    stuff from the office.

## Capital Reporting Company

Page 9

1     Q    And did she do this alone?

2     A    I'm not sure. Like I said, again, from talk

3  around the office, no. But I don't know.

4     Q    Do you know who people said helped her do

5  that?

6     A    Her sister, who was working in the office with

7  her, Keisha.

8     Q    OK. When eventually you told the doctor that

9  Lakeal was taking money from patients, how did he react?

10    A    Um-- I didn't tell him until after, like,

11 everything came out about her taking the money, I just

12 saw him, like, 'Oh, you know, well that explains why

13 this happened or when that happened.' Cause some

14 patients I actually thought were cash paying patients

15 which I see had insurance when I found out after she

16 left, you know, I found out that because I went for them

17 to collect payment then, they told me they weren't

18 supposed to be paying.

19    Q    And those patients just have given cash to

20 Lakeal?

21    A    Right.

22    Q    And why would they give her cash?

## Capital Reporting Company

Page 10

1      A    They said, she would ask for it. They had to,

2  like, go in her office and see her before they saw the

3  doctor.

4      Q    And what was her explanation for taking cash

5  from them?

6      A    Oh, I've never asked.

7      Q    So when you brought this up to the Doctor,

8  what was his reaction?

9      A    Um -- he really didn't say anything. Just,

10  like, really?

11      Q    Was he sort of in disbelief that this

12  happened?

13      A    Ah-- I don't know.

14      Q    Do you think he was just generally naive about

15  what was going on in the office?

16      A    Very.

17      Q    Who technically-- who was supposed to have

18  access to the prescription pads in the office?

19      A    Um-- just the office manager which was Lakeal

20  and, I guess, Dr. McLaren.

21      Q    OK. And do you know whether Lakeal ever wrote

22  prescriptions without running them past the Doc, the

**Capital Reporting Company**

Page 11

1    Doctor?

2        A    Um--- I'm sure it happened, I just can't say,

3    like when and where or, you know. We're just almost

4    positive that it happened.

5        Q    And-- do you know if she saw patients who

6    never saw the Doctor and would write prescriptions for

7    those patients?

8        A    Like I said, I think so. It was just so long

9    ago I can't remember specifically.

10       Q    OK. Do you know whether she ever signed the

11   Doctor's name, Dr. McLaren's name on prescription pads?

12       A    Um--- think so.

13       Q    Do you recall any time when Lakeal took

14   property from the Pay Management Center?

15       A    Um-- probably about a week after she was

16   fired. She came back into the office and was taking

17   stuff, like stuff off the computer, general office

18   supplies and-- maybe files, I'm not quite sure,  it was

19   like a box of stuff. And she was just around the office,

20   you know, just taking whatever she wanted.

21       Q    And at any other point did you see Lakeal take

22   anything else from the office?

**Capital Reporting Company**

Page 12

```
1        A    No, not since that day.

2        Q    Did you ever see anything in her house from

3    the office?

4        A    Um-- prescriptions, samples and, like,

5    injection medicine and, like, syringes and needles and

6    stuff.

7        Q    Was this-- were these items that she was

8    supposed to have in her house?

9        A    I guess not, technically.

10       Q    Can you think of any other examples of - I

11   know, it was a long time ago-of behavior of Lakeal's

12   that was dishonest or inappropriate?

13       A    Hmm-- You mean, like, in the office?

14       Q    In the office or out of the office, in her

15   personal life.

16       A    Hmm-- I know that when I first started working

17   there, I didn't have a car so I used to ride with her

18   and we would just stop at the bank a lot and she would

19   make a deposit of checks from the, like, office checks.

20   But at the time I thought it was OK and normal.

21       Q    And later you found out that it wasn't?

22       A    Well, when it came out that she had done all
```

**Capital Reporting Company**

Page 13

1    the money I kinda, like, put two and two together that-

2    -

3        Q    That she was depositing the office checks in

4    her own personal account?

5        A    Right.

6        Q    Any other examples of behavior?

7        A    No, not that I can think of. No.

8        Q    OK. Do you recall whether Lakeal ever got in

9    trouble for-- with a jewelry store?

10       A    Yeah. I heard of-- something about insurance

11   fraud or something that she had --something with a

12   jewelry store and insurance company she got caught for

13   and had to go to court for.

14       Q    Mmmhmmm.

15       A    I heard of that.

16       Q    Do you think that Lakeal knew when-- that when

17   she was overbilling she knew what she was doing or do

18   you think she just didn't understand the billing system?

19       A    I think she was very smart.

20       Q    So do you think she purposely was trying to

21   get extra money from the insurance company?

22       A    Um-- I can say 'purposely', but I know that--

**Capital Reporting Company**

Page 14

1    or I would think that she knew what she was doing in

2    order to do what she did. I'd think that she knew-- had

3    to know what she was doing.

4         Q    OK. Is there anything else that you wanna tell

5    us about Lakeal-- about her behavior, about her actions

6    in the office?

7         A    Um-- No, I mean, I think we covered-- or you

8    asked me everything that I can answer just about her as

9    a person and how she ran the office.

10        Q    Um-- And so, just finally, do you think that,

11   on whole, Lakeal is able to be an honest person?

12        A    Do I think that she is? No.

13        Q    OK. Thank you very much, Neki.

14        A    Mmmhmmm.

15        Q    That's all.

16        (Whereupon, at 4:02 p.m., the sworn statement of

17        NEKI DAMANSHU was concluded.)

18

19

20

21

22

**Capital Reporting Company**

Page 15

1          CERTIFICATE OF COURT REPORTER

2      I, NATASHA KORNILOVA, the officer before whom the

3   foregoing deposition was taken, do hereby certify

4   that the witness whose testimony appears in the

5   foregoing deposition was duly sworn; that the

6   testimony of said witness was taken by me in

7   stenotypy and thereafter reduced to typewriting by

8   me; that said deposition is a true record of the

9   testimony given by said witness; that I am neither

10  counsel for, related to, nor employed by any of the

11  parties to the action in which this deposition was

12  taken; and, further, that I am not a relative or

13  employee of any counsel or attorney employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17

18                    *Natasha Kornilova*

19              NATASHA KORNILOVA

20              NOTARY/COURT REPORTER

21

22

**Capital Reporting Company**

Page 16

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3

4    I, NEKI DAMANSHU, do hereby acknowledge I

5    have read and examined the foregoing pages of

6    testimony, and the same is a true, correct and

7    complete transcription of the testimony given by me,

8    and any changes or corrections, if any, appear

9    in the attached errata sheet signed by me.

10

11

12

13

14

15

16

17

18    _____        _____

19        Date                              NEKI DAMANSHU

20

21

22

## Capital Reporting Company

Page 17

1    Stephanie K. Rosenthal, Esquire

2    Paul, Hastings, Janofsky & Walker, LLP

3    875 15th Street, NW

4    Washington, DC 20005

5

6    IN RE:  Sworn Statement of Neki Damanshu

7

8    Dear Ms. Rosenthal:

9         Enclosed please find your copy of the

10   deposition of NEKI DAMANSHU, along with the

11   original signature page.  As agreed, you will

12   be responsible for contacting the witness

13   regarding signature.

14        If you have any questions, please do not

15   hesitate to call.   Thank you.

16

17   Yours,

18

19

20   Natasha Kornilova

21   Reporter/Notary

22

**Capital Reporting Company**

Page 18

1   Capital Reporting Company

2   1821 Jefferson Place, Northwest

3   Third Floor

4   Washington, D.C. 20036

5   (202) 857-DEPO

6           E R R A T A   S H E E T

7   IN RE:  Sworn Statement of Neki Damanshu

8   Witness Name:  NEKI DAMANSHU

9   Deposition Date:  Tuesday, February 27, 2007

10  Page No.   Line No.        Change

11

12

13

14

15

16

17

18

19

20

21  _____        _____

22  Signature                        Date

**Capital Reporting Company**

**A**

able 14:11
access 10:18
account 13:4
acknowledge 16:4
act 6:4
action 15:11,15
actions 14:5
address 2:3
Administration 4:10
ago 11:9
ago-of 12:11
agreed 17:11
ah 2:8,21 4:4,9 6:7
  10:13
Ahm 4:1 6:16
answer 14:8
Apartment 2:5
appear 16:8
appears 15:4
asked 6:21 10:6 14:8
attached 16:9
attorney 15:13
authority 8:6
aware 6:7,14

**B**

back 11:16
bank 12:18
based 7:8
began 3:12
behavior 12:11 13:6
  14:5
believe 5:11
billing 3:22 4:5,7,8 6:2
  6:8 13:18
birth 2:6
box 11:19
briefly 3:11 4:13
brought 10:7

**C**

C 2:1 16:1
call 17:15
Capital 18:1
car 12:17
cars 7:18,19
cash 6:14,17 8:2 9:14
  9:19,22 10:4
caught 13:12

cause 5:4 9:13
Center 2:18,20 3:13,18
  3:22 5:19 8:11 11:14
certain 6:8
CERTIFICATE 15:1
certify 15:3
Change 18:10
changes 16:8
checks 12:19,19 13:3
clothes 7:12,14
collect 6:20,21 9:17
collected 6:22
collecting 7:7
college 3:15
come 2:14
company 4:8 13:12,21
  18:1
complete 16:7
computer 11:17
concluded 14:17
Conducted 1:8
contacting 17:12
contract 4:10,13
copy 17:9
correct 16:6
corrections 16:8
correctly 3:9
counsel 15:10,13
couple 4:19
court 13:13 15:1
cover 4:18
covered 14:7
co-pays 6:16
currently 2:17 4:4,7

**D**

D 2:1 16:1,1
Damanshu 1:6 2:4
  14:17 16:4,19 17:6
  17:10 18:7,8
date 2:6 16:19 18:9,22
day 12:1
DC 1:15 17:4
Dear 17:8
Definitely 7:22
demeanor 5:14
Demetria 3:19
deposit 12:19
depositing 13:3
deposition 15:3,5,8,11

17:10 18:9
describe 3:11
desk 3:8 8:2
directly 6:14
disbelief 10:11
discussing 4:16
dishonest 5:12 12:12
Doc 10:22
doctor 5:13 6:2 7:5 9:8
  10:3,7 11:1,6
doctors 4:15
Doctor's 11:11
doing 4:7 13:17 14:1,3
Dr 4:11,15 5:22 6:15
  6:20 8:7 10:20 11:11
duly 15:5
duties 3:4
D.C 18:4

**E**

E 2:1,1 16:1,1,1,1,1
  18:6,6,6
early 8:20
Ellis 4:3,21
employed 2:17 8:14
  15:10,13
employee 15:13
employees 3:17
employment 3:12
Enclosed 17:9
errata 16:9
Esquire 17:1
eventually 9:8
examined 16:5
example 5:10
examples 12:10 13:6
exchange 2:11 4:15
expanded 3:4
expensive 7:12,18
explains 9:12
explanation 10:4
extra 13:21

**F**

F 16:1
factually 8:13
fared 8:4
FBI 8:13
February 1:10 18:9
federal 8:11

Fernwood 2:4
files 3:10 11:18
finally 14:10
financially 15:14
find 17:9
fired 11:16
first 3:21 6:3 8:14
  12:16
five 2:21 8:20
Floor 18:3
foregoing 15:3,5 16:5
found 9:15,16 12:21
four 2:21 8:20
fraud 13:11
free 2:8
front 3:8,8 8:1
full 2:2
further 15:12

**G**

G 2:1 16:1
general 5:3 11:17
generally 7:20 10:14
give 5:10 7:5 9:22
given 9:19 15:9 16:7
go 4:17 10:2 13:13
going 6:13 10:15
graduated 3:14
guess 8:20 10:20 12:9

**H**

H 18:6
hands 6:12
happened 9:13,13
  10:12 11:2,4
Hastings 1:13 17:2
heard 13:10,15
hearsay 6:12
help 5:4,7
helped 9:4
hereto 15:14
hesitate 17:15
high 3:14 7:21
hired 3:19 5:5
history 3:12
Hm 6:19
Hmm 12:13,16
honest 5:9,17 14:11
honesty 5:8
house 12:2,8

## Capital Reporting Company

houses 7:18,19

**I**

idea 7:2
impression 5:3,8
inappropriate 12:12
injection 12:5
insurance 6:11 9:15
13:10,12,21
interested 15:15
interfere 8:11
investigation 8:12
issues 6:7
items 12:7

**J**

Janofsky 1:13 17:2
Jefferson 18:2
jewelry 7:12,13,14
13:9,12
job 2:22
jobs 3:15

**K**

K 1:8 16:1 17:1
Keisha 9:7
kinda 13:1
knew 8:15,18 13:16,17
14:1,2
know 4:20,22 7:6,6,8
7:13 8:5,10,15,16,17
9:3,4,12,16 10:13,21
11:3,5,10,20 12:11,16
13:22 14:3
knowing 5:14
knowledge 8:7,9
Kornilova 15:2,19
17:20

**L**

L 16:1
Lakeal 4:1,20 5:18 6:6
6:6,8,14 8:2,10 9:9
9:20 10:19,21 11:13
11:21 13:8,16 14:5
14:11
Lakeal's 4:2 12:11
led 5:11
left 9:16
life 7:21 12:15
Line 18:10

living 7:21
LLP 1:13 17:2
long 2:19 11:8 12:11
lost 4:18
lot 12:18

**M**

M 16:1
major 3:16
making 3:8
Management 2:18,20
3:13,18,22 5:19 8:11
11:14
manager 6:1,2 10:19
Maryland 2:5
McLaren 4:11,15 5:22
6:21 8:7 10:20
McLaren's 6:15 11:11
mean 3:15 12:13 14:7
Medical 3:1
medicine 4:17 12:5
Mmhmm 7:19
Mmmhmm 7:13
Mmmhmmm 5:16
13:14 14:14
money 5:13 6:20,21,22
7:9 8:8 9:9,11 13:1
13:21
Monifa 3:19
morning 8:20,21

**N**

N 2:1 16:1,1,1
naive 10:14
name 2:2 4:2 11:11,11
18:8
narcotics 4:10,15,16
Natasha 15:2,19 17:20
needles 12:5
neither 15:9
Neki 1:6 2:2,4,8 14:13
14:17 16:4,19 17:6
17:10 18:7,8
never 10:6 11:6
new 3:20
normal 12:20
Northwest 18:2
NOTARY/COURT
15:20
NW 1:14 17:3

**O**

O 2:1 16:1,1,1
office 3:7,8 5:1,20 6:2,4
6:5,13,16,18 8:3,12
8:14,16,19,19,21,22
9:3,6 10:2,15,18,19
11:16,17,19,22 12:3
12:13,14,14,19 13:3
14:6,9
officer 15:2
offices 6:9
Oh 9:12 10:6
OK 2:8,19,22 3:11,17
4:9 5:2,6,10 8:5,7 9:8
10:21 11:10 12:20
13:8 14:4,13
once 5:2
order 14:2
original 17:11
outcome 15:15
outside 4:8
overbilling 13:17
o'clock 8:21

**P**

P 2:1 16:1
pads 10:18 11:11
page 17:11 18:10
pages 16:5
parties 15:11,14
patients 3:9,10 4:9,16
4:17 6:15,17,18 8:8
9:9,14,14,19 11:5,7
Paul 1:13 17:2
pay 2:18,19 3:12,18,22
5:19 6:18 8:11 11:14
paying 6:17 9:14,18
payment 9:17
people 5:4,7 9:4
person 3:20 5:17 14:9
14:11
personal 7:10 12:15
13:4
personality 5:14
pharmacy 4:18
Place 18:2
please 2:2 17:9,14
point 11:21
position 3:2 5:21
positive 11:4

prescription 4:18
10:18 11:11
prescriptions 10:22
11:6 12:4
prior 4:22
probably 7:11 11:15
procedures 6:8
promise 2:11
property 11:14
purposely 13:20,22
put 13:1
p.m 1:11 14:16

**Q**

questions 17:14
quite 4:19 11:18

**R**

R 2:1 18:6,6
ran 3:9 6:5 8:3 14:9
react 9:9
reaction 10:8
read 16:5
really 10:9,10
recall 11:13 13:8
receptionist 3:1
recieve 6:16
record 7:3,7 15:8
recorded 7:4
reduced 15:7
refused 2:14
regarding 6:7 17:13
related 15:10
relative 15:12
remember 11:9
REPORTER 15:1,20
Reporter/Notary 17:21
Reporting 18:1
required 4:9
responsible 3:6,22 4:4
17:12
ride 12:17
right 3:19 4:8 9:21
13:5
Riverdale 2:5
Rosenthal 1:8 17:1,8
running 10:22

**S**

S 2:1 18:6
samples 12:4

**Capital Reporting Company**

saw 9:12 10:2 11:5,6
school 3:14
seasonal 3:15
see 4:14 9:15 10:2
    11:21 12:2
seeing 3:9,10
self-pays 6:17
sheet 16:9
sign 4:9
signature 17:11,13
    18:22
signed 11:10 16:9
sister 9:6
smart 13:19
sort 10:11
specific 5:10
specifically 11:9
spoken 5:18
start 4:10 7:7
started 3:3,21 5:2
    12:16
state 2:2
statement 1:4 14:16
    17:6 18:7
stenotypy 15:7
Stephanie 1:8 17:1
stole 5:13
stolen 4:18
stop 8:2 12:18
stopped 5:19
store 13:9,12
Street 1:14 17:3
stuff 8:17,22 11:17,17
    11:19 12:6
style 7:21
supplies 11:18
supposed 9:18 10:17
    12:8
sure 3:9 4:19 7:6 9:2
    11:2,18
suspicion 7:8
sworn 1:4 14:16 15:5
    17:6 18:7
syringes 12:5
system 13:18

          **T**
T 16:1,1 18:6,6
take 8:8,17 11:21
taken 15:3,6,12

talk 8:18 9:2
technically 10:17 12:9
tell 9:10 14:4
Terrace 2:4
testimony 15:4,6,9
    16:6,7
Thank 14:13 17:15
things 4:19
think 7:9 10:14 11:8,12
    12:10 13:7,16,18,19
    13:20 14:1,2,7,10,12
Third 18:3
thought 6:1 8:5 9:14
    12:20
threaten 2:14
Tiffany's 7:16,17
time 7:16,17 8:14
    11:13 12:11,20
title 2:22 5:21
told 8:16 9:8,17
Tracy 3:20
transcription 16:7
tried 8:2,17
trouble 13:9
true 15:8 16:6
trying 5:4,7 13:20
Tuesday 1:10 18:9
two 7:19,19 13:1,1
typewriting 15:7

          **U**
um 3:4 4:14,20 5:4,9
    5:13,18,21 6:10 7:4,6
    7:16 8:11 9:10 10:9
    10:19 11:2,12,15
    12:4 13:22 14:7,10
understand 13:18
use 7:10

          **V**
visit 6:18

          **W**
W 16:1
Walker 1:13 17:2
wanna 14:4
wanted 11:20
Washington 1:15 17:4
    18:4
wasn't 7:4 12:21
week 11:15

went 7:16 8:19,21 9:16
weren't 9:17
We're 11:3
witness 15:4,6,9 17:12
    18:8
wore 7:16
work 3:17
worked 5:22 8:1
working 3:12 4:22 5:2
    5:19 9:6 12:16
write 11:6
wrote 10:21

          **Y**
Yeah 13:10
year 5:15
years 2:21

          **Z**
zipcode 2:5

          **1**
15th 1:14 17:3
1821 18:2

          **2**
20005 1:15 17:4
20036 18:4
2007 1:10 18:9
202 2:5 18:5
202)551-1719 1:16
20737 2:5
27 1:10 18:9

          **3**
3:45 1:11

          **4**
4:02 14:16

          **6**
6237 2:4

          **7**
7.9.1984 2:7

          **8**
857-DEPO 18:5
875 1:14 17:3