IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 08-16-01 (CKK) |
| MARTIN R. MCLAREN | : | |

GOVERNMENT'S REPLY
MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully presents this reply memorandum in aid of sentencing.

SUMMARY

Defendant McLaren did not, as he contends, foolishly permit himself to be manipulated into making a mistake in judgment. The evidence shows that the defendant was the leader in a criminal scheme to submit hundreds of false claims that caused health care benefit programs to lose $1.75 million. A sentence within the guideline range of 37 to 46 months is appropriate punishment and is consistent with the sentences given similar offenders. The defendant's contributions to society, especially in light of his advantages and the severity of his crime, do not mitigate the need for a sentence of incarceration within the guideline range.

ARGUMENT

I.  The defendant was the leader of the scheme.

A.  The defendant made decisions and controlled others.

The defendant, a mature, multi-millionaire, medical doctor who was awarded scholarships and was educated at some of the best schools and programs in Grenada, Jamaica, the Bahamas, and the United States, contends that he was fooled into playing a limited role in a false

billing scheme by Lakeal Ellis, a much younger, debt-ridden, high school graduate with a nursing degree. In support of his claim, the defendant relies upon statements of employees of the Pain Management Center which describe Ellis as a domineering and manipulative officer manager. The government does not dispute this description of Ellis, who will come before this Court to be sentenced for her participation in the false billing scheme. When read in their entirety, however, the employee statements provide a fuller description of the defendant's activity in the office than the defendant's memorandum presents.

    The defendant hired Ms. Ilupeju to replace Ellis when the defendant fired Ellis in July 2004. (Def. Ex. 1 at 1.) Ellis trained Ms. Ilupeju on the basics of the job, and Ellis continued to assist with billing and computer issues occasionally during 2004 and 2005. (Id. at 2.) Shortly after arriving at the office in 2004, Ms. Ilupeju realized that Aetna insurance company was sending letters requesting repayment of funds due to billing errors in CPT code 64483 (id. at 5), the same code the defendant admitted billing falsely in his Statement of Offense. The defendant refused to respond to the letters from Aetna. After working in the office for about a year, Ms. Ilupeju felt comfortable enough in her position to address the merits of these multiple letters. Despite her lack of expertise, Ms. Ilupeju realized that Aetna's requests were valid. When she brought the matter to the defendant's attention, the defendant was reluctant to make the change. (Id.) Eventually, he agreed with Ms. Ilupeju so the defendant instructed Ellis to use a different code going forward from July or August 2005. (Id.) This incident reveals that the defendant made billing decisions and that he could instruct Ellis to make changes that he wanted made.[1]

---

[1] Although this part of Ms. Ilupeju's statement does not explain why Ellis was instructed to make the change, Ms.Ilupeju's statement elsewhere refers to the assistance Ellis provided on computer issues even after she had been fired. (Id. at 2.)

Ms. Ilupeju also relates that, after correcting that code in July or August 2005, she determined the defendant also was billing incorrectly CPT code 64479. This was another code which the defendant admitted billing falsely in his Statement of Offense; therefore, he was aware that the claims made under this CPT code were fraudulent. Nonetheless, when Ms. Ilupeju brought this matter to the defendant's attention, the defendant told her not to change anything else. (Id.) Ms. Ilupeju also was confronted about making changes to the billing by Ellis, who claimed an interest in how the office was run because she was a partner with the defendant. (Id.) Because Ms. Ilupeju determined that the claims were so obviously wrong, she ignored the defendant and Ellis and stopped billing the code incorrectly. (Id.) This incident with Ms. Ilupeju proves that the defendant was not merely mislead by Ellis when she processed the billing, as he would like to pretend. With Ellis no longer submitting claims, the defendant could have stopped the false billing merely by agreeing with Ms. Ilupeju and by circling the correct CPT code on superbills. Instead, he intentionally continued to circle a false code. This incident also demonstrates that the defendant was not eager to correct erroneous billing as soon as he learned of it, as he suggested in his sentencing memorandum. (Def. Memo at 6.) Rather, the Aetna incident demonstrates that the defendant actively refused to heed the warning he had been given by the insurance company as well as by Ms. Ilupeju. On his own initiative, the defendant continued to circle false CPT codes even when Ellis was no longer the biller.

      Witness CS-3-82 gives an even fuller account of the manner in which the defendant headed the Pain Management Center. Although the witness described Ellis as manipulative and controlling (Def. Ex. 3 at 1), the witness also confirmed that the defendant did not want Ms. Ilupeju to correct the false billing because it meant less money for him, (id.). The witness said

that the defendant worked about five hours a day when he came to the Pain Management Center. During that time he saw about 60 patients per day for visits routinely lasting less than five minutes each. (Id. at 2.) During these quick visits the defendant did not take vital signs from his patients. Instead, the vital signs entered in the charts were the same for every patient. (Id.) The defendant knew that some patients were selling pain medication on the street, yet he continued to supply the patients with all the prescriptions they wanted. (Id.) The defendant ignored warnings from pharmacists who called about excessive prescriptions. (Id. at 3.) The defendant not only reprimanded the staff for trying to limit the number of prescriptions, but he also routinely overruled attempts to stop patient abuse of medication. (Id.) Far from being a dedicated professional oblivious to practicalities, the defendant was well informed about the details of what was happening at his practice. He not only felt free to contradict the staff to ensure things happened the way he wanted, but he did so routinely. Ellis may have managed the office, but the defendant ran the business.

    The defendant points out that Erin Johnson said Ellis tried to make her pay for appointments with the defendant.[2] (Def. Ex. 2 at 3.) However, Johnson did not let Ellis prevent her from making appointments with the defendant. Johnson explained that she simply went around Ellis directly to the defendant. (Id. at 3-4.) The defendant would see Johnson for five to ten minutes per appointment. (Id. 7.) Johnson considered herself to have a social relationship with the defendant. (Id. at 4.) Most of the time she would receive prescriptions from him in his office, but she also received prescriptions from the defendant at a gas station while he was on his

---

[2] Johnson was a patient prior to becoming a part-time employee. (Def. Ex. 2 at 9.)

way to play golf or on the golf course.[3] (Id. at 8.) This further demonstrates that the defendant did not subject himself to the way Ellis wanted to run the office.

B. The defendant controlled the money.

The defendant's control over the overwhelming majority of the fraud proceeds is compelling proof that he is the leader of the billing scheme. The defendant does not dispute that he received this money, nor can he do so. He does, however, repeatedly contend that Ellis stole money from his practice and then tried to cover it up with the false billing scheme. (Def. Memo at 3-5.) Although his memorandum does not give details of this alleged theft, the defendant must be referring to a claim he made against Ellis to Bank of America. This is a strange incident which the government had not completely investigated before the plea offer was accepted. However, Ellis told the bank investigator and the government that there was more to the story; and it certainly appears that way. In fact, Bank of America thought the situation unusual enough that it filed a Suspicious Activity Report.

On August 31, 2004, the defendant reported to Bank of America that Ellis had taken $229,989.77 from him by depositing checks written either to him or to his practice into an account called "Lakeal Odella Ellis T/A Ellis Billing Services." The account for Ellis Billing Services had been opened on July 29, 2003. The $9,000 check used to open the account was written to Ellis Billing Services, drawn on the account of McLaren Anesthesia Associates, and signed by the defendant. When the bank investigator asked the defendant to explain the $9,000

---

[3] Subsequent to giving her statement, Johnson was convicted in the Eastern District of Virginia of conspiring with her husband to obtain amphetamines and oxycodone by fraud, forgery, and deception. The couple committed their crime by presenting prescriptions from the defendant and another doctor at various pharmacies in order to avoid detection that they were obtaining too many drugs.

check, the defendant said that he had made a loan to Ellis. This explanation does not make sense, however, because on the same day of July 29, 2003, Ellis wrote a check back to the defendant drawn on the Ellis Billing Services in the amount of $7,000. The check was payable to "Martin McLaren." Further evidence of the defendant's involvement in the Ellis Billing Service account is the fact that the defendant became a signatory on the account on October 3, 2003.

When the bank investigator asked the defendant why it had taken so long to recognize the check fraud, the defendant said that he had several offices and makes a lot of money. The defendant said the forged endorsements went undetected until one of his employees brought the matter to his attention. The defendant spoke highly of Ellis and was concerned about what would happen to her. When the investigator informed the defendant that the bank would notify law enforcement if it compensated the defendant for the $229,989.77, the defendant said he would be satisfied with return of half the money. The investigator then talked with Ellis who said that the money had not been stolen; otherwise, Ellis asked, why would the defendant continue to keep her on payroll? The investigator independently verified that Ellis was receiving payroll checks. In fact, payroll records of the practice reveal that Ellis received payroll checks until February 2005, long after the defendant fired her on July 24, 2004. Less than one month after making his claim, on September 28, 2004, the defendant called the investigator to say that he wanted to withdraw his claim. On October 5, 2004, the defendant signed a release with the bank stating that he would not file his claim again.

Other facts also indicate that the Ellis Billing Services account was not created from stolen funds. For instance, Ms. Ilupeju said that the defendant asked her to make a list of all the checks allegedly stolen by Ellis and put into the account. Based on her review, Ms. Ilupeju

suspected that the defendant had given the checks to Ellis rather than Ellis stealing them. (Def. Ex. 1 at 6.) Furthermore, at least $32,000 was paid from the Ellis Billing Services account to the defendant's personal bank account at Bank of America during the time the Ellis Billing Services account was opened. Although she denied stealing the money in the account, Ellis did say that she had been given about $230,000 from the account to pay for personal expenses like her children's education, food, and jewelry. The government, however, has not determined exactly the defendant and Ellis divided the more than $317,000 deposited into the account.

Whatever the full story of the alleged theft, the defendant's leadership is shown by the fact that the defendant collected the overwhelming amount of money from the false billing for himself. In addition, the defendant showed his control over the scheme by continuing to submit false claims after the defendant fired Ellis and replaced her with Ms. Ilupeju.

II. The sentence should not be reduced further because of the $5 million settlement.

Although the defendant deserves credit for agreeing to pay the $5 million settlement in this case, his sentence should not be reduced further because of the agreement. Commentary Note 1(c) to § 3E1.1 points out that the voluntary payment of restitution should be weighed as a factor in deciding whether to grant a reduction in sentence for acceptance of responsibility. Because the defendant has received that reduction already, he should receive nothing further. Of course, the Court is not bound by the Guidelines, but the careful thought that has gone into drafting them is instructive. The Commission recognized that payment of restitution should be considered the norm from a criminal who has accepted responsibility rather than as something extraordinary. That certainly is true in this case because the defendant has an array of assets from which to make restitution so there is no reason that he should have delayed the settlement. In

addition, $4.5 million of the settlement was already under the control of the government pursuant to a forfeiture action. Thus, the settlement required the defendant to pay only an additional $500,000 out of his remaining multi-million dollar assets. A lot of money to be sure, but not an action that overwhelms the other sentencing factors.

Moreover, the $5 million settlement was not simply an agreement to pay three times the loss amount. At the time of his guilty plea, the defendant faced three potential demands from the government: criminal restitution; administrative, civil, or criminal forfeiture; and civil damages. Each of these potential demands was independent. An action for civil damages, for example, would have examined a wider array of potential false claims by investigating the billing for many CPT codes that were not part of the criminal plea. The civil investigation would have been conducted using a preponderance standard of proof, and it could have secured an award of treble damages for additional false claims that were found. Pursuant to the terms of the plea agreement, the $5 million payment settled the defendant's liability for the array of potential claims at one time. There is nothing extraordinary about the defendant's agreement to pay the money.

III. Defendant's contributions do not mitigate the need for a sentence of incarceration.

The defendant rose from modest circumstances because of his talent and the generosity of others. He has been given the benefit of preferred schooling, scholarships, and positions of prestige and prominence. He has been richly rewarded financially, and he is highly regarded by many in the community. As a result of his medical degree and training, the defendant has been given the right to prescribe regulated medications. Because of the powerful effect of these medications, it is not surprising that the defendant's work as a pain doctor would inspire loyalty in his patients, particularly ones to whom he also has given large sums of money.

The extraordinary fact in this case is not the defendant's contributions; it is the fact that the defendant comes before the Court for the theft of money he did not need. He told the Pre-Sentence Report Writer that he made the false claims because he felt he was not being paid enough for the time and energy he expended on his patients, not because he needed money. (PSR at par. 25.) Although the defendant may not have needed the $1.75 million he took from the health care system, many patients in the system could have used the money. Further, the defendant's behavior cost the government the resources used to investigate and prosecute him. The calculating nature of the defendant's crime, its extended duration, and the damage it caused fully justify a sentence within the guideline range of 37 to 46 months incarceration. This is particularly true because the guideline range is designed to ensure equal punishment to similarly situated offenders.

The defendant's request for a lower sentence because he is a first offender is unavailing. So much has been given to the defendant that it is to be expected that he would not have a criminal history. He should not receive a lower sentence merely on that account. In fact, the Sentencing Commission specifically commented that it did not foresee a basis to reduce the applicable guideline range simply because a defendant was a first offender with a low risk of recidivism. Commentary Note 3 to § 4A1.3.

The defendant requests a sentence of community service instead of incarceration because he is a medical doctor who could benefit society more through volunteer work than through incarceration. (Def. Memo at 7-10.) Given the severity of the defendant's crime, a sentence of community service would be seen by members of the community as unfair and as an example of yet another special benefit being given to someone already advantaged. The deterrent value of a

sentence also would be lost because every medical professional can make the same plea as the defendant. If the only criminal penalty facing medical professionals is payment of restitution followed by a period of unpaid volunteer work, it is likely that such "punishment" will encourage health care fraud rather than deter it.

## CONCLUSION

The Court should use its discretion to sentence the defendant to a period of incarceration of 37 to 46 months.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


/s/ *Thomas E. Zeno*
_____
THOMAS E. ZENO
 D.C. Bar. No. 348623
Assistant United States Attorney
Fraud & Public Corruption Section
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-6957
Thomas.Zeno@usdoj.gov